STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN YEH (CABN 314079)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-4063
      Fax: (415) 436-7234
      kevin.yeh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>LOVELL TAYLOR,<br><br>    Defendant. | **CASE NO. 21-cr-242 YGR**<br><br>**UNITED STATES' MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS**<br><br>Court:    Courtroom 1, 4th Floor<br>Date:    July 21, 2022<br>Time:    9:00 a.m. |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................6

BACKGROUND .....................................................................................................................8

ARGUMENT .........................................................................................................................11

I.     The Officers Initiated A Lawful Investigatory Stop To Investigate Vehicular
       Violations. ...................................................................................................................11

II.    The Stop Was Not Unreasonably Prolonged Because Officer Safety Is Part Of A
       Stop's Mission And, In Any Event, Deputy Dyer Had Independent Reasonable
       Suspicion. ....................................................................................................................12

       A.     Deputy Dyer's actions ensured officer safety, which was within the scope of
              the stop. ...........................................................................................................12

       B.     Even if Deputy Dyer's actions and questions prolonged the stop, the
              prolongation was supported by independent reasonable suspicion. ..................18

III.   Taylor Was Not Arrested When Deputy Dyer Asked Him To Step Out Of The Car...................21

IV.    Deputy Dyer Properly Searched Taylor Because Taylor Had a Search Condition and
       Deputy Dyer Had Reasonable Suspicion. ....................................................................23

V.     Taylor Was Not In Custody When Deputy Dyer Questioned Him And Did Not Need
       To Be *Mirandized*. .....................................................................................................23

VI.    Deputy Dyer Properly Searched the Car, Jacket, and Handbag. ...................................25

VII.   The Gun Would Have Been Inevitably Discovered. ......................................................27

VIII.  No Ground For Deterrence Exists....................................................................................28

IX.    No Evidentiary Hearing Is Necessary.............................................................................28

CONCLUSION.........................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.J. v. City of Bellingham,*
No. C16-0620-JCC, 2016 WL 7118381 (W.D. Wash. Dec. 7, 2016) ................................ 24

*Arizona v. Johnson,*
555 U.S. 323 (2009)...................................................................................... 12, 13, 23

*Berkemer v. McCarty,*
468 U.S. 420 (1984)............................................................................................ 15, 24

*Bowman v. United States,*
350 F.2d 913 (9th Cir. 1965) .................................................................................. 24

*Bryson v. United States,*
419 F.2d 695 (D.C. Cir. 1969) ............................................................................... 24

*Burrell v. McIlroy,*
464 F.3d 853 (9th Cir. 2006) .................................................................................. 20

*Illinois v. Caballes,*
543 U.S. 405 (2005).............................................................................................. 13

*Illinois v. Gates,*
462 U.S. 213 (1983).............................................................................................. 26

*Kyles v. Erickson,*
99 F.3d 1146 (9th Cir. 1996) .................................................................................. 19

*Maryland v. Wilson,*
519 U.S. 408 (1997).............................................................................................. 21

*Michigan v. Long,*
463 U.S. 1032 (1983)............................................................................................ 26

*New York v. Quarles,*
467 U.S. 649 (1984).............................................................................................. 24

*Nix v. Williams,*
467 U.S. 431 (1984).............................................................................................. 27

*Pennsylvania v. Mimms,*
434 U.S. 106 (1977).............................................................................................. 21

*People v. Schmitz,*
55 Cal. 4th 909, 288 P.3d 1259 (2012) ............................................................... 25, 26

*Rodriguez v. United States,*
575 U.S. 348 (2015).......................................................................................... passim

*Samson v. California,*
547 U.S. 843 (2006).............................................................................................. 20

*Sialoi v. City of San Diego,*
823 F.3d 1223 (9th Cir. 2016) ............................................................................... 22

*Terry v. Ohio,*
392 U.S. 1 (1968).............................................................................................. 18, 24

*United States v. Abbassi,*
801 F. App'x 484 (9th Cir.) ................................................................................... 25

*United States v. Bautista,*
599 F. App'x 645 (9th Cir. 2015) ........................................................................... 25

*United States v. Brignoni–Ponce,*
422 U.S. 873 (1975)............................................................................................. 24

*United States v. Bullock,*
    510 F.3d 342 (D.C. Cir. 2007) ....................................................................................... 23

*United States v. Burkett,*
    612 F.3d 1103 (9th Cir. 2010) ....................................................................................... 19

*United States v. Castellanos,*
    No. 19-50342, 2022 WL 153187 (9th Cir. Jan. 18, 2022) ............................................ 21

*United States v. Choudhry,*
    461 F.3d 1097 (9th Cir. 2006) ....................................................................................... 18

*United States v. Christian*
    356 F.3d 1103 (9th Cir. 2004) ....................................................................................... 15

*United States v. Cole,*
    445 F. Supp. 3d 484 (N.D. Cal. 2020) .......................................................................... 20

*United States v. Crenshaw,*
    No. 20-CR-00015-JD-1, 2020 WL 6873422 (N.D. Cal. Nov. 23, 2020) ...................... 18

*United States v. Davis,*
    332 F.3d 1163 (9th Cir. 2003) ....................................................................................... 26

*United States v. Del Vizo,*
    918 F.2d 821 (9th Cir. 1990) ......................................................................................... 21

*United States v. Diaz-Castaneda,*
    494 F.3d 1146 (9th Cir. 2007) .................................................................................. 13, 14

*United States v. Edmonds,*
    240 F.3d 55 (D.C. Cir. 2001) ........................................................................................ 19

*United States v. Evans,*
    786 F.3d 779 (9th Cir. 2015) ............................................................................. 13, 18, 20

*United States v. Harris,*
    No. 16-CR-00222-HSG-1, 2017 WL 11454445 (N.D. Cal. Apr. 18, 2017)................... 10

*United States v. Herring,*
    555 U.S. 135 (2009).................................................................................................... 28

*United States v. Holt,*
    264 F.3d 1215 (10th Cir. 2001) ................................................................................ 14, 15

*United States v. Howell,*
    231 F.3d 615 (9th Cir. 2000) ......................................................................................... 28

*United States v. Hylton,*
    30 F.4th 842 (9th Cir. 2022) ............................................................................. 13, 15, 17

*United States v. Jackson,*
    No. 4:19-CR-00010-JD-1, 2020 WL 6047235 (N.D. Cal. Oct. 13, 2020) .................... 23

*United States v. Janis,*
    428 U.S. 433 (1976)..................................................................................................... 28

*United States v. Jones,*
    438 F. Supp. 3d 1039 (N.D. Cal. 2020) ......................................................................... 17

*United States v. Kim,*
    292 F.3d 969 (9th Cir. 2002) ......................................................................................... 23

*United States v. Landeros,*
    913 F.3d 862 (9th Cir. 2019) ......................................................................................... 16

*United States v. Leon,*
    468 U.S. 897 (1984)..................................................................................................... 28

*United States v. Luckett,*
    No. 16-CR-00200-WHO-1, 2016 WL 4719268 (N.D. Cal. Sept. 9, 2016) ................... 20

*United States v. Luckett*,
    729 F. App'x 614 (9th Cir. 2018) ......................................................................... 20
*United States v. Maffei*,
    417 F. Supp. 3d 1212 (N.D. Cal. 2019) ............................................................... 16
*United States v. Mattarolo*,
    209 F.3d 1153 (9th Cir. 2000) ............................................................................. 13
*United States v. Mays*,
    No. CR-07-00295 EDL, 2008 WL 111230 (N.D. Cal. Jan. 9, 2008) ................... 19
*United States v. McCall*,
    268 F. App'x 646 (9th Cir. 2008) .................................................................. 13, 14
*United States v. McCloud*,
    No. 17-CR-00025-JD-1, 2021 WL 2322473 (N.D. Cal. June 7, 2021) ................ 17
*United States v. McReynolds*,
    No. 20-10115, 2021 WL 5492984 (9th Cir. Nov. 23, 2021) ................................ 12
*United States v. Mendez*,
    476 F.3d 1077 (9th Cir. 2007) ............................................................................. 13
*United States v. Miles*,
    247 F.3d 1009 (9th Cir. 2001) ............................................................................. 22
*United States v. Nava*,
    363 F.3d 942 (9th Cir. 2004) ............................................................................... 21
*United States v. Paulino*,
    850 F.2d 93 (2d Cir. 1988) .................................................................................. 19
*United States v. Ramirez-Sandoval*,
    872 F.2d 1392 (9th Cir. 1989) ............................................................................. 27
*United States v. Reilly*,
    224 F.3d 986 (9th Cir. 2000) .......................................................................... 24, 25
*United States v. Rodriguez*,
    100 F. Supp. 3d 905 (C.D. Cal. 2015) ................................................................. 27
*United States v. Ross*,
    456 U.S. 798 (1982) ............................................................................................. 26
*United States v. Simon*,
    No. 21-CR-00352-JSW-1, 2022 WL 797016 (N.D. Cal. Mar. 16, 2022) .......... 14, 16, 18, 23
*United States v. Sokolow*,
    490 U.S. 1 (1989) ........................................................................................... 18, 20
*United States v. Spencer*,
    1 F.3d 742 (9th Cir. 1992) ................................................................................... 20
*United States v. Taylor*,
    716 F.2d 701 (9th Cir. 1983) ............................................................................... 22
*United States v. Weaver*,
    9 F.4th 129 (2d Cir. 2021) ................................................................................... 19
*United States v. Williams*,
    846 F.3d 303 (9th Cir. 2016) ............................................................................... 26
*Washington v. Lambert*,
    98 F.3d 1181 (9th Cir. 1996) .......................................................................... 21, 22
*Williams v. City of San Leandro*,
    No. C 13-2302 CW (PR), 2014 WL 6306812 (N.D. Cal. Nov. 14, 2014) ........... 19
*Wyoming v. Houghton*,
    526 U.S. 295 (1999) ............................................................................................. 26

**Statutes**

18 U.S.C. § 922(g)(1) ......................................................................................................... 6, 11

Cal. Code Regs. tit. 15, § 2511 ................................................................................................ 25

Cal. Penal Code section 3067(b)(3) ........................................................................................ 25

# INTRODUCTION

A grand jury indicted defendant Lovell Taylor ("Taylor") on one count of violating 18 U.S.C. § 922(g)(1) – felon in possession of firearm and ammunition.  Taylor committed the instant offense on October 15, 2020, when he was on parole and probation for weapons-related offenses and subject to a warrantless search condition.

At 2:39 a.m. that night, sheriff deputies on patrol saw a car exit the highway and run through a stop sign.  The deputies attempted to conduct a traffic enforcement stop, but after the car apparently noticed their patrol vehicle, it sped back onto the highway well above the speed limit.  The car then abruptly crossed several lanes without signaling, causing three other cars to quickly brake to avoid crashing.  After officers turned on their lights and sirens, the car exited the highway, but did not immediately pull over.  Eventually, the car moved over to an off-ramp, but took an unusually long time to completely stop.

One of the officers, Sheriff's Deputy Jordan Dyer, approached the car on foot.  There were four people inside.  Using his flashlight, Deputy Dyer saw the right rear passenger, Lovell Taylor, reach towards the ground, then put an unknown object between him and his girlfriend sitting to his left.  Deputy Dyer then saw Taylor move a jacket between him and his girlfriend.

Concerned for officer safety, Deputy Dyer instructed the car's occupants to put their hands on the headrests or dashboard where he could see them.  Consistent with his general practice and to assess safety risk, Deputy Dyer then asked for everyone's identification and if anyone was on probation or parole.  Taylor responded that he was on parole for amed carjacking and was just released from prison two weeks ago.  Deputy Dyer returned to the patrol vehicle to run standard checks on the car's occupants, which reveals basic driver's information, criminal history, probation and parole status, whether there are any outstanding warrants, etc.  Deputy Dyer confirmed Taylor's parole status and also learned that he was on felony probation for illegally possessing a firearm.

Based on his experience and the check, Deputy Dyer knew that Taylor's parole status meant that he was subject to suspicionless search without a warrant.  Deputy Dyer asked Taylor to step out of the car and searched him; nothing was found.  After asking Taylor to sit on the curb, Deputy Dyer asked him if there was anything illegal in the car.  Because Taylor was a felon, Deputy Dyer knew that it was

1   illegal for him to possess a firearm, but mostly wanted to confirm whether there was a gun in the car that

2   could be accessible to the occupants.  Taylor grew nervous and said that he did not want to go back to

3   jail.  Deputy Dyer then directly asked if there was a gun in the car.  Taylor nodded yes.  To ensure

4   safety, Deputy Dyer handcuffed Taylor and had him remain on the curb.  The other occupants were also

5   asked to step out and were placed in handcuffs for officer safety.  None were under arrest.

6        Deputy Dyer began searching the car and picked up the jacket that he saw Taylor place on top of

7   something next to him.  Under the jacket was a black handbag.  Deputy Dyer opened the handbag and

8   found a gun loaded with 10 bullets.  Also in the handbag was a separate high-capacity magazine with 25

9   bullets.  Dispatch confirmed that the gun was unregistered.

10        After the gun was secured, Deputy Dyer escorted Taylor to the patrol vehicle.  Now that Deputy

11   Dyer considered Taylor under arrest, he read Taylor his *Miranda* rights and Taylor declined to answer

12   any questions.  Deputy Dyer placed Taylor in the patrol vehicle and, after speaking with the other car

13   occupants, the occupants left with the car.  Taylor was charged with illegal possession of the firearm.

14        Taylor filed a motion to suppress, arguing that Deputy Dyer's actions were unlawful at every

15   step and moves that the Court "suppress all fruits" of the traffic encounter.  The motion should be

16   denied.

17        First, the deputies validly initiated the stop after they observed multiple traffic violations.

18   Second, the stop was not unreasonably prolonged by Deputy Dyer's questions and ID checks because

19   they were directed towards officer safety, which is within the mission of the stop.  And even if

20   additional time was incurred, Deputy Dyer had independent reasonable suspicion due to the car's

21   evasive manner and Taylor's furtive movements.  Third, Taylor was not under arrest when he was asked

22   to step out because officers are entitled to ask car occupants to step out during stops.  Fourth, Deputy

23   Dyer validly searched Taylor to ensure officer safety and, in any event, Taylor was subject to a search

24   condition and Deputy Dyer had independent reasonable suspicion.  Fifth, Taylor was not in custody

25   when he told Deputy Dyer that there was a gun in the car, and thus he did not need to be *Mirandized*.

26   Sixth, the search of the car, jacket, and handbag are justified by officer safety and reasonable suspicion,

27   and pursuant to Taylor's search condition.  Finally, to the extent that any constitutional violations

28   occurred, suppression should be denied because the firearm would have been inevitably discovered and

deterrence is unnecessary because there is no evidence that Deputy Dyer did not act in good faith.

For these reasons, and as further explained below, the motion to suppress should be denied.

## BACKGROUND

On October 15, 2020, at approximately 2:39 a.m. in Concord, CA, Contra Costa County Deputy Sheriff Jordan Dyer (along with his patrol partner Deputy Sheriff Joseph Sabella) was on patrol watching traffic when he observed a black Ford Expedition exiting Eastbound Highway 4 and approaching a four-way-stop intersection. Declaration of Deputy Sheriff Justin Dyer ("Dyer Decl.") ¶¶ 4–5. The Ford failed to come to a complete stop at the intersection. *Id.* The Ford then turned northbound onto Willow Pass Road towards Evora Road. *Id.* ¶ 5. Deputy Dyer suspected that the Ford's driver and/or occupants saw the officers and were trying to avoid being pulled over. *Id.* As Deputy Dyer attempted to intercept the Ford due to the stop sign violation, the Ford quickly turned onto the on-ramp for Westbound Highway 4, which Deputy Dyer found odd because that was the direction from which the car came, so he suspected the Ford was trying to evade them. *Id.* The Ford quickly sped away at 80–85 miles per hour, about 20 miles per hour above the speed limit. *Id.* As Deputy Dyer chased after the Ford, the Ford abruptly crossed three lanes without signaling, causing three other cars to brake to avoid crashing into it. *Id.* Based on the Ford's unsafe driving pattern and high speeds, Deputy Dyer was concerned for his own safety and that of others on the road. *Id.*

Deputy Dyer caught up to the Ford and attempted to initiate a traffic enforcement stop by turning on his overhead lights. *Id.* ¶ 6. The Ford exited the highway, but did not immediately pull over. *Id.* Eventually, it moved over to an off-ramp to pull over, but the Ford appeared to be "slow rolling" or taking an unusually long time to come to a complete stop. *Id.* Based on his experience, because cars that "slow roll" may indicate that the occupants are trying to conceal weapons, drugs, or other contraband, Deputy Dyer grew worried about officer safety. *Id.* His fears were heightened by the fact that the Ford appeared to be evading the traffic stop, and because the stop occurred when it was late and dark, and they were now stopped in an area where mentally unstable and drug-addicted individuals are often present (in part because of a homeless shelter a short distance away). *Id.* Such individuals could themselves be threats or could distract officers from any threat the car's occupants may pose. *Id.*

After the Ford stopped, Deputy Dyer exited his patrol vehicle and walked towards it.[1]  *Id.* ¶¶ 7–8. He could see that there were four people in the car, which outnumbered him and his partner, thus creating a riskier situation.  *Id.* ¶ 7.  As he approached with a flashlight, Deputy Dyer saw the right rear passenger, later identified as Lovell Taylor, reach toward the floorboard near his feet, then place an unknown item on the seat next to his left thigh, between him and the left rear passenger (later identified as Teuila Failauga, Taylor's girlfriend).  *Id.* ¶ 8.  Deputy Dyer stopped at the left rear passenger door, shined his flashlight into the vehicle, and saw Taylor moving a black jacket between himself and Failauga.  *Id.*

Given Taylor's actions, Deputy Dyer grew concerned about safety since, from experience, people who are pulled over generally do not move around or try to hide things so as not to arouse suspicion with the officers.  *Id.* ¶ 9.  Taylor's movements led Deputy Dyer to suspect that Taylor was trying to conceal something from him, such as drugs or possibly a gun.  *Id.*  Deputy Dyer thus asked everyone to place their hands on the headrest or dashboard so that he could see them.  *Id.*

Deputy Dyer then asked all four individuals for identification and if they were on parole or probation.  *Id.* ¶¶ 10–11.  As a matter of practice, Deputy Dyer almost always asks everybody in a vehicle for identification and their parole or probation status—a practice that most Contra Costa County Sheriff's Deputies have too.  *Id.*  Knowing whether someone is on probation or parole allows officers to assess any safety risks that person may pose.  *Id.* ¶ 10.  For example, someone who is on parole for a violent offense presents a different safety risk profile than someone on probation for vandalism.  *See id.* But given the Ford's high-speed driving in an apparent attempt to avoid getting pulled over and then slow rolling to a stop, and because of Taylor's furtive actions which raised Deputy Dyer's suspicions, Deputy Dyer believed his inquiry was especially important given the circumstances.[2]  *Id.*

---

[1] There is no video recording of the traffic stop because, at the time, Contra Costa County Sheriff's Deputies were not provided with, nor were they required to use, video-recording equipment. Dyer Decl. ¶ 22.

[2] A standard records check will indicate whether someone is on probation or parole at the same time that other information is generated.  As a matter of practice, after requesting someone's identification, Deputy Dyer runs a standard check on them using the computer in his patrol vehicle, and the results will reveal basic information about the individual, including information regarding an individual's identity, address or other contact information, DMV photos, driving records, outstanding tickets, active warrants, restraining orders, criminal history, and any parole or probation status.  All this information is generated and displayed at the same time after basic identifiers are entered (e.g., name,

OPP'N TO MOT. TO SUPPRESS

Taylor stated that he was on active California Department of Corrections and Rehabilitation ("CDCR") parole for an armed carjacking and had been released from jail two weeks earlier. *Id.* ¶ 13. Deputy Dyer confirmed Taylor's parole status, and also learned that Taylor was on active felony probation out of Alameda County for illegal possession of a firearm. *Id.* ¶ 14. Deputy Dyer ran records checks on the other three occupants as well. *Id.* ¶ 15. Based on Deputy Dyer's training and experience, the fact that Taylor was on parole for armed carjacking and on probation for illegally possessing a firearm, coupled with his suspicious movements earlier, led Deputy Dyer to strongly suspect that Taylor was armed and was trying to conceal it. *Id.* ¶ 14.

After checking records and confirming Taylor's parole status, Deputy Dyer asked Taylor to step out of the car to conduct a search of his person and surroundings pursuant to the terms of Taylor's CDCR parole—Deputy Dyer knew that anyone on CDCR parole is subject to search without a warrant at any time by any law enforcement officer of their person, residence, and any property under their control. *Id.* ¶ 15. Deputy Dyer did not consider Taylor under arrest, but merely wanted to ensure that Taylor did not have anything on him, like a weapon, that could threaten officer safety. *Id.* After Deputy Dyer searched Taylor, he sat Taylor on the curb. *Id.* ¶ 16. To ensure officer safety, Deputy Dyer asked Taylor if there was anything illegal in the car. *Id.* Because Taylor was a felon, Deputy Dyer knew that it was illegal for Taylor to possess a firearm, but for safety reasons, Deputy Dyer simply wanted to know if Taylor was armed. *Id.* Taylor became nervous and said that he did not want to go back to jail. *Id.* Deputy Dyer asked Taylor if there were any firearms in the vehicle because there were still three other individuals in the car and Deputy Dyer wanted to ensure that no one else could take any firearm that was in fact present and threaten officer safety. *Id.* Taylor looked at Deputy Dyer and nodded his head up and down, which Deputy Dyer understood to mean "yes." *Id.* Deputy Dyer then handcuffed Taylor for safety reasons and had him remain seated on the curb. *Id.* He then ordered the other three passengers out of the car and handcuffed them for his safety, though they were not under arrest. *Id.*

Pursuant to the search condition and for safety, Deputy Dyer searched the area of the rear

---

sex, and/or date of birth); he does not choose what information is displayed or specifically search for parole or probation status. Thus, Deputy Dyer would learn the car occupants' parole or probation status simply by running a basic records check and irrespective of whether he had previously asked them whether they were on parole or probation. Dyer Decl. ¶ 12.

passenger seat where Taylor previously sat and moved a jacket.  *Id.* ¶ 17.  Underneath the jacket, Deputy

Dyer located a black handbag.  *Id.*  After unzipping the black handbag, Deputy Dyer saw a firearm and a

separate high-capacity magazine inside the handbag.  *Id.*  Deputy Dyer removed the firearm, which was

a Glock-type handgun loaded with 10 rounds of ammunition.  *Id.* ¶¶ 17–18.  Deputy Dyer also found a

high-capacity magazine loaded with 25 rounds of ammunition.  *Id.* ¶ 17. Deputy Dyer conducted a

function test and determined that the firearm was capable of operating.  *Id.*  A records check through

dispatch revealed that the gun was unregistered.  *Id.* ¶ 18.

After securing the firearm in the patrol vehicle, Deputy Dyer escorted Taylor from the curb to his

patrol vehicle.  *Id.* ¶ 19.  Given his felon status, his admission that there was a gun in the car found next

to where he was sitting, his suspicious movements when Deputy Dyer approached the car, and his

criminal history, Deputy Dyer now considered Taylor to be under arrest and advised Taylor of his

*Miranda* rights, which Taylor said he understood.  *Id.*  Taylor declined to any answer questions.  *Id.*

Deputy Dyer proceeded to arrest Taylor for unlawful possession of a firearm by a felon pursuant

to California Penal Code section 29800.  *Id.* ¶ 20.  The other occupants were not charged and were

released with the vehicle.  *Id.* ¶ 21.

On June 10, 2011, a federal grand jury indicted Taylor on one count of violating 18 U.S.C.

§ 922(g)(1) – felon in possession of firearm and ammunition.  Dkt. No. 6.  On April 18, 2022, a status

conference was held in this matter and a briefing schedule for a suppression motion set.  Dkt. No. 18.

On May 2, 2022, the defense filed its motion to suppress.  Dkt. No. 19 ("Mot.").

## ARGUMENT

Taylor challenges virtually every aspect of the October 15, 2020, traffic stop as unconstitutional.

To the extent he supports any of his claims with argument, none withstands scrutiny.

## I.     The Officers Initiated A Lawful Investigatory Stop To Investigate Vehicular Violations.

Taylor insinuates that the traffic stop itself violated the Fourth Amendment because it was an

unjustified warrantless seizure.  Mot. 4.  That implication is wrong.

The deputies had reasonable suspicion that the driver of the black Ford Expedition committed

multiple vehicular violations and were thus permitted to stop the car and temporarily detain everyone in

it.  "Violations of California's Vehicle Code are sufficient to establish reasonable suspicion for a traffic

stop." *United States v. Harris*, No. 16-CR-00222-HSG-1, 2017 WL 11454445, at *3 (N.D. Cal. Apr. 18, 2017). While it is true that, "[f]or the duration of a traffic stop . . . a police officer effectively seizes 'everyone in the vehicle,'" such a stop is permissible "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

Here, there is no dispute that the officers witnessed the driver of the Ford committing multiple traffic violations and pulled the car over due to the driver's failure to observe a stop sign, speeding approximately 20 miles per hour above the limit, and abrupt lane changes without using turn signals—all in violation of California's Vehicle Code. Because the deputies had reasonable suspicion that the Ford's driver committed traffic violations, they were permitted to stop him and anyone else in the vehicle to investigate, and they did not need a warrant to do so.

## II. The Stop Was Not Unreasonably Prolonged Because Officer Safety Is Part Of A Stop's Mission And, In Any Event, Deputy Dyer Had Independent Reasonable Suspicion.

Taylor argues that Deputy Dyer's asking the Ford's passengers for identification, running ID checks on each occupant, asking about their probation and parole status, and asking Taylor whether there was anything illegal in the car were "unrelated to the traffic-stop mission" and added time to the stop. Mot. 5. Thus, he suggests, the stop was prolonged in violation of the Fourth Amendment.

The stop was not unreasonably prolonged. All of Dyer's actions were directed towards officer safety, which is part of the mission of a traffic stop. And even if his actions were not part of the traffic stop's mission, Deputy Dyer had independent reasonable suspicion to prolong the stop.

### A. Deputy Dyer's actions ensured officer safety, which was within the scope of the stop.

"Following a lawful traffic stop, an officer can ask questions of both the driver and passenger, so long as doing so does not prolong the stop." *United States v. McReynolds*, No. 20-10115, 2021 WL 5492984, at *2 (9th Cir. Nov. 23, 2021). The reasonable duration of a traffic stop depends on the stop's "'mission'—to address the traffic violation that warranted the stop *and attend to related safety concerns*." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted and emphasis added). "[A]n officer's mission includes 'ordinary inquiries incident to [the traffic] stop,'" which

1   typically involve inquiries such as "checking the driver's license, determining whether there are

2   outstanding warrants against the driver, and inspecting the automobile's registration and proof of

3   insurance." *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (original alternation)).  In

4   particular, "[t]he police may ask people who have legitimately been stopped for identification without

5   conducting a Fourth Amendment search or seizure."  *United States v. Diaz-Castaneda*, 494 F.3d 1146,

6   1152 (9th Cir. 2007).

7        As the Ninth Circuit explained just last month, the "interest in officer safety 'stems from the

8   mission of the stop itself' because '[t]raffic stops are especially fraught with danger to police officers, so

9   an officer may need to take certain negligibly burdensome precautions in order to complete his mission

10  safely.'"  *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022) (quoting *Rodriguez*, 575 U.S. at

11  356)).  Officers need no additional reasonable suspicion to conduct tasks consistent with this mission.

12  *See Rodriguez*, 575 U.S. at 355; *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015).  Even aside

13  from officer safety, "[a]n officer's inquiries into matters unrelated to the justification for the traffic

14  stop . . . do not convert the encounter into something other than a lawful seizure, so long as those

15  inquiries do not measurably extend the duration of the stop."  *Johnson*, 555 U.S. at 333; *see also*

16  *Rodriguez*, 575 U.S. at 355; *United States v. Mendez*, 476 F.3d 1077, 1080–81 (9th Cir. 2007).

17       All of Deputy Dyer's actions were directed towards ensuring officer safety, which is within the

18  mission of a traffic stop.  To be sure, Deputy Dyer and his partner were initially attempting to pull over

19  the Ford to investigate a vehicular violation.  However, the circumstances of the stop, the Ford's driving

20  pattern, and Taylor's actions gave Deputy Dyer reason to be concerned about his and his partner's

21  safety.

22       As discussed above, the traffic stop occurred late at night, at 2:39 a.m.  Dyer Decl. ¶ 4; *see*

23  *United States v. McCall*, 268 F. App'x 646, 647 (9th Cir. 2008) (stating that time of day can give officer

24  "reasonable concern for his own safety"); *United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir.

25  2000) (stating that nighttime stop can justify a *Terry* pat-down).  The deputies saw a black Ford

26  Expedition run through a stop sign, and when the deputies attempted to initiate a traffic stop, the Ford

27  went back the way it came and sped away at about 20 miles per hour above the speed limit, seemingly in

28  an attempt to evade being pulled over.  *Id.* ¶ 5.  It then abruptly crossed several lanes and almost collided

with three cars, causing the deputies to become concerned about their own safety and that of others.  *Id.*
While the Ford eventually began to pull over, it took an unusually long time to come to a complete stop,
which in Deputy Dyer's experience may indicate that the occupants were trying to conceal weapons,
drugs, or other evidence of criminal activity before any contact with officers.  *Id.* ¶ 6.  It was also dark
and the stop occurred in an area which Deputy Dyer knew to be frequented by mentally unstable and/or
drug-addicted individuals, who may themselves pose a threat or distract officers during the stop.  *Id.*
Dyer then saw that the car's occupants outnumbered the officers 2-to-1, further heightening safety risks.
As he approached the car on foot, he also saw Taylor reach to the car's floor and place an unknown
object next to him, and then apparently move a jacket to the same spot, leading Dyer to believe that
Taylor might have been concealing drugs or a weapon.  *Id.* ¶¶ 7–8; *see McCall*, 268 F. App'x at 647
("furtive movement in the car, . . . the hour, and the darkness of the location gave the officer reasonable
concern for his own safety").  Later, Dyer learned that Taylor was on parole for armed carjacking,
having just been released from prison two weeks prior, and was also on probation for illegal firearms
possession.  *Id.* ¶¶ 13–14.  Based on these violations and his experience, Dyer strongly suspected that
Taylor might have been armed and was trying to conceal it.  *Id.*

     So much of the stop gave Deputy Dyer legitimate cause to be concerned, but Deputy Dyer
merely took reasonable steps in furtherance of officer safety.  Here, the scope of the stop was to
investigate the Ford's failure to observe a stop sign, speeding, and abrupt lane changes without
signaling, but an officer may take "certain negligibly burdensome precautions in order to complete his
mission safely" because an officer's safety interest "stems from the mission of the stop itself."
*Rodriguez*, 575 U.S. at 356.  To begin, the Ninth Circuit has squarely held that asking individuals for
identification is entirely permissible.  *See Diaz-Castaneda*, 494 F.3d at 1152 ("The police may ask
people [including passengers] who have legitimately been stopped for identification without conducting
a Fourth Amendment search or seizure.").  Furthermore, inquiring about parole/probation status here
was within the scope of the stop because they supported the officer's mission in completing the stop
safely.  *See Rodriguez*, 575 U.S. at 356 (citing *United States v. Holt*, 264 F.3d 1215, 1221–22 (10th Cir.
2001) (en banc), approvingly for "recognizing officer safety justification for criminal record and
outstanding warrant checks"); *United States v. Simon*, No. 21-CR-00352-JSW-1, 2022 WL 797016, at

*3 (N.D. Cal. Mar. 16, 2022) ("Inquiries into a suspect's past criminal conduct is relevant to officer safety."). As Deputy Dyer explains in his declaration, information learned in response to such inquiries can assist officers in assessing the risks they face, Dyer Decl. ¶¶ 10–11, which in turn can apprise officers about whether they should take certain precautions, such as calling for backup or frisking a subject. *See Holt*, 264 F.3d at 1221–22 ("By determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprised of whether the detained motorist might engage in violent activity during the stop.") (cited approvingly by *Rodriguez*, 575 U.S. at 356). And indeed, after confirming that Taylor was on parole for armed carjacking and probation for being a felon in possession, he asked Taylor whether there was a gun in the car, which in fact there was.

As the Supreme Court has held, during an investigatory detention, an officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Here, Deputy Dyer had reasonable grounds to suspect that officer safety might be threatened based on the Ford's manner of driving, apparent evasion, and slow rolling, and Taylor's furtive movements as Deputy Dyer approached on foot. Questions about the car occupants' identities and probation or parole status were relevant to dispelling whether there was contraband in the vehicle that put officer safety at risk and, therefore, were within the scope of the stop.

Furthermore, the Supreme Court, Ninth Circuit, and this district have recognized that inquiries into an individual's background and past criminal conduct are relevant to officer safety. In *Rodriguez*, the Supreme Court cited approvingly a Tenth Circuit case "recognizing officer safety justification for criminal record and outstanding warrant checks" in discussing the officer safety portion of the traffic mission. 575 U.S. at 356 (citing *Holt*, 264 F.3d at 1221–22). And, in *United States v. Christian*, the Ninth Circuit held that an officer could ask for a suspect's identity and check their criminal history during a *Terry* stop for safety: "On learning a suspect's true name, the officer can run a background check to determine whether a suspect has an outstanding arrest warrant, or a history of violent crime. This information could be as important to an officer's safety as knowing that the suspect is carrying a weapon." 356 F.3d 1103, 1107 (9th Cir. 2004). Just last month, in *United States v. Hylton*, the Ninth Circuit held that "because a criminal history check 'stems from the mission of the stop itself,' it is a

'negligibly burdensome precaution[ ]' necessary 'to complete [the stop] safely.'"  30 F.4th at 848

(quoting *Rodriguez*, 575 U.S. at 356) (original brackets).  Similarly, as one judge in this district has held,

"Inquiries into a suspect's past criminal conduct is relevant to officer safety."  *Simon*, 2022 WL 797016,

at *3.  Deputy Dyer's inquiries into the Ford occupants' identity and parole/probation status to ensure

his and his partner's safety were entirely within the mission of the traffic stop.

　　　　　Taylor cites *United States v. Landeros* for the proposition that collecting or obtaining a

passenger's identification "is not part of the mission of a stop."  913 F.3d 862, 868 (9th Cir. 2019).

There, the Ninth Circuit proceeded to explain that "[t]he identity of a passenger . . . will *ordinarily* have

no relation to a driver's safe operation of a vehicle."  *Id.* (emphasis added).  The officer in *Landeros*

spent "[a]t least several minutes" repeatedly demanding that a reluctant passenger identify himself.  *Id.*

at 865.  The court held that those several minutes of additional questioning to ascertain a vehicle

passenger's identity was not within the scope of the traffic stop, was not supported by reasonable

suspicion, and impermissibly prolonged the stop.  *Id.* at 867–68.  Critically, the Ninth Circuit concluded

that "the stop was no longer lawful by the time the officers ordered Landeros to leave the car, as it had

extended longer than justified by either the suspected traffic violation or any offense as to which there

was independent reasonable suspicion."  *Id.* at 870.  Thus, the court held, the stop was unreasonably

prolonged.  Here, in contrast, the stop was still lawful when Deputy Dyer asked—but did not order—

everyone in the vehicle for their identification and parole/probation status and ran checks on them

because Deputy Dyer was still conducting inquiries related to the stop's mission.  Thus, Deputy Dyer's

actions with regard to Taylor did not unreasonably prolong the stop at all.  And as soon as Deputy Dyer

learned that Taylor was on parole, he had an independent basis to search him.  Furthermore, while a

passenger's identity "ordinarily" will not be related to the safe operation of a vehicle, here, Deputy Dyer

saw Taylor reach for an unknown item on the car floor and place it next to him, and then move a jacket

in the same spot.  To the extent Deputy Dyer was concerned about Taylor's actions and the possibility

that he was concealing something dangerous, learning his identity and criminal history would

undoubtedly be related to the "safe operation of a vehicle." [3]

---

[3] For the same reason, Taylor's citation to *United States v. Maffei* is inapposite.  417 F. Supp. 3d
1212, 1222–23 (N.D. Cal. 2019) (finding stop unreasonably prolonged due to records check of
passenger where there was no showing of any risk to officer safety).  To the extent that Taylor suggests

Taylor cites *United States v. Jones* for the proposition that "asking car occupants if there is anything illegal in the car is 'unrelated to the mission of the traffic stop.'"  Mot. 5 (quoting *United States v. Jones*, 438 F. Supp. 3d 1039, 1052 (N.D. Cal. 2020)).  In *Jones*, officers asked a car's occupants whether there was contraband in the car based on the vehicle's "evasive" movements and the smell of marijuana.  The court held that their inquiry unlawfully prolonged the traffic stop.  *Jones* is distinguishable, however, because a car's evasive movements prior to being pulled over and the smell of marijuana, without more, do not provide a sufficient basis for officers to conduct further inquiry for safety concerns.  Here, however, Deputy Dyer saw Taylor reach for something from the ground and appear to conceal it next to him.  Taylor's furtive actions led Deputy Dyer to reasonably suspect that Taylor might have been attempting to hide a weapon, which threatens officer safety.  Because ensuring officer safety is part of the mission of a traffic stop, *Jones* is distinguishable.

Finally, even assuming that Deputy Dyer's actions were not part of the mission of the stop, there simply was no prolongation here because Deputy Dyer asked the occupants a straightforward question about their probation and parole status immediately after collecting their driver's licenses but before he ran checks on them.  *See United States v. Hogg*, No. 20-cr-00127-JSW, Dkt. No. 39, at 9 (N.D. Cal. Aug. 4, 2020) (finding questions about probation status did not prolong the traffic stop even assuming they were not part of the traffic stop mission).  In contrast to *Landeros*, Deputy Dyer "did not prolong an otherwise lawful traffic stop by repeatedly demanding irrelevant information; [he] simply asked [the occupants] a question, and [Taylor] chose to answer it."  *United States v. McCloud*, No. 17-CR-00025-JD-1, 2021 WL 2322473, at *6 (N.D. Cal. June 7, 2021) ("McCloud says it was wrong for the officers to even ask him about whether he was on probation or parole.  That is a doubtful proposition that McCloud does not adequately support with case law.").  This "brief question" about Taylor's probation and parole status "also had no measurable impact on the length of the stop, and, like a check for outstanding warrants, was justifiable as a 'negligibly burdensome' safety precaution."  *Id.* (citing *Rodriguez*, 575

---

that certain cases hold that asking car occupants about their probation or parole status necessarily prolongs a traffic stop in violation of the Fourth Amendment, Mot 4–5, as noted above, the Ninth Circuit has squarely held that "because a criminal history check 'stems from the mission of the stop itself,' it is a 'negligibly burdensome precaution[ ]' necessary 'to complete [the stop] safely.'"  *Hylton*, 30 F.4th at 848 (quoting *Rodriguez*, 575 U.S. at 356) (original brackets).

U.S. at 356).  Furthermore, as Deputy Dyer declared, the probation and parole information was disclosed at the same time he was running a basic check on the occupants' drivers' licenses.  Dyer Decl. ¶ 12. Thus, no prolongation occurred.  *See Simon*, 2022 WL 797016, at *4 ("[T]he record shows that both queries were part of the same records check designed to uncover information relevant to the traffic stop. . . . [B]ecause the identifying information query that returned the probation status was done in tandem with the license number search, it did not add time to traffic stop . . . ."); *United States v. Crenshaw*, No. 20-CR-00015-JD-1, 2020 WL 6873422, at *4 (N.D. Cal. Nov. 23, 2020) (denying suppression motion where "probation check was done at the same time [as a 'perfectly legitimate' record and warrants check], and did not prolong the stop").

### B.  Even if Deputy Dyer's actions and questions prolonged the stop, the prolongation was supported by independent reasonable suspicion.

 "[A]n officer may [lawfully] prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion."  *Evans*, 786 F.3d at 788.  Reasonable suspicion must be "supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  It entails "'some minimal level of objective justification' for making a stop"—that is, "something more than an 'inchoate and unparticularized suspicion or "hunch,"' but "*considerably less* than proof of wrongdoing by a preponderance of the evidence" and "*obviously less*" than the level of suspicion required for probable cause.  *Id.* at 7 (emphases added).  In reviewing whether the officer had reasonable suspicion, courts must consider the totality of the circumstances.  *Id.* at 8.  Even if each fact standing alone might be consistent with innocent activity, the factors can form reasonable suspicion when viewed together.  *Id.* at 9–10.  "'This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'"  *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citation omitted).

Even if Deputy Dyer's questions and ID check prolonged the stop, he had independent reasonable suspicion to justify his actions.  As detailed above, much leading up to the stop gave the officers grounds to think that criminal activity was afoot.  First, the deputies observed the Ford commit multiple vehicular violations; it also appeared that the car was attempting to evade the officers.  Dyer

Decl. ¶ 5.  And when the deputies initiated a traffic stop by turning on their lights and sirens, the Ford did not immediately pull over.  *Id.*  "[T]he failure of [a car's] driver or passengers to comply promptly with officers' orders" "may be indicative of criminal activity."  *Williams v. City of San Leandro*, No. C 13-2302 CW (PR), 2014 WL 6306812, at *3 (N.D. Cal. Nov. 14, 2014), *aff'd*, 667 F. App'x 965 (9th Cir. 2016).

Second, after the deputies turned on their lights and sirens, the Ford drove for a while longer before pulling over to an off-ramp and "slow rolling" to a complete stop.  Dyer Decl. ¶ 6.  Based on Deputy Dyer's experience, vehicles being pulled over that "slow roll" to a complete stop may indicate that the occupants are trying to conceal weapons, drugs, or other evidence of criminal activity before any contact with officers.  *Id.*  Indeed, the Ninth Circuit has found that the fact that a car took "an extremely long time" to stop even though there were multiple places to pull over, in part, "would justify an experienced law enforcement officer's belief that [a defendant] was armed and dangerous."  *United States v. Burkett*, 612 F.3d 1103, 1104–07 (9th Cir. 2010).

Third, as Deputy Dyer approached the Ford on foot, he saw Taylor reach down to the car's floor where his feet were and then place an unknown item on the seat between him and his girlfriend. Dyer Decl. ¶ 8.  Deputy Dyer then saw Taylor move a jacket in the space between himself and his girlfriend.  *Id.*  Based on Deputy Dyer's experience, individuals who are pulled over by officers generally remain still and do not move around so as not to create suspicion, and individuals typically do not attempt to hide items that are legal.  Thus, Deputy Dyer suspected that Taylor was trying to conceal drugs or possibly a firearm.  Unsurprisingly, courts consistently hold that "furtive movements in the car . . . as if to hide something" can create reasonable suspicion.[4]  *Kyles v. Erickson*, 99 F.3d 1146, at *1 (9th Cir. 1996); *see also United States v. Mays*, No. CR-07-00295 EDL, 2008 WL 111230, at *4–5

---

[4] "Unusual, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis."  *United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021) (en banc).  The Second Circuit has described as furtive "conduct suggesting that [the defendant] was hiding something from the police," including moving things around inside a car.  *Id.*; *see also United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001) (suspect reached under driver's seat; "this Court recognizes that 'furtive' gestures in response to the presence of the police can serve as the basis of an officer's reasonable suspicion"); *United States v. Paulino*, 850 F.2d 93, 97–98 (2d Cir. 1988) (upholding search for weapons under car floor mat after the defendant was observed making furtive movement in that direction).

1   (N.D. Cal. Jan. 9, 2008) (finding that bending down in car "as if to conceal something" can support

2   reasonable suspicion).  Indeed, the Ninth Circuit has held that a defendant's "concealing movements"

3   can, in part, justify an officer's belief that a firearm might be in the car.  *United States v. Spencer*, 1 F.3d

4   742, 746 (9th Cir. 1992).

5          Finally, the fact that Deputy Dyer learned from Taylor that he was on parole for armed

6   carjacking and was released from prison just two weeks before, and that he was on probation for

7   illegally possessing a firearm as a felon, provided additional bases for reasonable suspicion.  In *United*

8   *States v. Luckett*, the court found that knowledge that a defendant was on probation "can provide part of

9   the basis for reasonable suspicion."  *United States v. Luckett*, No. 16-CR-00200-WHO-1, 2016 WL

10  4719268, at *3 (N.D. Cal. Sept. 9, 2016), *aff'd*, 729 F. App'x 614 (9th Cir. 2018); *see also Samson v.*

11  *California*, 547 U.S. 843, 853 (2006) (stating that the Supreme Court "has repeatedly acknowledged"

12  that "'parolees . . . are more likely to commit future criminal offenses'").  So "[a]lthough a prior

13  criminal history cannot alone establish reasonable suspicion or probable cause to support a detention or

14  an arrest, it is permissible to consider such a fact as part of the total calculus of information in these

15  determinations."  *Burrell v. McIlroy*, 464 F.3d 853, 858 n.3 (9th Cir. 2006).  The Ninth Circuit has held

16  that where an officer is aware of a defendant's "criminal convictions, including an arrest for carrying a

17  loaded firearm," it is "reasonable for that officer to suspect that [the defendant] was engaged in criminal

18  activity."  *United States v. Luckett*, 729 F. App'x 614, 615–16 (9th Cir. 2018).  Here, Taylor was on

19  active parole and probation for two weapons-related offenses.  An individual's prior firearms-related

20  offenses "are relevant to the totality of circumstances bearing on the reasonableness of the officers'

21  suspicion."  *United States v. Cole*, 445 F. Supp. 3d 484, 489 (N.D. Cal. 2020).  Thus, Deputy Dyer's

22  suspicion that Taylor might have a gun and was hiding it is more than reasonable.  Dyer Decl. ¶ 13.

23         Taken together, these facts provide abundant grounds for independent reasonable suspicion

24  sufficient to justify prolongation of the traffic stop.  *See Evans*, 786 F.3d at 788.  As the Supreme Court

25  has emphasized, the bar for finding reasonable suspicion is not high:  it is "considerably less" than proof

26  of wrongdoing by a preponderance of the evidence and "obviously less" than the level of suspicion

27  required for probable cause.  *Sokolow*, 490 U.S. at 7.  In a recent Ninth Circuit case, the court held that

28  where a police "encounter took place shortly before midnight, and officers observed [the defendant]

make quick movements stuffing or hiding something away in his vehicle in a high-risk drug and gang-activity area, just after he saw their police vehicle approaching," "[t]he officers could reasonably suspect criminal activity given these circumstances."  *United States v. Castellanos*, No. 19-50342, 2022 WL 153187, at *2 (9th Cir. Jan. 18, 2022) (citations and internal punctuation omitted).  Here, Deputy Dyer similarly saw Taylor making furtive movements as if to conceal something as the officer approached.  Indeed, this happened after the vehicle in which Taylor was a passenger drove in an evasive and suspicious manner.  Furthermore, Taylor said that he was on parole for an arms-related offense and Dyer learned that Taylor was on probation for illegally possessing a gun.  Deputy Dyer had more than sufficient cause to have reasonable suspicion that Taylor might be engaged in illegal activity.

### III.     Taylor Was Not Arrested When Deputy Dyer Asked Him To Step Out Of The Car.

Taylor argues that Deputy Dyer arrested him without probable cause when Deputy Dyer directed him to get out of the car, searched him, and told him to sit on the curb.  Mot. 6.  Not so.

In *Pennsylvania v. Mimms*, the Supreme Court held that an officer may routinely order a driver out of a vehicle as part of a traffic stop, based on the "legitimate and weighty" interest in officer safety, without violating the Fourth Amendment's prohibition on unreasonable seizures.  434 U.S. 106, 111 (1977); *see also United States v. Nava*, 363 F.3d 942, 946 (9th Cir. 2004) (finding defendant was detained, not arrested, when handcuffed and told he was not under arrest, and he was only arrested after the contraband was found).  This rule extends to passengers.  *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).  This is true because "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car."  *Id.*

"[I]n determining whether stops have turned into arrests, courts consider the 'totality of the circumstances.'"  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (quoting *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990)).

In looking at the totality of the circumstances, [courts] consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. . . . As a result, [courts] have held that while certain police actions constitute an arrest in certain circumstances, e.g., where the suspects are cooperative, those *same* actions may *not* constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists.  The relevant inquiry is always one of reasonableness under the

circumstances.

*Id.* (internal citations and quotation marks omitted).  Indeed, the Ninth Circuit allows "intrusive and aggressive police conduct without deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers."  *Id.* at 1186 (9th Cir. 1996) (emphasis omitted). The Ninth Circuit has also "held that the use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, do not necessarily convert a *Terry* stop into an arrest necessitating probable cause."  *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983).  In some cases, even "holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest."  *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001).

Taylor cites no authority for the proposition that asking him to exit the car, patting him down for weapons, and asking him to sit on the curb ripened into an arrest.  Nor could he because it did not.  The totality of the circumstances shows no arrest occurred until after the gun was found.  Deputy Dyer was permitted to order Taylor out of the car to ensure officer safety.  This is especially the case given Deputy Dyer's observation of Taylor seemingly concealing an object and his knowledge of Taylor's two weapons-related offenses.  But even Deputy Dyer did not consider Taylor to be under arrest at this time; rather, he merely wanted to ensure that Taylor was not armed for officer safety reasons.  Dyer Decl. ¶¶ 15–16.  There was also no indicia of an arrest.  For example, Deputy Dyer did not use intrusive or aggressive tactics with Taylor; Taylor was not yet handcuffed; he was not held at gunpoint, and he was not asked to go on his knees or to lie down.  *See Washington*, 98 F.3d at 1185.  Even under the factors cited by Taylor as to whether a seizure constitutes arrest, it is clear that Taylor was not under arrest:  he was not handcuffed; no officer had drawn his or her weapon; and Taylor was not physically restricted, including by being placed in a police car.  Mot. 6 (citing *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016)).  At most, Taylor was asked to wait on the curb while Dyer asked him some questions.  *Id.* ¶ 16.  No violation of the Fourth Amendment occurred because no arrest had yet occurred.

## IV.   Deputy Dyer Properly Searched Taylor Because Taylor Had a Search Condition and Deputy Dyer Had Reasonable Suspicion.

Taylor argues that Deputy Dyer impermissibly searched Taylor.  Mot. 6–7.

Deputy Dyer's search of Taylor's person did not violate the Fourth Amendment.  Because Deputy Dyer knew that Taylor was on parole, based on his experience, Deputy Dyer correctly understood that Taylor was "was subject to a search clause that authorized a search of his person, possession, and vehicle." *Simon*, 2022 WL 797016, at *6; *see also United States v. Jackson*, No. 4:19-CR-00010-JD-1, 2020 WL 6047235, at *2 (N.D. Cal. Oct. 13, 2020) ("Dispatch reported that Jackson was on parole for a California state robbery conviction.  Officer Rombough understood this to mean that Jackson was subject to a search clause that authorized a search of his person, possessions, and vehicle."); Dyer Decl. ¶ 15.  That ends the inquiry.

Even if Taylor was not subject to a search condition, "officers who conduct 'routine traffic stops' may perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Johnson*, 555 U.S. at 332 (internal punctuation omitted).  As explained above, Deputy Dyer had reasonable suspicion that Taylor might be armed, so he was entitled to quickly search Taylor to ensure officer safety.  *See United States v. Bullock*, 510 F.3d 342, 348 (D.C. Cir. 2007) (holding that a defendant's furtive movements, "along with the additional facts that the stop occurred in a medium- to high-crime area and that [the defendant] did not immediately pull over when [an officer] ordered him to do so—overwhelmingly justify a protective frisk").

In any event, "the pat down did not produce any evidence.  Therefore, even if it was a violation of Defendant's Fourth Amendment rights, it is irrelevant to the discovery of the evidence Defendant seeks to suppress here." *Simon*, 2022 WL 797016, at *7.

## V.   Taylor Was Not In Custody When Deputy Dyer Questioned Him And Did Not Need To Be *Mirandized.*

Taylor argues that Deputy Dyer impermissibly questioned Taylor about "anything illegal" in the car without advising Taylor of his *Miranda* rights.  Opp'n 7.  The problem for Taylor, however, is that he was not yet entitled to *Miranda* rights.

"An officer's obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir.

2002).  In *Berkemer v. McCarty*, the Supreme Court rejected the contention that "the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.'"  468 U.S. at 435.  While the Court acknowledged that "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle," *id.* at 436, it explained that "the usual traffic stop is more analogous to a so-called 'Terry stop,' see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest," *id.* at 439.  Thus, "'a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'"  *Id.* (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975)).  "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond."  *Id.*

As explained above, Taylor was not yet in custody for purposes of *Miranda* when Deputy Dyer asked him if there was "anything illegal" or a gun in the car.[5]  Thus, there was no need to advise Taylor about his Fifth Amendment rights.  Deputy Dyer also only asked Taylor a few questions that would confirm or dispel his suspicions—especially about whether Taylor or anyone else in the car might have a gun and thus threaten officer safety.  *See id.*  Since Taylor was not in custody, he was "not obliged to respond," *id.*, even though he did.  His statement did not violate *Miranda* or the Fifth Amendment.

Even if Taylor should have been read his *Miranda* rights, the public-safety exception to the rule applies.  Under that exception, "an officer's questioning of a suspect before giving a *Miranda* warning is acceptable if it 'relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon.'"  *United States v. Reilly*, 224 F.3d 986, 992 (9th Cir. 2000) (quoting *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984)).  Thus, for example, the Ninth Circuit has held an officer is permitted to ask a question such as "Where is the gun?" where the officer

---

[5] To the extent Taylor challenges the questioning of the other occupants in the car, *see* Mot. 7,  Taylor has not established that he has standing to do so.  *See Bryson v. United States*, 419 F.2d 695, 698 (D.C. Cir. 1969) ("a defendant had no standing to challenge fruits of a violation of another party's Fifth Amendment rights"); *Bowman v. United States*, 350 F.2d 913, 915 (9th Cir. 1965) ("It has long been settled that the privilege against self-incrimination is personal to the witness."); *A.J. v. City of Bellingham*, No. C16-0620-JCC, 2016 WL 7118381, at *4 (W.D. Wash. Dec. 7, 2016) (citing cases).

"sought only to protect himself and his fellow officers" and the "inquiry was narrow, asking only a single question directed at determining the presence of the gun."  *Id.* at 993.  Similarly, in *United States v. Abbassi*, the Ninth Circuit held that an officer is not required to read an individual his *Miranda* rights before asking him if he had "anything illegal on his person" as the officer frisked the individual for weapons.  801 F. App'x 484, 486 (9th Cir.), *cert. denied*, 141 S. Ct. 351, 208 L. Ed. 2d 83 (2020).  Here, that is precisely what happened.  Deputy Dyer merely sought to safeguard his and his partner's safety and ensure that none of the car's occupants was armed, so he simply asked Taylor whether there was a gun in the car.  No Fifth Amendment violation occurred.

## VI.    Deputy Dyer Properly Searched the Car, Jacket, and Handbag.

Taylor argues that the searches of the car, jacket, and handbag were unconstitutional initially and as fruits of the earlier unconstitutional violations.  Mot. 7.  Deputy Dyer's search of the car, jacket, and handbag did not violate the Fourth Amendment for several reasons.

First, Taylor was on parole for armed carjacking.  California Penal Code section 3067(b)(3) provides that every parolee "is subject to search or seizure . . . at any time of the day or night, with or without a search warrant or with or without cause."  This condition extends to a parolee's residence and "any property under [their] control."  Cal. Code Regs. tit. 15, § 2511.  "[A] vehicle search based on a passenger's parole status may extend beyond the parolee's person and the seat he or she occupies." *People v. Schmitz*, 55 Cal. 4th 909, 926, 288 P.3d 1259, 1272 (2012); *see United States v. Bautista*, 599 F. App'x 645, 646 (9th Cir. 2015) ("A parole search is valid if it complies with state law.").  The scope of the search extends "to those areas of the passenger compartment where the officer reasonably expects that the parolee could have stowed personal belongings or discarded items when aware of police activity." *Schmitz*, 55 Cal. 4th at 926 (2012).

Here, Deputy Dyer saw Taylor place an unknown object on the seat next to him and then move a jacket to the same area.  The black handbag was later found under the jacket.  Deputy Dyer's search of those items was therefore within the scope of the search condition.  Similarly, Deputy Dyer was permitted to search the rest of the passenger compartment because he could reasonably expect that Taylor could have concealed contraband elsewhere in the compartment when the car was pulled over. *Id.*  Even though Taylor was sitting in the rear, the permissible scope of Deputy Dyer's search also

1    extended to the front seat area.  *See id.* at 927 ("the parolee status of the front seat passenger justified a

2    warrantless search of the backseat area").

3          Second, even if Taylor did not have a search condition, Deputy Dyer's search would also be

4    justified under the "automobile exception" to the warrant requirement.  "Officers may conduct a

5    warrantless search of an automobile, including containers within it, when they have probable cause to

6    believe that the vehicle contains contraband or evidence of criminal activity."  *United States v. Williams*,

7    846 F.3d 303, 312 (9th Cir. 2016); *see also Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("When

8    there is probable cause to search for contraband in a car, it is reasonable for police officers . . . to

9    examine packages and containers without a showing of individualized probable cause for each one").

10   Probable cause exists when, based on the totality of the circumstances, there is a "fair probability that

11   contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213,

12   238 (1983).  Where established, law enforcement may search "every part of the vehicle and its contents

13   that may conceal the object of the search."  *United States v. Ross*, 456 U.S. 798, 806 (1982).  Here,

14   Deputy Dyer had probable cause to search the vehicle since Taylor indicated that there was a firearm in

15   the car and Deputy Dyer knew that he was a felon.  Those facts, taken together, provided probable cause

16   to believe that Taylor was a felon in unlawful possession of a firearm and that the car contained

17   evidence of that crime.

18          Third, Deputy Dyer would also be entitled to search the car based on a reasonable suspicion that

19   there may be a weapon in it.  If a traffic stop is valid, officers can search the passenger compartment of a

20   vehicle "limited to those areas in which a weapon may be placed or hidden."  *Michigan v. Long*, 463

21   U.S. 1032, 1049 (1983).  Here, Deputy Dyer saw Taylor's place an object on the seat next to him and

22   move the jacket in the same area.  Thus, he had reasonable suspicion that a weapon may be hidden there.

23          Alternatively, Taylor has not established that he has standing to challenge the search of the

24   handbag, car, or jacket.  Taylor "must first demonstrate that he personally had a 'legitimate expectation

25   of privacy' in the place searched or the thing seized."  *United States v. Davis*, 332 F.3d 1163, 1167 (9th

26   Cir. 2003).  Taylor has not made such a showing for any of those three things and has therefore forfeited

27   the issue.  Accordingly, his suppression motion fails.  *Id.* ("In the absence of such an expectation [of

28   privacy], [defendant's] motion fails.").

1    Taylor has failed to show a Fourth Amendment violation stemming from the search of the car,

2    handbag, and jacket.

3    **VII.    The Gun Would Have Been Inevitably Discovered.**

4            The inevitable discovery doctrine is an exception to the exclusionary rule and permits the

5    admission of otherwise excluded evidence "if the government can prove that the evidence would have

6    been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the

7    police." *Nix v. Williams*, 467 U.S. 431, 447 (1984).  If, "by following routine procedures, the police

8    would inevitably have uncovered the evidence," then the evidence must not be suppressed despite any

9    constitutional violation.  *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).  The

10   government must make this showing by a preponderance of the evidence.  *Nix*, 467 U.S. at 444.

11           To the extent that Taylor argues that the gun would not have been found but for Deputy Taylor's

12   inquiry regarding whether anyone was on probation on parole, the Court should reject it.  It was not just

13   Deputy Dyer's question regarding probation or parole that led to the discovery of the gun.  As Deputy

14   Dyer states in his declaration, a standard records check that he runs virtually any time he is provided

15   with someone's identification will reveal whether that person is on probation or parole.  Dyer Decl. ¶ 12.

16   Even if Deputy Dyer never asked Taylor whether he was on probation or parole, by running a check on

17   Taylor's driver's license, Deputy Dyer would have learned of Taylor's parole status in any event and

18   would discover that he had a search condition.  *See United States v. Rodriguez*, 100 F. Supp. 3d 905, 924

19   (C.D. Cal. 2015) ("that such questioning [about whether defendant was on probation or parole] related to

20   officer safety and sought information that would be revealed by a routine records check militate against

21   a finding of unreasonableness"), *aff'd*, 695 F. App'x 339 (9th Cir. 2017).  "[F]ollowing routine

22   procedures," Deputy Dyer still would have conducted a parole search on Taylor (which, as discussed

23   above, would have extended to searching the car) and inevitably would have found the gun.

24           Going one step further, even if Deputy Dyer never requested anyone's identification, ran any

25   checks, or inquired about anyone's parole or probation status, Taylor's earlier furtive movements would

26   still have created independent reasonable suspicion for Deputy Dyer to search the car for any weapons

27   or contraband and would have led to discovery of the gun.  For these reasons, the inevitable discovery

28   doctrine should apply and suppression is unwarranted.

**VIII.   No Ground For Deterrence Exists.**

Police conduct triggers the exclusionary rule only when the questionable police conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Herring*, 555 U.S. 135, 144 (2009). "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct . . . ." *Id.* "[W]hen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." *United States v. Leon*, 468 U.S. 897, 907–08 (1984).

Taylor has failed to show that Deputy Dyer acted with anything less than objective good faith. To the extent any constitutional violations occurred, there is no evidence whatsoever that he was deliberate, reckless, or even grossly negligent. In cases such as this, where "the exclusionary rule does not result in appreciable deterrence" of officer misconduct, "then, clearly, its use in the instant situation is unwarranted." *United States v. Janis*, 428 U.S. 433, 454 (1976). Suppression here would therefore be improper.

**IX.   No Evidentiary Hearing Is Necessary.**

Taylor moves the Court for an evidentiary hearing on any contested issues of fact, Mot. 1, but there are none.

"An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). While Taylor states that he "does not concede the truth of any of the statements in the police report," *id.* at 2 n.1, his motion cites and entirely relies on the facts stated therein, *see id.* at 2–3. Indeed, he disputes none of them. Because Deputy Dyer's declaration, upon which the government's brief relies, is entirely consistent with his narrative in the police report, there are no contested issues of fact and thus no evidentiary hearing is necessary.

**CONCLUSION**

Taylor claims a multitude of alleged constitutional violations supported by virtually no argument in his brief. As explained above, no violations occurred. To the extent any did, there is no evidence that

1 | Deputy Dyer acted with anything less than good faith, so suppression is unwarranted.  The United States

2 | respectfully requests that the Taylor's motion be denied.

3 |

4 | DATED: May 30, 2022                                        Respectfully submitted,

5 |                                                                         STEPHANIE M. HINDS
                                                                             United States Attorney
6 |

7 |                                                                          /s/ Kevin Yeh_____
                                                                            KEVIN YEH
8 |                                                                         Assistant United States Attorney

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |