STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN YEH (CABN 314079)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-4063
    Fax: (415) 436-7234
    kevin.yeh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LOVELL TAYLOR, <br><br> Defendant. | CASE NO. 21-cr-242 YGR <br><br> **DECLARATION OF DEPUTY SHERIFF JUSTIN DYER IN SUPPORT OF UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS** <br><br> Court: Courtroom 1, 4th Floor <br> Date: July 21, 2022 <br> Time: 9:00 a.m. |

I, Jordan Dyer, declare and state as follows:

1. I am a Deputy Sheriff with the Contra Costa County Office of the Sheriff and have been with the office since 2013. During my tenure, I have served in multiple capacities and units, including street teams, the Custody Division, and the K-9 Unit. I have also been staffed in multiple stations across the county, including Muir Station, where I was assigned on the night of the events described herein.

2. I authored a written statement included in Contra Costa County Office of the Sheriff Incident Report No. 200010688.

3. The facts set forth in this declaration are based on my personal knowledge, my review of the above-referenced incident report, other evidence in this matter, and information I received from other law enforcement personnel. I make this declaration for the limited purpose of responding to the

DYER DECL.
21-CR-242 YGR                     1

defendant's motion to suppress evidence. This declaration does not include everything I know about the investigation of the defendant.

4. On October 15, 2020, I was on patrol and assigned to Muir Station in the city of Martinez, Contra Costa County. I was wearing a full Deputy Sheriff's uniform and using a fully marked Sheriff's Office patrol vehicle equipped with overhead red and blue emergency lights and an audible siren. Before my shift, I ensured that my patrol vehicle had a properly functioning solid red forward-facing lamp. With me on patrol was Deputy Sheriff Joseph Sabella.

5. At approximately 2:39 a.m., I was parked and observing traffic on Willow Pass Road near the off-ramp to Eastbound Highway 4 in Concord, California. As I was watching traffic, I observed a black Ford Expedition exiting Eastbound Highway 4. As the Ford came to the four-way stop sign at the bottom of the off-ramp, it failed to come to a complete stop in violation of California Vehicle Code 22450 - Stop Sign Violation. The Ford made a left turn and began driving northbound on Willow Pass Road to Evora Road. At this point, I believe that the driver and/or occupants of the Ford saw my patrol vehicle and were attempting to avoid being pulled over. I began driving after the Ford to initiate a traffic enforcement stop for the stop sign violation. As I tried to catch up, the Ford quickly turned left onto the on-ramp for Westbound Highway 4. In other words, the Ford drove back in the direction from which it came, which I found odd and believe to be in response to seeing and wanting to evade my patrol vehicle. The Ford rapidly accelerated to approximately 80 to 85 miles per hour—above the 65-mile-per-hour speed limit on this portion of Highway 4 and thus violating California Vehicle Code 22350 - Basic Speed Law. As I caught up to the Ford, it abruptly changed lanes from the number 4 lane to the number 1 lane without using any turn signal, in violation of California Vehicle Code 22107 - Failure to Use Turn Signal. Approximately three other cars had to brake to avoid a collision with the Ford. The Ford's unsafe driving pattern and very high speed caused me to be concerned for my safety and the safety of others on the road.

6. I activated the overhead red and blue emergency lights on my patrol vehicle to conduct a traffic enforcement stop on the Ford. The Ford exited onto Solano Way from Westbound Highway 4 but did not immediately pull over in response to the emergency lights and come to a complete stop. Eventually, the Ford began to pull over on the off-ramp, but appeared to be "slow rolling" to a complete

stop, i.e., the stop took an unusually long time. In my experience, vehicles that are being pulled over and that "slow roll" to a complete stop may indicate that the occupants are trying to conceal weapons, drugs, or other evidence of criminal activity before any contact with officers. The Ford's slow-rolling thus caused me to be concerned about our safety. In addition, because the car appeared to have been attempting to evade our traffic enforcement stop, I became more concerned about officer safety because, based on my experience, a car that attempts to evade being pulled over often indicates the presence of weapons, drugs, or other contraband in the car that the occupant(s) may be trying to hide, or that there may be an outstanding arrest warrant for someone who does not want to be caught. Furthermore, the fact that it was late at night and dark gave me more reason to be worried about our safety. Finally, based on my experience patrolling the area, I know that many mentally unstable and/or drug-addicted individuals are frequently in the area, in part due to a homeless shelter less than a mile away along the side of the highway where we pulled over. Thus, I had to be cautious about such individuals and/or ensure that such individuals do not distract us from any threat that the car's occupant(s) may pose.

7. As the Ford finally stopped, I used my vehicle's overhead flood lights, as well as the driver-side spotlight, to illuminate the interior of the Ford. I could see that the number of occupants in the car—four—outnumbered my partner and me. Based on my training and experience, a law enforcement encounter where officers are outnumbered can create a heightened risk situation for the officers.

8. As I approached the Ford on foot, I saw the right rear seat passenger (later identified as Lovell Taylor ("Taylor")) begin reaching around near the floorboard of the vehicle where his feet were. I then saw Taylor place an unknown item on the seat next to his left thigh. The item he placed on the seat was between himself and the left rear seat passenger (later identified as Teuila Failauga, Taylor's girlfriend). I stopped at the left rear passenger door and used my hand-held flashlight to illuminate the area where Taylor was reaching around. I then saw Taylor moving a black jacket between himself and Failauga.

9. Given Taylor's actions, I immediately became concerned for my safety. Based on my experience, individuals who are pulled over generally remain still and do not move around so as not to create suspicion, nor do individuals typically attempt to hide items that are legal. Based on my

DYER DECL.
21-CR-242 YGR                                  3

experience, I suspected that Taylor was trying to conceal drugs or possibly a firearm. Thus, to ensure officer safety, I immediately asked everyone in the vehicle to place their hands on the headrest or dashboard of the vehicle where I could see them.

10. I then asked everyone for their driver's license or other identification. As a matter of practice, I almost always ask everybody in a vehicle for identification, and I believe that most Contra Costa County Sheriff's Deputies have the same practice. However, given the vehicle's high speed in an apparent attempt to evade our enforcement stop and slow rolling to a stop, and given Taylor's actions which raised my suspicions, and based on my training and experience, I believed it was important to verify identification for all of the car's occupants so that I could assess any risks they posed, including based on their criminal history or if they had outstanding warrants.

11. Immediately after collecting everyone's driver's licenses, I asked if anyone was on probation or parole. As a matter of practice, I almost always ask everybody in a vehicle whether anyone is on probation and parole after requesting identification, and I believe that most Contra Costa County Sheriff's Deputies have the same practice. However, given the vehicle's high speed in an apparent attempt to evade our enforcement stop and slow rolling to a stop, and given Taylor's actions which raised my suspicions, and based on my training and experience, I believed it was important to know whether anyone is on probation or parole so that I could further assess any risks they posed. For example, knowing whether someone is on probation or parole for violent offenses can assist in assessing the likelihood that an individual may be dangerous.

12. That said, the standard records check to confirm identification through the computer systems in our patrol vehicles would simultaneously indicate whether someone is on probation or parole. As a matter of practice, after requesting someone's identification, I run a standard check on them using the computer in my patrol vehicle, and the results will reveal basic information about the individual, including information regarding an individual's identity, address or other contact information, DMV photos, driving records, outstanding tickets, active warrants, restraining orders, criminal history, and any parole or probation status. All this information is generated and displayed at the same time after I type in basic identifiers (e.g., name, sex, and/or date of birth); I do not choose what information is displayed or specifically search for parole or probation status. Thus, I would learn the car occupants' parole or

probation status by virtue of the standard check I perform and would have learned of their status irrespective of whether I had previously asked them whether they were on parole or probation.

13. In response to my question, Lovell Taylor told me that he was on California Department of Corrections parole for armed carjacking and had been released from jail approximately two weeks prior. Because armed carjacking is a violent crime and Taylor had just been released from incarceration, Taylor's response made me even more concerned about officer safety and made me have additional suspicion that he was possibly hiding a gun when he was reaching and moving an unknown item as I approached the vehicle.

14. At this point, backup deputies arrived. I asked Sheriff's Deputy Nicholas Mazza to stand by with the car occupants while I returned to the patrol vehicle to conduct a records check of the car's occupants. A records check confirmed that Taylor was on active parole with a discharge date of December 15, 2022 (Docket No. 11641515). I also learned that Taylor was on active felony probation out of Alameda County for being a felon in possession of a firearm with a discharge date of July 29, 2023 (Docket No. 1454144). Based on my training and experience, the fact that Taylor was on parole for armed carjacking and on probation for illegally possessing a firearm, coupled with his suspicious movements earlier, led me to strongly suspect that Taylor was armed and was trying to conceal it.

15. After conducting the records checks and confirming Taylor's active parole and felony probation statuses, I returned to the vehicle on the passenger side. I know that anyone on CDCR parole is subject to search without a warrant at any time by any law enforcement officer of their person, residence, and any property under their control. For officer safety and pursuant to the search condition, I asked Taylor if he would step out of the vehicle so I could conduct a search of him and the area where he was seated. I did not consider Taylor under arrest at this time, but because he was on parole and probation for weapons-related offenses, and given his suspicious movements earlier, I wanted to ensure that Taylor did not have anything on him, such as a weapon, that could threaten officer safety. Taylor complied and exited the vehicle to be searched. I did not find anything notable on Taylor.

16. I asked Taylor to take a seat on the curb between my patrol vehicle and the Ford. Given his suspicious movements when I approached the car, his history of armed carjacking and being a felon in possession, and to ensure officer safety, I asked Taylor if there was anything illegal in the car.

1  Because he was a felon, I knew that it was illegal for Taylor to possess a firearm and, for safety reasons, I simply wanted to know if he had been armed. Taylor appeared to become nervous and stated, in effect, "I really don't want to go back to jail." I told Taylor that I was aware that he had been arrested for firearm offenses before and directly asked him if there was a firearm in the vehicle right now—because there were still three other individuals in the car, I wanted to ensure that no one else had access to any firearm that was in fact present and threaten officer safety. Taylor looked up at me and nodded up and down, which I interpreted to mean "Yes." I placed Taylor in handcuffs to secure him for safety reasons and had him remain seated on the curb. Given the presence of a firearm in the vehicle, I also had all of the car's remaining occupants step out of the vehicle one at a time to be placed in handcuffs for officer safety, but did not consider them to be under arrest. After everyone was searched for weapons and placed in handcuffs, I asked them to sit on the curb near Taylor.

17. Backup deputies stood by with the car occupants as I began my search of the rear passenger seat where Taylor was seated pursuant to his search condition. I picked up the jacket I observed Taylor place on top of an object on the seat next to him. As I picked up the jacket, I saw a black handbag underneath it. I picked up the black handbag and unzipped it to search the contents inside. I immediately saw the handgrip of a firearm inside the handbag and a separate high-capacity magazine. I photographed the handbag where I located it after discovering the firearm inside. I then removed the firearm from the handbag and removed the magazine from the firearm. I inspected the magazine and discovered that it was loaded with nine live rounds of 45-caliber ammunition. I then locked the slide of the handgun to the rear and expelled one round of 45-caliber ammunition from the chamber of the firearm. I removed the high-capacity magazine from the handbag. The magazine had 25 live rounds of 45-caliber ammunition. After ensuring that the firearm was completely unloaded, I conducted a function test of the firearm and determined that it was in full working condition capable of being fired.

18. I conducted a records check of the firearm (a Glock 21 with serial number BHEM980) through dispatch, which informed me that there was no record on file and the firearm was unregistered. I placed everything back inside the handbag and secured the evidence in the patrol vehicle's trunk for safety. I proceeded to search the car for any other dangerous items and did not find any.

19. After securing the firearm in the patrol vehicle, I escorted Taylor from the curb to my patrol vehicle. Given his felon status, his admission that there was a gun in the car which was found where he was sitting, his suspicious movements when I approached the car, and his criminal history, I now considered Taylor to be under arrest and read him his *Miranda* rights from my department-issued *Miranda* Waiver Card. After reading Taylor his rights, I asked him if he understood them and he responded, "Yes." I asked Taylor questions regarding the firearm I found inside the vehicle where he had been sitting. Taylor did not answer any of my questions, so I ceased questioning him. I then had Taylor sit in the back of the patrol vehicle.

20. After speaking with the car's other occupants, I informed Lovell Taylor that he was being placed under arrest for illegal possession of the firearm. He was then transported to the Martinez Detention Facility and booked on that charge.

21. The cars' other occupants were not charged and were released at the scene with the vehicle.

22. There is no video recording of the traffic stop because, at the time, Contra Costa County Sheriff Deputies were not provided with or required to use video-recording equipment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of May, 2022, in Oakley, California.

JORDAN DYER
Deputy Sheriff
Contra Costa County Office of the Sheriff