1   JODI LINKER
    Federal Public Defender
2   Northern District of California
    GRAHAM ARCHER
3   Assistant Federal Public Defender
    13th Floor Federal Building - Suite 1350N
4   1301 Clay Street
    Oakland, CA 94612
5   Telephone:   (510) 637-3500
    Facsimile:   (510) 637-3507
6   Email:       Graham_Archer@fd.org

7

8   Counsel for Defendant Taylor

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14   UNITED STATES OF AMERICA,            **Case No.:** CR 21–00242 YGR

15              Plaintiff,                **DEFENDANT'S REPLY TO MOTION
                                          TO SUPPRESS**
16          v.
                                          **Court:**         Courtroom 1, 4th  Floor
17   LOVELL TAYLOR,                       **Hearing Date:**  July 21, 2022
                                          **Hearing Time:**  9:00 a.m.
18              Defendant.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES..........................................................................................i

INTRODUCTION .......................................................................................................1

ARGUMENT ..............................................................................................................2

I.    The prolonged stop of Mr. Taylor violated the Fourth Amendment ...............................2

    A.    Asking about probation and parole, obtaining passenger identifications and running records checks on passengers are not part of the traffic-stop mission ....3

        1.    Obtaining passenger identification is outside the traffic-stop mission .....4

        2.    Running records checks on the three passengers was not part of the traffic-stop mission ...................................................................................5

        3.    Asking the occupants about probation and parole status was not part of the traffic-stop mission .......................................................................6

    B.    Dyer's diversions from the traffic-stop mission prolonged the stop.....................7

    C.    Because Dyer diverted from the traffic-stop mission, any safety precautions had to be justified by reasonable suspicion .................................................................9

    D.    The government did not establish independent reasonable suspicion to prolong the stop ............................................................................................................12

II.    The government did not establish that all evidence obtained after the unconstitutional prolongation was not the fruit of the Fourth Amendment violation ..............................15

III.    The government did not establish that the pat-search of Mr. Taylor was constitutional 16

IV.    Dyer questioned Mr. Taylor in violation of *Miranda* .....................................................17

V.    The government did not establish that the warrantless searches of the car, jacket and handbag were constitutional .............................................................................................20

    A.    The government did not show that Dyer lawfully searched the car based on Mr. Taylor's parole search condition.........................................................................20

    B.    The government did not show that Dyer had reasonable suspicion to search the car for weapons .................................................................................................21

    C.    Mr. Taylor has standing to challenge at least the jacket and handbag searches .22

VI.    The government did not establish the inevitable discovery exception ...........................23

VII.    The government did not show that the usual remedy of exclusion should not apply here ..................................................................................................................................24

CONCLUSION...........................................................................................................24

# TABLE OF AUTHORITIES

**Federal Cases**

*Amanuel v. Soares*, 2015 WL 3523173 (N.D. Cal. 2015) ............................... 6-7

*Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ............................... 4, 17

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ............................... 5, 18

*Bond v. United States*, 529 U.S. 334 (2000) ............................... 23

*Bonneau v. Murphy*, 2013 WL 1386331 (D. Or. 2013) ............................... 15

*Byrd v. United States*, 138 S. Ct. 1518 (2018) ............................... 23

*Floyd v. City of N.Y.*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011) ............................... 14

*Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177 (2004) ............................... 15, 16

*Hudson v. Michigan*, 547 U.S. 586 (2006) ............................... 23-24

*Kansas v. Glover*, 140 S. Ct. 1183 (2020) ............................... 2, 12, 13

*Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011) ............................... 22

*Maryland v. Wilson*, 519 U.S. 408 (1997) ............................... 5, 10

*Michigan v. Long*, 463 U.S. 1032 (1983) ............................... 21, 22

*New York v. Quarles*, 467 U.S. 649 (1984) ............................... 20

*Pennsylvania v. Bruder*, 488 U.S. 9 (1988) ............................... 18

*Rodriguez v. United States*, 575 U.S. 348 (2015) ............................... *passim*

*Thomas v. Dillard*, 818 F.3d 864 (9th Cir. 2016) ............................... 12, 17

*Thompson v. Keohane*, 516 U.S. 99 (1995) ............................... 18

*United States v. Abarza*, 143 F. Supp. 3d 1082 (D. Or. 2015) ............................... 14, 15

*United States v. Abbassi*, 801 F. App'x 484 (9th Cir. 2020) ............................... 20

*United States v. Bautista*, 599 F. App'x 645 (9th Cir. 2015) ............................... 21

*United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987) ............................... 19

*United States v. Burkett*, 612 F.3d 1103 (9th Cir. 2010) ............................... 11, 12, 15

*United States v. Camou*, 773 F.3d 932 (9th Cir. 2014) ............................... 24

*United States v. Castellanos*, 2022 WL 153187 (9th Cir. 2022) ............................... 14, 15

*United States v. Christian*, 356 F.3d 1103 (9th Cir. 2004) ............................... 5

*United States v. Clark*, 902 F.3d 404 (3d Cir. 2018) ............................... 6, 8, 16

*United States v. Crenshaw*, 2020 WL 6873422 (N.D. Cal. 2020) ............................... 9

*United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007)................................. 4

*United States v. Dixon*, 984 F.3d 814 (9th Cir. 2020) ................................ 21

*United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001) ................................ 13, 15

*United States v. Flatter*, 456 F.3d 1154 (9th Cir. 2006) ................................ 17

*United States v. Garcia-Rivera*, 353 F.3d 788 (9th Cir. 2008) ................................ 15

*United States v. Gates*, 745 F. Supp. 2d 936 (N.D. Cal. 2010) ................................ 23

*United States v. Griffin*, 884 F. Supp. 2d 767 (E.D. Wis. 2012) ................................ 14

*United States v. Harris*, 103 F. Supp. 2d 1025 (S.D. Ohio 2000) ................................ 13

*United States v. Harvey*, 2010 WL 3219314 (N.D. Ind. 2010) ................................ 11

*United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001) ................................ 3

*United States v. Humphrey*, 409 F.2d 1055 (10th Cir. 1969) ................................ 22

*United States v. Hurtt*, 31 F.4th 152 (3d Cir. 2022) ................................ 8, 9, 12

*United States v. Hylton*, 30 F.4th 842 (9th Cir. 2022) ................................ 3

*United States v. Jimenez-Robles*, 98 F. Supp. 3d 906 (E.D. Mich. 2015) ................................ 18

*United States v. Korte*, 918 F.3d 750 (9th Cir. 2019) ................................ 21

*United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019) ................................ *passim*

*United States v. Lewis*, 2019 WL 3430603 (D. Kan. 2019) ................................ 23

*United States v. Maffei*, 417 F. Supp. 3d 1212 (N.D. Cal. 2019) ................................ 5, 24

*United States v. Maffei*, 2021 WL 4243388 (N.D. Cal. 2021) ................................ 24

*United States v. Mati*, 466 F. Supp. 3d 1046 (N.D. Cal. 2020) ................................ *passim*

*United States v. Mays*, 2008 WL 111230 (N.D. Cal. 2008) ................................ 13

*United States v. McCloud*, 2021 WL 2322473 (N.D. Cal. 2021) ................................ 9

*United States v. McCowan*, 547 F. Supp. 3d 966 (D. Nev. 2021) ................................ 3, 4, 5

*United States v. McCraney*, 674 F.3d 614 (6th Cir. 2012) ................................ 14, 22

*United States v. McKoy*, 428 F.3d 38 (1st Cir. 2005) ................................ 14

*United States v. McReynolds*, 2021 WL 5492984 (9th Cir. 2021) ................................ 8

*United States v. Mendez*, 476 F.3d 1077 (9th Cir. 2007) ................................ 3

*United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) ................................ 15

*United States v. Mora-Alcaraz*, 986 F.3d 1151 (9th Cir. 2021) ................................ 18-19

*United States v. Ngumezi*, 980 F.3d 1285 (9th Cir. 2020) ................................ 16

*United States v. Odom*, ___ F. Supp. 3d ___, 2022 WL 611206 (N.D. Cal. 2022) .............................. 7, 8, 17, 24

*United States v. Paulino*, 850 F.2d 93 (2d Cir. 1998) ........................................................................ 13

*United States v. Reilly*, 224 F.3d 986 (9th Cir. 2000) ......................................................................... 20

*United States v. Ruiz*, 832 F. Supp. 2d 903 (M.D. Tenn. 2011) ........................................................ 11

*United States v. Simon*, 2022 WL 797016 (N.D. Cal. 2022) .............................................................. 5

*United States v. Spencer*, 1 F.3d 742 (9th Cir. 1992) ........................................................................ 13

*United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007) ................................................................. 3

*United States v. Thompson*, 481 F. Supp. 3d 1128 (D. Mont. 2020) ............................................... 6

*United States v. Ward*, 2017 WL 1549474 (N.D. Cal. 2017) .......................................................... 6, 8

*United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) ......................................................................... 13

*United States v. Wong*, 334 F.3d 831 (9th Cir. 2003) ....................................................................... 20

*United States v. Wrobel*, 295 F. Supp. 3d 1127 (D. Idaho 2018) ...................................................... 2

*Whren v. United States*, 517 U.S. 806 (1996) .................................................................................... 2

**State Cases**

*People v. Gutierrez*, 596 P.2d 759 (Colo. 1979) ................................................................................ 19

**State Statutes**

California Penal Code § 215 ................................................................................................................ 17

**Other Authority**

C. Remsberg, *Tactics for Criminal Patrol* 205 (1995) ...................................................................... 2

Jordan Blair Woods, *Policing, Danger Narratives, and Routine Traffic Stops*, 117 Mich. L. Rev. 635, 682-83 (2019)....................................................................................................................................... 11

Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651, 671 (2002)......................................................................................................... 2

Wayne R. LaFave, 4 *Search and Seizure* § 9.3 (6th ed. 2021) ....................................................... 5, 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

As the other three occupants of the Ford all told Deputy Dyer when he questioned them after arresting Mr. Taylor, they were on their way to Cache Creek Casino when he stopped them. Dkt. 33-1 Bates 15. The front-seat passenger had visible on her cell phone directions to the casino. *Id.* Because the Ford initially was heading the wrong way (eastbound) on Highway 4, it got off the highway, and then got back on again heading west, towards the casino. Declaration of Deputy Sheriff Justin Dyer in Support of United States' Opposition to Defendant's Motion to Suppress ["Dyer Dec."] ¶ 5. In the three miles from where the Ford got back on Highway 4 at Willow Pass Road to the Solano Way exit, where Dyer stopped the car, *id.* ¶ 6, the Ford had to cross multiple lanes of the highway to get to the left two lanes to be able to stay on Highway 4 towards the casino. *See* Declaration of Madeline Larsen ["Larsen Dec."].

Knowing these facts would have explained the Ford getting off and back on the freeway and quickly crossing multiple lanes of traffic, actions that Dyer found "odd." Dyer Dec. ¶ 5. But Dyer did not know these facts because he never took the basic traffic-stop steps of telling the driver the basis for the stop or asking where he was going. Instead, the first thing he did was to ask "everyone for their driver's license or other identification." *Id.* ¶ 10. "Immediately after collecting everyone's driver's licenses, [he] asked if anyone was on probation or parole." *Id.* ¶ 11. He then ran records check on all four car occupants, starting with Mr. Taylor. *Id.* ¶ 14; Dkt. 33-1 Bates 4.

In asking about probation and parole status and obtaining and checking identification from the three passengers, Dyer deviated from the mission of the traffic stop -- addressing the alleged traffic violations -- and into a criminal investigation. Indeed, Dyer *never* addressed any traffic violations, allowing the driver and other passengers to drive away without a citation. United States' Memorandum in Opposition to Motion to Suppress ["Opp."] 11.

The parole-and-probation questioning and the passenger license requests and record checks were not part of the mission of the traffic stop, which was "to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation omitted). Who the passengers were, or whether or not they were on probation or parole or otherwise had criminal records, had nothing to do with "ensuring that vehicles

1   on the road are operated safely and responsibly." *Id.* at 355. Nor were these inquiries necessary for

2   the officer "to complete his mission safely." *Id.* at 356. In fact, by unnecessarily prolonging the stop -

3   - and by causing the car occupants to move their hands from the visible locations where Dyer had

4   directed them to keep their hands, Dyer Dec. ¶ 9, to retrieve their licenses -- these inquiries were

5   detrimental to officer safety.

6        Because Dyer's inquiries were investigatory, they required "the reasonable suspicion ordinarily

7   demanded to justify detaining an individual."[1] *Rodriguez*, 575 U.S. at 355; *see United States v.*

8   *Wrobel*, 295 F. Supp. 3d 1127, 1134 (D. Idaho 2018) (granting suppression because officer ordered

9   driver to exit vehicle "for investigatory purposes" without "a reasonable articulable suspicion that

10  [he] was engaged in criminal activity"). Mr. Taylor's alleged movement of an "unknown item" from

11  the rear floorboard of the car to the rear seat and his movement of a jacket between himself and the

12  other back-seat passenger, Dyer Dec. ¶ 8, did not give rise to "a reasonable suspicion that a specific

13  individual was potentially engaged in specific criminal activity." *Kansas v. Glover*, 140 S. Ct. 1183,

14  1190 (2020). The prolonged seizure of Mr. Taylor thus violated the Fourth Amendment, and all fruits

15  of the unconstitutional prolongation must be suppressed.

16                              **ARGUMENT**

17  **I.     The prolonged stop of Mr. Taylor violated the Fourth Amendment**

18       Dyer (1) asked everyone in the car "for their driver's license or other identification," Dyer Dec.

19  ¶ 10; (2) "asked if anyone was on probation or parole," *id.* ¶ 11; and (3) "conduct[ed] a records check

20  of the car's occupants." *Id.* ¶ 14. The government has not shown that the four identification requests

21  and responses and the probation-and-parole questioning did not add time to the stop; the records

_____

23  [1] Police commonly use traffic stops as a pretext to pursue general criminal investigations. *See, e.g.,*

24  W*hren v. United States,* 517 U.S. 806, 810 (1996) (approving of police use of traffic stops based on
    probable cause for traffic violations "as a means of investigating other law violations"); *United States*

25  *v. Mati*, 466 F. Supp. 3d 1046, 1057 (N.D. Cal. 2020) (noting that officer "essentially acknowledged
    having an investigatory motive in this case" and that questioning drivers stopped for traffic violation

26  about probation and parole status was "one of the 'little things' that lead to the discovery of other
    crimes."); C. Remsberg, *Tactics for Criminal Patrol* 205-06 (1995) (encouraging police to "run at

27  least a warrants check on all drivers you stop" in order to develop "cause for an immediate custodial
    arrest and search of the suspect"); Samuel R. Gross & Katherine Y. Barnes, Road *Work: Racial*

28  *Profiling and Drug Interdiction on the Highway, 10*1 Mich. L. Rev. 651, 671 (2002) ("Starting in the
    early 1980s, police departments around the country have been systematically using their virtually
    unrestricted power to stop cars as a tool to hunt for illegal drugs.").

REPLY TO MOTION TO SUPPRESS
*TAYLOR*, CR 21–00242 YGR

checks of the three passengers indisputably added time to the stop. Dkt. 33-1 Bates 4. These inquiries were not part of the traffic-stop mission. They did not address "related safety concerns" and were not "negligibly burdensome precautions" necessary to "complete [the traffic-stop] mission safely." *Rodriguez*, 575 U.S. at 354. The government has not shown that they were supported by independent reasonable suspicion. The prolonged traffic stop violated the Fourth Amendment.

### A.    Asking about probation and parole, obtaining passenger identifications and running records checks on passengers are not part of the traffic-stop mission

The "ordinary inquiries incident to [the traffic] stop" are those directed specifically at the *driver* and "ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355 (brackets in original; internal quotation marks omitted). *United States v. Hylton* addressed only a criminal history check of the driver. 30 F.4th 842, 845 (9th Cir. 2022); *see also United States v. Mendez*, 476 F.3d 1077, 1079-80 (9th Cir. 2007) (holding, pre-Rodriguez, that reasonable suspicion was not required for questioning of driver that occurred during identification check of driver). And *United States v. Holt*, cited by *Rodriguez* as allowing criminal history checks, 575 U.S. at 356, addressed only checks on the *driver*. 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) ("The justification for detaining a *motorist* to obtain a criminal history check is, in part, officer safety."; emphasis added), *overruled on other grounds as recognized by United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

The government has not cited any post-*Rodriguez* case holding that police may, without independent reasonable suspicion, prolong a traffic stop by asking questions about parole and probation status and requesting identification from, and running records checks, on passengers.  The government's main argument is that Dyer was justified in taking all these steps because they "were directed towards ensuring officer safety, which is within the mission of a traffic stop." Opp. 13. But courts "have recognized that an officer cannot make an unconstitutional detour lawful by merely labeling it as an officer safety measure; the act must genuinely promote officer safety." *United States v. McCowan*, 547 F. Supp. 3d 966, 974 (D. Nev. 2021). And courts have rejected the investigative actions Dyer took here as genuinely promoting officer safety.

**1.    Obtaining passenger identification is outside the traffic-stop mission**

"The identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019). "[K]nowing Landeros's name would not have made the officers any safer. Extending the stop, and thereby prolonging the officers' exposure to Landeros was, if anything, 'inversely related to officer safety.'" *Id.* (quoting *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015)). Likewise, in *McCowan*, where the officer "was working alone at night in a high-crime area" and "wanted to know who he was talking to," the district court held that determining the passengers' identities did not "ma[k]e this officer any safer." *Id.* . Indeed, "[t]he limited investigation into McCowan's passengers' identities . . . only increased the likelihood of a violent encounter." *Id.* at 975.

This case shows how requesting identification from the passengers detracted from officer safety. When Dyer first contacted the car occupants, he asked them "to place their hands on the headrest or dashboard of the vehicle where I could see them" "to ensure officer safety." Dyer Dec. ¶ 9. But the passengers had to move their hands to comply with Dyer's request for identification. *See id.* ¶ 11 (Dyer "collect[ed] everyone's driver's licenses"). If he was genuinely concerned that Mr. Taylor might have been trying to hide a gun, *id.* ¶ 9, having him and the other two passengers retrieve their identifications increased any risk.

The government's reliance on *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007), for the proposition that "'police may ask people who have been legitimately been stopped for identification without conducting a Fourth Amendment seizure,'" Opp. 13 is misplaced. As the government acknowledges, Mr. Taylor already was seized by virtue of the traffic stop. Opp. 12 (citing *Arizona v. Johnson*, 555 U.S. 323, 327 (2009)). Thus, the relevant question is whether Dyer lawfully could "order a person to identify herself absent particularized suspicion that she has engaged, is engaging, or is about to engage in criminal activity." *Landeros*, 913 F.3d at 870. The answer is no. *Id.*

Moreover, the request for passenger identification in *Diaz-Castaneda* occurred "only after [the officer] learned that the driver had a suspended license and could not leave with the car." *McCowan*, 547 F. Supp. 3d at 969, 974 n.50 (distinguishing *Diaz-Castaneda*). In *McCowan*, the district court

1   held that the officer's "40-second detour from his investigation of the driver to ask the passengers for

2   identification -- which they lacked -- and then for their names and birthdates, purportedly for officer

3   safety, before running the driver's information" violated the Fourth Amendment. *Id.* at 969, 973-77

4   (suppressing guns found during subsequent inventory search of car). *Diaz-Castaneda* not only relies

5   on facts not present here, it is of dubious authority in the traffic-stop context after *Rodriguez*.

6   *Landeros*, 913 F.3d at 870.

7          The government's other cases are distinguishable because Mr. Taylor (like the other two

8   passengers) was not the "suspect." Opp. 15-16; *cf. Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)

9   (police can ask "a moderate number of questions to determine [the] identity" of a person stopped

10   based on reasonable suspicion); *United States v. Christian*, 356 F.3d 1103, 1106 (9th Cir. 2004)

11   (where police were investigating report of man brandishing gun in apartment building, police

12   demands for suspect's identification were reasonable); *United States v. Simon*, 2022 WL 797016, at

13   *3-4 (N.D. Cal. 2022) ("Inquiries into a *suspect's* past criminal conduct is relevant to officer safety").

14   Neither Mr. Taylor nor either of the other two passengers committed any of the traffic violations that

15   were the bases for the traffic stop. *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997) ("There is

16   probable cause to believe that the driver has committed a minor vehicular offense, but there is no

17   such reason to stop or detain the passengers."). Without reasonable suspicion, Dyer could not

18   lawfully prolong the stop to ask for and obtain their identification.

19                    **2.      Running records checks on the three passengers was not part of the
                              traffic-stop mission**

20

21          "A records check of a passenger . . . will ordinarily have no relation to the safe operation of that

22   vehicle." *United States v. Maffei*, 417 F. Supp. 3d 1212, 1222 (N.D. Cal. 2019) (holding that police

23   unreasonably prolonged traffic stop by conducting records check of passenger/car-owner); *see also*

24   Wayne R. LaFave, 4 *Search and Seizure* § 9.3(c) (6th ed. 2021) ["LaFave"] ("there should be a total

25   prohibition . . . on use of criminal history checks incident to traffic stops except when there also

26   exists a reasonable suspicion of more serious criminal conduct"; "any police safety claim is relatively

27   weak vis-a-vis a passenger").

28          Even brief unnecessary inquiries into a *driver's* criminal history can unconstitutionally prolong

1    a traffic stop. In *United States v. Clark*, an officer's "computerized check of the vehicle's registration

2    based on the license plate number . . . revealed the license was valid, [the driver] had a criminal

3    record for drug offenses, there were no outstanding warrants for his arrest, and the vehicle was

4    registered to" a woman with the same last name as the driver listed on the driver's license. 902 F.3d

5    404, 406 (3d Cir. 2018). Yet the officer questioned the driver, for approximately 20 seconds, "about

6    his criminal record." *Id*. at 407, 410 n.4. The Third Circuit affirmed the district court's suppression

7    order because this questioning unconstitutionally prolonged the traffic stop. *Id*. at 411. Once the

8    officer had determined that the driver was driving lawfully, the "inquiry into Roberts' criminal

9    history was . . . not tied to the traffic stop's mission." *Id*.

10       The government has not cited any authority upholding traffic-stop-prolonging records checks

11    of passengers. Whether it was his practice or not,[2] Dyer's records checks on the passengers were not

12    part of the traffic-stop mission. *See United States v. Thompson*, 481 F. Supp. 3d 1128, 1134 (D.

13    Mont. 2020) (officer "testified that he routinely runs passenger information" but passenger records

14    search "fell outside the mission parameters of the original stop, requiring independent reasonable

15    suspicion"); *accord* LaFave ("it is to be doubted whether there is any valid reason for automatic

16    warrant checks on mere passengers"). Because they prolonged the stop and were not justified by

17    independent reasonable suspicion, the three passenger records checks resulted in an unconstitutional

18    seizure of Mr. Taylor that violated the Fourth Amendment.

19
20              **3.     Asking the occupants about probation and parole status was not part of the traffic-stop mission**

21       Judges of this Court have held that questioning about probation and parole status is outside the

22    scope of a routine traffic stop and, when it adds time to the stop, violates the Fourth Amendment.

23       "Asking about parole and probation status or inquiring whether a person has anything illegal in

24    his vehicle are attempts by law enforcement to uncover criminal activity, not casual conversation.

25    Nor are those questions related, as the government claims, to the mission of the traffic stop." *United*

26    *States v. Ward*, 2017 WL 1549474, at *3 (N.D. Cal. 2017) (internal quotation marks omitted); *see*

27

28    [2] Although Dyer and the government point to case-specific reasons, discussed below, Dyer also says that he takes these steps in "almost" every traffic stop. Dyer Dec. ¶¶ 10, 11, 12. Given the well-recognized racial disparities in traffic stops, his "almost" signals potentially discriminatory discretion.

1  *also Amanuel v. Soares*, 2015 WL 3523173, at \*7 (N.D. Cal. 2015) (officer's "confirm[ing] with

2  Amanuel that he is not on probation or parole" and asking about prior arrest were unrelated to traffic-

3  stop mission). In *United States v. Mati*, another judge of this Court agreed "that asking a driver about

4  his probation status . . . is not aimed at ensuring that vehicles on the road are operated safely and

5  responsibly. Asking whether a driver is on probation and has a search condition is, instead, intended

6  to uncover evidence of criminal activity." 466 F. Supp. 3d 1046, 1056 (N.D. Cal. 2020) (noting that

7  several California jurisdictions have "prohibit[ed] law enforcement from asking such questions").

8  Most recently, a judge of this Court held that an officer's prolonging a traffic stop by "a few seconds"

9  to ask the driver's probation status violated the Fourth Amendment. *United States v. Odom*, ___ F.

10  Supp. 3d ___, 2022 WL 611206, at \*4 (N.D. Cal. 2022).

11      The government did not acknowledge any of this authority. Its argument that the probation and

12  parole questioning does not matter because Dyer would have learned of Mr. Taylor's supervision

13  through his records check, Opp. 27, fails because, as discussed above, that records check

14  unconstitutionally prolonged the stop. Moreover, as discussed below, the record does not establish

15  what Dyer learned about Mr. Taylor through the records check. It seems clear, at least, that the

16  records did not say anything about armed carjacking.

17                    **B.      Dyer's diversions from the traffic-stop mission prolonged the stop**

18      The government's claim that the traffic stop was not prolonged fails to account for *all* Dyer's

19  actions, addressing only his probation-and-parole inquiry. Opp. 17. But Dyer's diversion from the

20  traffic-stop mission began when he asked the three passengers for identification. Dyer Decl. ¶¶ 10-11.

21  Although his declaration suggests that he asked for and received all four licenses simultaneously, *id.*,

22  according to his police report, he asked at least two of the car occupants for identification separately,

23  receiving at least the driver's license before he asked the front-seat passenger for identification. Dkt.

24  33-1 Bates 14. Dyer did not ask about probation and parole until after he asked for and received

25  identification from all four occupants. Dyer Dec. ¶¶ 10-11. The three passenger license requests and

26  responses and the question and Mr. Taylor's answer about supervision status had to have added a

27  measurable amount of time to the stop.

28      The CAD indicates that approximately four and a half minutes passed between the stop and the

1   request for a records check on Mr. Taylor, who was the first of the four occupants that Dyer checked.

2   Dkt. 33-1 Bates 4. Inquiries into the four Ford occupants took approximately a minute to enter. *Id.*

3   Bates 4-5. There is no indication in the discovery or Dyer's declaration how long it took to receive

4   responses, but presumably they added even more time to the stop.

5       "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.

6   But . . . he may not do so in a way that prolongs the stop." *Rodriguez*, 575 U.S. at 355. "The critical

7   question" is whether the challenged police conduct "prolongs -- *i.e.*, adds time to -- the stop." *Id.* at

8   357 (ellipses added; internal quotation marks omitted); *see United States v. McReynolds*, 2021 WL

9   5492984, at *2 (9th Cir. 2021) ("Following a lawful traffic stop, an officer can ask questions of both

10  the driver and passenger, *so long as doing so does not prolong the stop*."; emphasis added). It does

11  not matter if the diversionary inquiries did not take much time: *Rodriguez* rejected a *de minimis*

12  exception. 575 U.S. at 356; *see, e.g.*, *Clark*, 902 F.3d at 410 n.4 (finding unconstitutional

13  prolongation based on 20-second questioning of driver about criminal history); *Odom*, ___ F. Supp.

14  3d ___, 2022 WL 611206, at *4 ("brief question regarding [driver's] probation status violated the

15  Fourth Amendment by adding a few seconds to the traffic stop"); *Mati*, 466 F. Supp. 3d at 1058 (that

16  "questions may only have lasted a few minutes does not make them lawful"); *Ward*, 2017 WL

17  1549474, at *3 ("it does not matter that the time added was relatively short").

18      The government attempts to distinguish this case from *Landeros* by arguing that the challenged

19  actions "did not unreasonably prolong the stop at all" because Dyer "was still conducting inquiries

20  related to the stop's mission." Opp. 16. But Dyer *interrupted* the traffic-stop mission with the

21  unrelated inquiries into the passengers' identities and criminal histories and all the occupants'

22  probation and parole statuses. "What mattered [in *Rodriguez*] was the added time, not at what point,

23  in the chronology of the stop, that time was added." *Landeros*, 913 F.3d at 866; *see also Ward*, 2017

24  WL 1549474, at *1 (probation-and-parole questioning of driver unconstitutionally prolonged stop

25  even though it was "unclear" whether it occurred before or after officer ran driver's name).

26      Apply *Rodriguez*, the Third Circuit explained that "an unreasonable extension occurs when an

27  officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other

28  crimes. *United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022) (brackets and internal quotation

1  marks omitted). "In short, we ask whether the mission of the traffic stop was continuously carried out

2  before the discovery of evidence giving rise to a reasonable suspicion of criminality. Any break in

3  that mission taints the stop because it is the result of an unreasonable delay." *Id.*

4      In contrast to the cases the government relies on, Opp. 17-18, here the obtaining and checking

5  identification of the three Ford passengers and asking all the occupants about their probation and

6  parole status diverted from the traffic-stop mission *and* added time to the stop. *Cf. United States v.*

7  *McCloud*, 2021 WL 2322473, at *6 (N.D. Cal. 2021) ("brief question about [driver's] probation

8  status . . . had no measurable impact on the length of the stop"); *United States v. Hogg*, 20-cr-00127-

9  JSW, Dkt. 39, at 9 (N.D. Cal. 2020) (because officer asked about probation status while driver was

10  still looking for her identification, question did not prolong stop); *United States v. Crenshaw*, 2020

11  WL 6873422, at *4 (N.D. Cal. 2020) (two officers were conducting "simultaneous interaction[s],"

12  one (concededly legitimate) looking into the driver's registration while the other (challenged) asking

13  the defendant-passenger for identification and about his probation status). The prolongation here

14  violated the Fourth Amendment.

15      **C.      Because Dyer diverted from the traffic-stop mission, any safety precautions**
        **had to be justified by reasonable suspicion**

16

17  *Rodriguez* distinguished between "negligibly burdensome precautions" police "may need to

18  take . . . in order to complete [the traffic-stop] mission safely" and "safety precautions taken in order

19  to facilitate . . . detours" from the traffic-stop mission. 575 U.S. at 356. Thus, not all claimed safety

20  precautions are a necessary and automatic part of the traffic-stop mission. Unlike obtaining and

21  checking the driver's and car's paperwork, which police may do in every traffic-stop case, *id.* at 355,

22  stop-prolonging safety precautions must not only be no more than "negligibly burdensome" but also

23  serve the traffic mission and be necessary in a particular case.

24      As discussed above, other than obtaining the driver's license, nothing Dyer did before running

25  the records check on Mr. Taylor served the mission of investigating the driver's traffic violations.

26  None of his actions furthered road safety. And even if his actions "theoretically serve[d] a safety

27  interest," they were unlawful because they were "actually a means of investigation." *Mati*, 466 F.

28  Supp. 3d at 1057.

1         Several points make this clear. First, Dyer says that he routinely or "almost always" takes these

2    steps during traffic stops, regardless of any risk factors. Dyer Dec. ¶¶ 10, 11, 12. Second, Dyer did

3    not take any of the steps that he lawfully could have taken if he genuinely was concerned about

4    danger. *See* LaFave § 9.3(c) (listing "the various other rules that exist with respect to what an officer

5    may do in the interest of his own protection during a stop"). Notably, he did not ask any of the

6    occupants to get out of the car. *See Wilson*, 519 U.S. at 414 ("Outside the car, the passengers will be

7    denied access to any possible weapon that might be concealed in the interior of the passenger

8    compartment."). Finally, neither Dyer nor the government satisfactorily explains how prolonging the

9    traffic stop by asking for and obtaining passenger identifications, asking all the car occupants if they

10    are on probation or parole and running records checks on all four occupants contributes to officer

11    safety. As Judge Breyer noted, "there are lots of intrusions that might make officers safer -- like strip-

12    searching everyone the police come into contact with -- but that might nonetheless run afoul of the

13    Fourth Amendment." *Mati*, 466 F. Supp. 3d at 1057.

14         In addition, the government's claimed safety concerns are mis- or over-stated. There is no

15    evidence that any of the car occupants was in any way not compliant with Dyer's directions.

16    Although it was "late at night and dark," and there was apparently a homeless shelter within a mile of

17    the traffic-stop location, Dyer Dec. ¶ 6, Dyer could see into the car with his patrol-car lights, *id.* ¶¶ 7-

18    8, and there is no evidence that any "mentally unstable and/or drug-addicted individuals" *id.* ¶ 6,

19    were present at the time. Although the two deputies initially on the scene were outnumbered by the

20    four occupants of the car (two male, two female), *id.* ¶ 7, backup deputies arrived before Dyer

21    conducted the records checks. *Id.* ¶ 14. Although the government claims that the Ford got back on the

22    highway and sped away "when the deputies attempted to initiate a traffic stop," Opp. 13, Dyer did not

23    "activate[] the overhead red and blue emergency lights on my patrol vehicle to conduct a traffic

24    enforcement stop" until the Ford had driven some distance on Highway 4. Dyer Dec. ¶ 6.

25         Similarly, Dyer's claim that he was concerned because "the car appeared to have been

26    attempting to evade our traffic enforcement stop," *id.* ¶ 6, is not supported by the record. Aside from

27    his newly raised claim of "slow-rolling," Dec. ¶ 6, there is no indication of any attempted evasion by

28    the car or its occupants. And although Dyer and the government now rely heavily on Dyer's new

REPLY TO MOTION TO SUPPRESS
*TAYLOR*, CR 21–00242 YGR

claim of slow-rolling to justify safety concerns, *id*. ¶¶ 6, 10, 11; Opp. 8, 9, 14, 15, 19, there are several reasons to question his credibility on this point. His detailed, near-contemporaneous police report about the traffic stop says nothing about slow rolling.[3] Dkt. 33-1, Bates 13-16; *see, e.g.,* United *States v. Ruiz,* 832 F. Supp. 2d 903, 913 (M.D. Tenn. 2011) (granting suppression; finding testifying officer not credible in part because his evidentiary hearing testimony was "different, in a key respect, from the account contained in the Narrative, which he drafted two days after the traffic stop"); *United States v. Harvey*, 2010 WL 3219314, at *5-6 (N.D. Ind. 2010) (granting suppression; finding testifying officer not credible in part because officer's justification for stop at suppression hearing was different from justification in police report).

Dyer's new slow-rolling claim also raises credibility questions because it lacks detail. Neither his declaration nor his police report indicates exactly where he signaled the Ford to stop, where the Ford stopped, or how long or far it took to stop. *Cf. United States v. Burkett*, 612 F.3d 1103, 1104 (9th Cir. 2010) (noting where car eventually stopped, how far it had traveled after officer signaled and that "there were multiple safe places to pull over before that point"). Given the speed the Ford was traveling, its position in the far left ("number 1") lane and its size and weight, it is understandable if the driver was slow and cautious in pulling over. Dyer Dec. ¶¶ 5, 6; *see* Dkt. 33-1 Bates 17 (Ford photos); Edmunds, *Used 2000 Ford Expedition Specs & Features*, *available at* https://www.edmunds.com/ford/expedition/2000/features-specs/ (dimensions of 2000 Ford Expedition).

Finally, actual data shows that generalized police traffic-stop safety concerns are overstated. *See* Jordan Blair Woods, *Policing, Danger Narratives, and Routine Traffic Stops*, 117 Mich. L. Rev. 635, 682-83 (2019) (empirical evidence concerning infrequency of traffic-stop violence -- especially during routine traffic stops -- "do[es] not support" conclusion that "police officers are more frequently injured or killed during [routine traffic stops] compared to other police settings"); David D. Kirkpatrick, *et al.*, *Why Many Police Traffic Stops Turn Deadly* , New York Times Magazine

---

[3] According to Dyer, there was no video recording of the traffic stop because, "at the time, Contra Costa County Sheriff's Deputies were not provided with, nor were they required to use, video-recording equipment." Dyer Dec. ¶ 22. But the sheriff's department did at that time have a video-recording policy, Dkt. 33-1 Bates 461-68, and apparently available body cameras. Larsen Dec. ¶ 5.

1   (Oct. 31, 2021) (discussing investigation into killings during traffic stops *by* police,

2   disproportionately of Black drivers, "follow[ing] from an overstatement, ingrained in court

3   precedents and police culture, of the danger that vehicle stops pose to officers."), *available at*

4   https://www.nytimes.com/2021/10/31/us/police-traffic-stops-killings.html.

### D.   The government did not establish independent reasonable suspicion to prolong the stop

6           Of the facts the government relies on to establish the necessary independent reasonable

7   suspicion to prolong the traffic stop, Opp. 18-21, only Mr. Taylor's movements in the car are

8   appropriately a part of the inquiry.

9           The driver's traffic violations do not weigh towards whether Dyer had reasonable suspicion to

10  investigate Mr. Taylor because "reasonable suspicion must be individualized," *Thomas v. Dillard*,

11  818 F.3d 864, 877 (9th Cir. 2016); the government must show "a reasonable suspicion that a specific

12  individual was potentially engaged in specific criminal activity." *Glover*, 140 S. Ct. at 1190. Because

13  Dyer's unconstitutionally prolonging actions Dyer were directed at Mr. Taylor (and the other two

14  passengers), not the driver who was responsible for the traffic violations and any failure to pull over

15  promptly, the government must show reasonable suspicion as to the passengers.[4] *See Rodriguez*, 575

16  U.S. at 357 ("The reasonableness of a seizure . . . depends on what the police in fact do.").

17          Nor can the government rely for reasonable suspicion on Mr. Taylor's response to Dyer's

18  question about probation and parole, Opp. 20, because, as discussed above, that inquiry

19  unconstitutionally prolonged the stop. In *Hurtt*, when an officer interrupted the initial mission of the

20  stop -- investigating the driver for DUI -- to assist another officer who had put himself in a dangerous

21  position, any facts learned after that point could not contribute to reasonable suspicion. 31 F.4th at

22  161-62. Here too, because Dyer diverted from his traffic stop mission before and by asking if the

---

25  [4] Although the driver in *Burkett* took an unusually long time to pull over after the officer signaled her
    to stop, the Ninth Circuit found reasonable suspicion to frisk the passenger based on *his* actions. *See*
26  612 F.3d at 1104 (citing passenger's "furtive movements during the time the driver was refusing to
    comply with the order to stop her vehicle, his evasive and deceptive responses when asked what he
27  was doing at that time, the peculiar way he opened the door with his left hand, and the way he kept
    his right hand near and reached for his right coat pocket when he got out of the vehicle"). Mr.
28  Taylor's alleged furtive movements were after the Ford stop, while Dyer was approaching on foot,
    Dyer Dec. ¶¶ 7-8, and none of the other facts in *Burkett* were present here.

1   occupants were on probation or parole, the government cannot rely on Mr. Taylor's response for the

2   necessary reasonable suspicion.

3        The necessary particularized showing of reasonable suspicion to prolong the traffic stop by

4   investigating Mr. Taylor (and the other passengers) thus depends solely on Mr. Taylor's "reaching

5   around near the floorboard," "plac[ing] an unknown item on the seat next to his left thigh," and

6   "moving a black jacket between himself and" the other rear-seat passenger "as [Dyer] approached the

7   Ford on foot." Dyer Dec. ¶ 8. None of the government's authority, Opp. 19-20 & n.4, establishes that

8   such movements in the presence of a police officer, standing alone, gives rise to reasonable suspicion

9   that the person was "potentially engaged in specific criminal activity." *Glover*, 140 S. Ct. at 1190; *cf.*

10  *United States v. Weaver*, 9 F.4th 129, 147-49 (2d Cir. 2021) (en banc) (upholding frisk where officer

11  "had thrice witnessed Weaver make suspicions movements concentrated around his waist and pelvis,

12  where a firearm might easily be concealed"; he also denied, falsely, that he had anything); *United*

13  *States v. Spencer*, 1 F.3d 742, 745-46 (9th Cir. 1992) (upholding search of car where driver had no

14  license and defendant-passenger presented jail identification, had shoulder holster under jacket and

15  had made "concealing movements"); *United States v. Paulino*, 850 F.2d 93, 94 (2d Cir. 1998)

16  (upholding weapons search of car double-parked in "neighborhood plagued by a high incident of

17  drug-trafficking and robberies" where back-seat passenger "mov[ed] his torso and ben[t] over as if

18  placing an object on the floor"); *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) (citing

19  three factors supporting reasonable suspicion: in addition to "furtive gestures," location's "notoriety

20  as an 'open air drug market'" and defendant's "presence in a van parked after hours in a school lot

21  known to be the site of numerous drug transactions"); *Kyles v. Erickson*, 99 F.3d 1146 (9th Cir. 1996)

22  (unpublished) (upholding jail strip search of arrestee "following her arrest on an outstanding traffic

23  warrant during the felony drug arrest of her then-fiancé" based on circumstances surrounding her

24  arrest including her "moving low in the seat and squirming as if to hide something"); *United States v.*

25  *Mays*, 2008 WL 111230, at *4 (N.D. Cal. 2008) (finding reasonable suspicion based on passenger's

26  nervousness and "furtive movement to conceal drugs or drug paraphernalia" in plain view).[5]

27  _____

28  [5] "[T]he officers in [*Spencer*] had a wealth of other information, in addition to having observed that act. The Ninth Circuit did not intimate that merely seeing the defendant bend over would have

REPLY TO MOTION TO SUPPRESS
*TAYLOR*, CR 21–00242 YGR

1   Although some specific furtive movements "are relevant to [a reasonable suspicion] analysis,"

2   *United States v. Castellanos*, 2022 WL 153187, at *2 (9th Cir. 2022) (internal quotation marks

3   omitted), cases have not relied solely on furtive movements to establish reasonable suspicion. *See,*

4   *e.g.*, *Floyd v. City of N.Y.*, 813 F. Supp. 2d 417 n.254 (S.D.N.Y. 2011) (noting expert's analysis

5   showing high percentage (42.3%) of New York stop-and-frisks based in whole or part on alleged

6   "furtive movements," which are not "standing alone . . . sufficient for reasonable suspicion."); *United*

7   *States v. Abarza*, 143 F. Supp. 3d 1082, 1096 (D. Or. 2015), *clarified on other grounds on*

8   *reconsideration*, 199 F. Supp. 3d 1270 (D. Or. 2016) ("furtive movements alone are not sufficient for

9   continuing the stop for as long as the troopers did here"); *United States v. McCraney*, 674 F.3d 614,

10  621 (6th Cir. 2012) (finding no reasonable suspicion for car frisk during 1 a.m. traffic stop even

11  though driver and passenger both twice "leaned down toward the floor as if concealing something

12  under the seat"); *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) (finding no reasonable

13  suspicion for frisk of driver who reached toward the center console during traffic stop).

14      Again, Mr. Taylor was not a "suspect" when he put something on the back seat of the Ford. *See*

15  *United States v. Griffin*, 884 F. Supp. 2d 767, 777-78 (E.D. Wis. 2012) (granting suppression because

16  no reasonable suspicion of criminal activity where defendant, parked across the street from residence

17  where controlled-delivery was delivered, surprised when officer approached, "dropped his hands

18  from the steering wheel" and citing cases where defendant's hand movements did not establish

19  reasonable suspicion). He was not responsible for the traffic violations that led to the stop. He played

20  no role in determining where the Ford was pulled over or how it stopped. Dyer did not know Mr.

21  Taylor. Dyer did not see any contraband or suspicious object in the car, though he was able to

22  recognize "a black jacket." Dyer Dec. ¶ 8. And there is no indication that Mr. Taylor (or anyone else

23  in the car) was nervous or less than completely compliant with Dyer's directions.

24      Other facts also cast doubt whether any suspicion was reasonable. Dyer claims that, in his

25  experience, "individuals who are pulled over generally remain still and do not move around so as not

26  to create suspicion." Dyer Dec. ¶ 9. But other officers have testified that their experience is the

27  _____

28  justified the search of the automobile." *United States v. Harris*, 103 F. Supp. 2d 1025, 1031 (S.D. Ohio 2000).

opposite. *See Abarza*, 143 F. Supp. 3d at 1096 (noting that court had declined to rely, as justification for search, on passengers' having "remained quiet and still," which officers characterized as "abnormal"); *Bonneau v. Murphy*, 2013 WL 1386331, at *8 (D. Or. 2013) (noting officer's testimony that "' it is highly unusual for persons during a traffic stop" to "never move[], and stare[] straight ahead"). It cannot be the case that an officer would have reasonable suspicion whether the car occupants moved or remained still. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000) (en banc) (expressing "skepticism" of factors, like eye contact, that "can so easily devolve into a case of damned if you do, equally damned if you don't.").

People trying to hide things usually move them *to* the floorboard, not *from* the floorboard onto the seat. *See, e.g.*, *Burkett*, 612 F.3d at 1104-05; *United States v. Garcia-Rivera*, 353 F.3d 788, 791 (9th Cir. 2008); *Edmonds*, 240 F.3d 61. Moreover, if "the driver and/or occupants of the Ford" saw his police car at the Willow Pass Road exit, Dyer Dec. ¶ 5, why would Mr. Taylor have waited to conceal something until the Ford was stopped and Dyer was walking up to it? *Id.* ¶ 8; *cf. Castellanos*, 2022 WL 153187, at *2 (considering that defendant, at night and "in a high-risk drug and gang-activity area," "made quick movements stuffing or hiding something away in his vehicle . . . just after he saw their police vehicle approaching.").

Finally, the Court should consider what Dyer's actions were supported by reasonable suspicion in light of what he actually did during the traffic stop. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004) ("The officer's action must be justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place."; ellipses and internal quotation marks omitted). Dyer asked all four occupants "for their driver's license or other identification," questioned them about their parole and probation status and ran records checks on them. Dyer Dec. ¶¶ 10, 11, 14. These actions, at least as related to the other passengers, were not "reasonably related in scope" to the driver's traffic violations *or* to Mr. Taylor's alleged movement. The government did not establish independent reasonable suspicion for the traffic-stop prolongation.

## II. The government did not establish that all evidence obtained after the unconstitutional prolongation was not the fruit of the Fourth Amendment violation

The government acknowledges that Mr. Taylor challenged "the searches of the car, jacket, and

1   handbag . . . as fruits of the earlier unconstitutional violations." Opp. 25. It relies on information Dyer

2   learned during the unconstitutional prolongations to justify the searches under the parole-search and

3   automobile exceptions. *Id.* 25, 26. It did not argue that Dyer's warrantless pat-search or un-

4   *Mirandized* questioning of Mr. Taylor were not the fruit of the prior unconstitutional prolongations.

5   *Cf. id.* 23-25. "If the traffic stop was impermissibly extended to reach [the point at which the

6   challenged evidence was discovered], any evidence seized after the stop should have ended may be

7   suppressed." *Clark*, 902 F.3d at 406. The fruits of the searches and questioning must be suppressed as

8   the fruits of the prior unconstitutional prolongation. *United States v. Ngumezi,* 980 F.3d 1285, 1291

9   (9th Cir. 2020); *Landeros*, 913 F.3d at 870.

10  **III.    The government did not establish that the pat-search of Mr. Taylor was constitutional**

11          The government's main justification for the warrantless search of Mr. Taylor (as well as the

12  car, handbag and jacket) is his parole search condition. Opp. 23, 25. Dyer also claims that he would

13  have discovered Mr. Taylor's parole or probation status through obtaining his identification and

14  running a records check even had he not unlawfully asked the probation-and-parole inquiry. Dyer

15  Dec. ¶ 12. But it is not clear from the documentary evidence that his probation and parole status

16  showed up on the records check before his arrest.

17          The CAD shows inquiries into the four occupants of the car, as well as the VIN of the car and

18  the gun.  Dkt. 33-1 Bates 4-5. The CAD also shows a response for the gun, *id.* Bates 5, and an

19  attachment to the police report includes what appears to be a report on the VIN that was run at the

20  time of the traffic stop. *Compare id.* Bates 5 (showing 2:48:22 message in response to 2:47:56 VIN

21  inquiry) *with* Bates 22 (results of records check on Ford at 2:48 a.m. on October 15, 2020). The CAD

22  does not, however, show any response for *Mr. Taylor* (or any of the other occupants) before the

23  discovery of the gun. Dkt. 33-1 Bates 4-5.

24          Moreover, several CAD notations for Mr. Taylor *after* he is taken into custody suggest that his

25  probation status had not been confirmed. *See id.* Bates 5-6 (request for docket number for "prob info"

26  at 4:25; results of "neg prob" at 4:32 and 4:35; message that Alameda County "is unable to locate

27  prob for the subj" at 4:44). At 5:17, the CAD shows a message about "SRF INFO," received at 5:15,

28  apparently referring to the "supervised release file" that would include information about probation

1   and parole. *Id*. Bates 6. The printout about Mr. Taylor's probation and parole that apparently was

2   attached to the police report also has a time of 5:15.[6] *Id*. Bates 20-21.

3        This *post-arrest printout* includes the information Dyer referred to in his police report and

4   declaration. But these timing and content discrepancies raise questions about Dyer's credibility in

5   claiming that he "confirmed" that Mr. Taylor was on active parole before relying on a parole-search

6   condition to search Mr. Taylor, the car, handbag and jacket. Dyer Dec. ¶¶ 14, 15, 17.

7        And although the government relies heavily on Mr. Taylor being "on parole for armed

8   carjacking," Opp. 10, 14, 15, 20, 25, the record does not support its claim that Dyer "confirm[ed] that

9   Taylor was on parole for armed carjacking." Opp. 15. Dyer himself does not include carjacking in the

10  information he learned from his records check, Dyer Dec. ¶ 14, and neither the CAD nor the post-

11  arrest printout mentions carjacking, California Penal Code § 215. Dkt. 33-1 Bates 4-5, 20. It thus

12  appears that information about the offense for which Mr. Taylor was on parole came only from Mr.

13  Taylor, in response to Dyer's parole-and-probation inquiry.

14       Moreover, the government has not carried its burden of establishing that Dyer had the

15  reasonable suspicion necessary for a pat-search that Mr. Taylor was armed *and presently dangerous*.

16  *Johnson*, 555 U.S. at 327; *Dillard*, 818 F.3d at 876; *United States v. Flatter*, 456 F.3d 1154, 1157

17  (9th Cir. 2006); *cf.* Opp. 23 (arguing only that "Deputy Dyer had reasonable suspicion that Taylor

18  might be armed"). Judge Tigar recently held that, under the totality of the circumstances, the

19  government did not carry its burden of establishing the necessary reasonable suspicion to pat-search a

20  driver stopped for a traffic violation despite the stop "occur[ring] in the middle of the night," the

21  driver's nervous behavior, "affiliations with criminal gang activity" and "firearms-related criminal

22  history." *Odom*, ___ F. Supp. 3d ___, 2022 WL 611206, at *6-9. Nothing in this record suggests that

23  Mr. Taylor was anything less than completely cooperative.

24       The unlawful pat-search added to the unconstitutional prolongation of the stop.

25  **IV.   Dyer questioned Mr. Taylor in violation of *Miranda***

26       The government argues that Dyer was not required to advise Mr. Taylor of his rights before

27

28

---

[6] The record cautions, "Do not arrest or detain based solely on this response." Dkt. 33-1 Bates 20-21.

interrogating him about the gun in the car because Mr. Dyer was not in custody. Opp. 23-24. But by
that point, it was clear that this was not "a routine traffic stop," *Berkemer*, 468 U.S. at 435, and these
were not ordinary traffic-stop questions. As *Berkemer* acknowledged, a person detained during a
traffic stop who is "subjected to treatment that renders him 'in custody' for practical purposes" must
be advised of their rights before questioning. *Id.* at 440; *see Pennsylvania v. Bruder*, 488 U.S. 9, 11
(1988) (noting that Berkemer "did not announce an absolute rule for all motorist detentions" but
required lower courts to "be vigilant" that police do not postpone making arrests for the purpose of
conducting unwarranted interrogation); *United States v. Jimenez-Robles*, 98 F. Supp. 3d 906, 919
(E.D. Mich. 2015) (suppressing un-*Mirandized* statement because circumstances during non-routine
traffic stop showed defendant was in custody).

Here, sheriff's deputies stopped the car in which Mr. Taylor was a passenger at 2:39 a.m. on or
near a highway off-ramp. Dyer Decl. ¶¶ 4, 6. They asked for his identification and the identification
of all the other car occupants. *Id.* ¶ 10. They asked if the car occupants were on probation or parole,
*id.* ¶ 11, and Mr. Taylor said he was on parole for armed carjacking. *Id.* ¶ 13. Backup deputies
arrived. *Id.* ¶ 14. With the driver's licenses they had collected from everyone in the car, they ran
records checks on them. *Id.*

Police then singled out Mr. Taylor. *Id.* ¶ 15. They directed him to get out of the car so they
could search him and the area of the car where he was sitting. *Id.* They searched Mr. Taylor. *Id.* They
told him to sit on the curb between the Ford and the police car. *Id.* ¶ 16. Dyer, a uniformed officer,
"asked Taylor if there was anything illegal in the car." *Id.* When Mr. Taylor did not answer, Dyer
"told Taylor that I was aware that he had been arrested for firearm offenses before and directly asked
him if there was a firearm in the vehicle right now." *Id.*

Under the totality of these circumstances here, as in *Jimenez-Robles*, 98 F. Supp. 3d at 916-19,
a reasonable person would not have felt "at liberty to terminate the interrogation and leave."
*Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Factors relevant to determining whether a defendant
was in custody include "(1) the language used to summon the individual; (2) the extent to which the
defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4)
the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United*

1  *States v. Mora-Alcaraz*, 986 F.3d 1151, 1156-57 (9th Cir. 2021) (internal quotation marks omitted).

2  In *Mora-Alcarez*, the Ninth Circuit applied several of these factors to hold that the defendant was in

3  custody when questioned in a "public shopping mall" because he was confronted by multiple armed

4  officers, one of whom "confront[ed him] with guilt," albeit non-aggressively, and separated from his

5  seven-year-old son, without whom he would not have left.

6  Similar facts support a finding of custody here. The location -- a highway off-ramp at 2:30 a.m.

7  -- was isolated to begin with, and Mr. Taylor was further isolated from his companions when Dyer

8  removed only him from the Ford. *See United States v. Beraun-Panez*, 812 F.2d 578, 582 (9th Cir.

9  1987), *as modified*, 830 F.2d 127 (distinguishing *Berkemer* where defendant was "isolated from other

10  people" during questioning). Mr. Taylor knew that Dyer had information about his serious criminal

11  history and his supervision status. Dyer had already searched him and indicated that he was going to

12  search the car. Although the timing is not completely clear, it appears that the car -- and Mr. Taylor --

13  had been stopped for approximately ten minutes by the time Dyer questioned him about the gun. *See*

14  Dkt. 33-1 Bates 4-5 (showing stop began at 2:39:56, inquiries into passengers and car were entered

15  until 2:47:56 and first gun query was at 2:57:37). The number of officers present had increased.

16  Dyer did not tell Mr. Taylor that he was free to leave, and he certainly would not have been, at

17  least before Dyer's impending search of the car. *Cf.* Dyer Dec. ¶ 15 (stating that Dyer "did not

18  consider Taylor under arrest" when he directed Taylor to exit car). Dyer had Mr. Taylor's driver's

19  license and had told him to where to sit. *See People v. Gutierrez*, 596 P.2d 759, 760 (Colo. 1979)

20  (affirming suppression because defendant, questioned without being advised of rights, was in custody

21  when police took his license and instructed him to remain by police car). Nor did Dyer tell Mr.

22  Taylor that he did not have to respond to questioning. Indeed, when Mr. Taylor did not answer

23  Dyer's first question about anything illegal, Dyer confronted him with a reference to his gun history

24  and asked an even more pointed question. The totality of these circumstances establish that Mr.

25  Taylor was in custody and entitled to *Miranda* warnings before interrogation.

26  Nor has the government established that Dyer was entitled to ask Mr. Taylor about a gun in the

27

28

1   car under the public-safety exception to *Miranda*. Opp. 24-25.[7] That "narrow exception" applies

2   when "police officers ask questions reasonably prompted by a concern for the public safety." *New*

3   *York v. Quarles*, 467 U.S. 649, 656, 659 (1984) (applying exception where police "were confronted

4   with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason

5   to believe the suspect had just removed from his empty holster and discarded in the supermarket"). In

6   contrast to *Quarles* and *United States v. Reilly*, there was nothing public, "volatile" or unstable about

7   the situation here; Mr. Taylor was in an isolated location, outside the car and not engaging in any

8   suspicion-raising conduct when Dyer questioned him about the gun. 224 F.3d 986, 992-93 (9th Cir.

9   2000). Dyer's more-general initial question about "anything illegal in the car," Dyer Dec. ¶ 16, belies

10  the claim that his questioning was designed only to protect the officers from a firearm. *Cf. Reilly*, 224

11  F.3d at 993 ("Where is the gun" was "a single question directed at determining the presence of the

12  gun"). The government has not shown that the public-safety exception applies.

13  **V.    The government did not establish that the warrantless searches of the car, jacket and
14  handbag were constitutional**

15          The government concedes that Dyer conducted three distinct warrantless searches: of the car,

16  the jacket and the handbag. Opp. 25-26. It bears the burden of justifying each of these searches.

17  Moreover, unless it can justify the warrantless search of the car, it cannot establish that the jacket and

18  handbag searches were constitutional: Without lawful entry into the car, Dyer could not have lawfully

19  accessed the jacket and handbag. *Cf. United States v. Wong*, 334 F.3d 831, 838 (9th Cir. 2003)

20  (stating plain-view-exception requirement that "the officer must be lawfully in the place where the

21  seized item was in plain view").

22          **A.    The government did not show that Dyer lawfully searched the car based on
        Mr. Taylor's parole search condition**

23          The government argues the warrantless searches did not violate the Fourth Amendment because

24  "Taylor was on parole for armed carjacking." Opp. 25. As explained in the pat-search discussion,

25  above, at least the carjacking part of this information appears to have come only from Dyer's

26

27  ───────────────────────
[7] The government's other cited case, Opp. 25, did not involve the public-safety exception. *United*
28  *States v. Abbassi* rejected a challenge to a question about "anything illegal on his person" because it
    did not prolong the stop, made to execute a felony arrest warrant for a passenger in the defendant's
    car, and the defendant was not in custody. 801 F. App'x 484, 486 (9th Cir. 2020).

1    questioning of Mr. Taylor, Dyer Dec. ¶ 13, not from Dyer's records check. The CAD does not reflect

2    results showing that Mr. Taylor was on parole (or probation) before the discovery of the gun, and

3    neither the CAD nor the (post-arrest) parole/probation printout reflects a carjacking charge. Dkt. 33-1

4    Bates 4-5, 20-21

5        More problematic for the government's parole-search justification, it has not carried its burden

6    of establishing that Dyer had "probable cause to believe that [Mr. Taylor] owns or controls the

7    vehicle to be searched." *United States v. Dixon*, 984 F.3d 814, 822 (9th Cir. 2020) (stating probable-

8    cause requirement for warrantless search of car based on supervision condition that authorized search

9    of supervisee's "'vehicle, or any other property under his control"). The government here has not

10   shown, or even claimed, that the Ford "was either owned by [Mr. Taylor] or under his control." *Id.* at

11   823; *cf. United States v. Korte*, 918 F.3d 750, 754 (9th Cir. 2019) (affirming car search based on

12   California parole search condition where parolee "rented the car and referred to it as 'my car.'");

13   *United States v. Bautista*, 599 F. App'x 645, 645-46 (9th Cir. 2015) (affirming car search based on

14   California parole search condition where parolee was both owner and driver of car).[8] It thus has not

15   carried its burden of justifying the car search based on Mr. Taylor's search condition.

16       **B.    The government did not show that Dyer had reasonable suspicion to search
         the car for weapons**

17   The government claims that Dyer could search the car under *Michigan v. Long*, 463 U.S. 1032

18   (1983), based solely on his observation of Mr. Taylor "plac[ing] an object on the seat next to him and

19   mov[ing] the jacket in the same area." Opp. 26. As discussed above, in the pat-search context, the

20   alleged furtive movements do not establish the necessary reasonable suspicion.

21   *Long* held that police can search a car for weapons if they have reasonable suspicion "that the

22   suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. at 1049

23   (internal quotation marks omitted). *Long* upheld such a search where the driver was speeding

24   recklessly and apparently intoxicated, late at night in a rural area, and police saw "a large knife in the

25

26

27   ───────────────

28   [8] The government's quoting *Bautista* that "a parole search is valid if it complies with state law," Opp.
     25, ignores its next sentence, clarifying that state law determines only "the meaning and scope of a
     parole search clause"; the Fourth Amendment controls whether the parole search is constitutional.
     599 F. App'x at 646.

1   interior of the car into which Long was about to reenter." *Id*. at 1050. But the Ninth Circuit has

2   rejected the *Long* justification for a car search where there were "no specific and articulable facts that

3   would reasonably warrant a belief that Plaintiff was dangerous or that he might gain immediate

4   control of a weapon."  *Liberal v. Estrada*, 632 F.3d 1064, 1083 (9th Cir. 2011); *see McCraney*, 674

5   F.3d at 621 (finding no reasonable suspicion for *Long* search during 1 a.m. traffic stop even though

6   driver and passenger both twice "leaned down toward the floor as if concealing something under the

7   seat");*United States v. Humphrey*, 409 F.2d 1055, 1059 (10th Cir. 1969) (although affirming search

8   of car based also on driver's "suspicious money orders," noting that traffic-stop passenger's

9   "allegedly 'furtive' movements alone establish nothing").

10       Here, Dyer did not know what the object was (before he asked Mr. Taylor, without advising

11   him of his rights, during the unconstitutional prolongation of the stop). Dyer Dec. ¶ 9. Mr. Taylor,

12   like the other occupants, was completely compliant with all Dyer's directions. *Id.* ¶¶ 9-16. Dyer's

13   concern that the "unknown item" might "possibly" be a gun increased only after Mr. Taylor

14   responded to his parole-and-probation question, *id*. ¶ 13, and the records check. *Id*. ¶ 14. Dyer did not

15   order Mr. Taylor (or any occupant) out of the car until after the records checks, *id*. ¶¶ 15, 16, though

16   he lawfully could have done so. The government has not carried its burden of establishing,

17   independent of the unconstitutional prolongation and un-*Mirandized* questioning, reasonable

18   suspicion for a warrantless weapons search of the Ford.

19       If the Court determines that the government carried its burden of establishing that Dyer

20   obtained information that Mr. Taylor had a prior felony conviction without violating the Fourth

21   Amendment and that he elicited Mr. Taylor's acknowledgement that there was a gun in the car

22   without violating Apex *Miranda*, the automobile exception justified the searches. Opp. 26.

23       **C.     Mr. Taylor has standing to challenge at least the jacket and handbag**
            **searches**

24       The car, jacket and handbag searches were the fruit of the preceding unconstitutionally

25   prolonged seizure of Mr. Taylor's person, and his un-*Mirandized* custodial interrogation, which he

26   indisputably has standing to challenge. The fruits of these searches must be suppressed on either or

27   both of those bases.

28

1    Moreover, by relying on Mr. Taylor's parole search condition to justify the searches, Opp. 25,

2    the government implicitly takes the position that the car, jacket and handbag were "property under

3    [his] control," which is what his search condition covers. Dyer Dec. ¶ 5; *see United States v. Gates*,

4    745 F. Supp. 2d 936, 948 n.4 (N.D. Cal. 2010) ("a defendant may establish standing by pointing to all

5    evidence in the record, including the Government's evidence"). Although, as discussed above, this is

6    not a sufficient showing to search the car based on the parole condition, *Dixon*, 984 F.3d at 822, it is

7    enough to show that Mr. Taylor had a reasonable expectation of privacy in at least the jacket and

8    handbag.[9] *See Byrd v. United States*, 138 S. Ct. 1518, 1524 (2018) (identifying "lawful possession

9    and control" as being key to determining "reasonable expectation of privacy"). Mr. Taylor's

10   demonstrated possession of and control over at least the handbag and jacket, Dyer Dec. ¶ 8, are

11   sufficient to show he had a reasonable expectation of privacy to challenge these searches.[10] *See, e.g.,*

12   *Bond v. United States,* 529 U.S. 334, 338 (2000) (bus passenger demonstrated reasonable expectation

13   of privacy "by using an opaque bag and placing that bag directly above his seat").

14   **VI.   The government did not establish the inevitable discovery exception**

15   The government argues that even if Dyer had not unconstitutionally prolonged the stop to ask

16   about probation and parole and obtain and check the occupants' licenses, he would have searched the

17   car based solely on the "furtive movements." Opp. 27. This would not have been a legal search. As

18   discussed above, the alleged furtive movements, alone, would not have established reasonable

19   suspicion of a weapon to justify a car frisk, let alone probable cause for the automobile exception.

20   Moreover, the government has failed to establish the factual predicate necessary for inevitable

21   discovery by showing not only that Dyer *could* have but that he actually *would have* taken the steps

22   that would have led to the search of the car, jacket and handbag absent his constitutional violations.

23   *See Hudson v. Michigan*, 547 U.S. 586, 616 (2006) (Breyer, J., dissenting) ("'What a man could do is

24   not at all the same as what he would do.'"; quoting Austin, *Ifs and Cans*, 42 Proceedings of the

---

[9] The driver of the car was Mr. Taylor's brother. Dkt. 33-1 Bates 15.

[10] *Byrd* rejected the argument that a passenger can never have an expectation of privacy in a car. 138 S. Ct. at 1528; *see United States v. Lewis*, 2019 WL 3430603, at *3 (D. Kan. 2019) ("The Supreme Court has clarified that there is no bright-line rule that passengers never have an expectation of privacy in automobiles.").

British Academy 109, 111-112 (1956)). At every step, Dyer justified his actions based not only on the movements but also on (1) Mr. Taylor's response to his question about probation and parole and (2) the results of his records check. Dyer Dec. ¶¶ 13, 14, 15, 16. His declaration did not establish that he *would have* searched the car had he not learned about Mr. Taylor's probation and parole status and criminal history from the unconstitutional questioning and records check. *See, e.g., United States v. Camou,* 773 F.3d 932, 944 (9th Cir. 2014) (government did not carry burden of showing it would have sought warrant absent illegal search); *United States v. Maffei*, 2021 WL 4243388, at *4 (N.D. Cal. 2021) (government did not carry burden of showing "that it would have actually" conducted claimed investigation "absent the illegal search"). The government has not carried its burden of establishing the inevitable discovery exception.

**VII.  The government did not show that the usual remedy of exclusion should not apply here**

The government's claimed good-faith exception to the exclusionary rule, Opp. 28, does not apply "to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights." *Camou*, 773 F.3d at 945. Here, as in *Camou*, the relevant law at time of the officer's challenged conduct was clear, and the government has not shown "that a reasonably well-trained officer in [this officer's] position could have believed [their conduct] was lawful." *Id.* at 944-45 "[L]ack of flagrancy is not a freestanding basis for avoiding the application of the exclusionary rule -- at least not where, as here, it falls short of establishing that the officer had an objectively reasonable good-faith belief in the lawfulness of his conduct." *Ngumezi*, 980 F.3d at 1291. Judges of this Court have repeatedly rejected the government's anti-exclusionary-rule argument in similar circumstances. *See, e.g., Odom,* ___ F. Supp. 3d ___, 2022 WL 611206, at *10; *Mati,* 466 F. Supp. 3d at 1061; *Maffei,* 417 F. Supp. 3d at 1231 n.31. The Fourth Amendment and *Miranda* violations require exclusion of the unconstitutionally obtained fruits.

## CONCLUSION

For the reasons stated above and in his motion, Mr. Taylor respectfully asks the Court to suppress all fruits of Dyer's (1) unlawful and prolonged warrantless seizure of Mr. Taylor; (2) unlawful warrantless search of Mr. Taylor; (3) unlawful un-*Mirandized* questioning of Mr. Taylor and the other car occupants; and (5) unlawful warrantless searches of the car, jacket and handbag.

1

2      Dated:      June 20, 2022                          Respectfully submitted,

3                                                          JODI LINKER
4                                                          Federal Public Defender
                                                           Northern District of California
5
                                                           _____/S_____
6                                                          GRAHAM ARCHER
                                                           Assistant Federal Public Defender
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28