STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN YEH (CABN 314079)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-4063
    Fax: (415) 436-7234
    kevin.yeh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 21-cr-242 YGR |
| Plaintiff, | **UNITED STATES' SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |
| v. | |
| LOVELL TAYLOR, | Court: Courtroom 1, 4th Floor |
| Defendant. | Date: July 21, 2022<br>Time: 9:00 a.m. |

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..................................................................................................................................2

I.  Because Deputy Dyer Acted In Furtherance Of Officer Safety, Which Is Within A Traffic Stop's Mission, No Prolongation Occurred. ...........................................................2

II. Even If The Stop Was Prolonged, Deputy Dyer Had Reasonable Suspicion In Part Because He Saw Taylor Reach Towards The Ground, Place An Object Next To Him, And Then Apparently Conceal It. ........................................................................................7

III. Taylor Did Not Need To Be *Mirandized* When He Was Questioned And, Even If He Did, The Public Safety Exception Applies And Suppression Is Unwarranted. .................9

IV. Deputy Dyer Properly Searched The Car, Jacket, And Handbag. ....................................11

V.  The Gun Would Have Been Inevitably Discovered. ........................................................12

VI. Taylor's Cited Cases Are Distinguishable. ......................................................................12

VII. Deputy Dyer Acted In Good Faith and Exclusion Should Not Apply............................13

CONCLUSION .............................................................................................................................14

# **TABLE OF AUTHORITIES**

## **CASES**

*Amanuel v. Soares*,
 No. 13-CV-05258 NC, 2015 WL 3523173 (N.D. Cal. June 3, 2015) .................................................. 13

*Berkemer v. McCarty*,
 468 U.S. 420 (1984) ........................................................................................................................ 10

*Florida v. Bostick*,
 501 U.S. 429 (1991) ...................................................................................................................... 3, 4

*Kyles v. Erickson*,
 99 F.3d 1146 (9th Cir. 1996) ............................................................................................................. 7

*New York v. Quarles*,
 467 U.S. 649 (1984) ........................................................................................................................ 11

*Oregon v. Mathiason*,
 429 U.S. 492 (1977) ........................................................................................................................ 10

*People v. Schmitz*,
 55 Cal. 4th 909 (2012) .................................................................................................................... 12

*Rodriguez v. United States*,
 575 U.S. 348 (2015) ............................................................................................................... 1, 2, 3, 6

*Samson v. California*,
 547 U.S. 843 (2006) ........................................................................................................................ 12

*Sandoval v. Las Vegas Metro. Police Dep't*,
 756 F.3d 1154 (9th Cir. 2014) ....................................................................................................... 8, 9

*Terry v. Ohio*,
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ......................................................................... 10

*United States v. Arvizu*,
 534 U.S. 266 (2002) .......................................................................................................................... 9

*United States v. Barajas*,
 517 F. Supp. 3d 1008 (N.D. Cal. 2021) ............................................................................................ 8

*United States v. Brignoni–Ponce*,
 422 U.S. 873 (1975) ........................................................................................................................ 10

*United States v. Castellanos*,
 No. 19-50342, 2022 WL 153187 (9th Cir. Jan. 18, 2022) ................................................................ 7

*United States v. Christian*,
   356 F.3d 1103 (9th Cir. 2004) ............................................................................................... 4

*United States v. Clark*,
   902 F.3d 404 (3d Cir. 2018) ................................................................................................ 13

*United States v. Cole*,
   445 F. Supp. 3d 484 (N.D. Cal. 2020) ................................................................................... 8

*United States v. Crenshaw*,
   2020 WL 6873422 (N.D. Cal. Nov. 23, 2020) ....................................................................... 4

*United States v. Diaz-Castaneda*,
   494 F.3d 1146 (9th Cir. 2007) ............................................................................................... 6

*United States v. Dixson*,
   984 F.3d 814 (9th Cir. 2020) ............................................................................................... 11

*United States v. Evans*,
   445 F. App'x 29 (9th Cir. 2011) ......................................................................................... 4, 5

*United States v. Evans*,
   786 F.3d 779 (9th Cir. 2015) ......................................................................................... 3, 4, 7

*United States v. Herring*,
   555 U.S. 135 (2009) ............................................................................................................ 14

*United States v. Hicks*,
   2019 WL 2905047 (D. Nev. July 5, 2019) ........................................................................ 4, 6

*United States v. Holt*,
   264 F.3d 1215  (10th Cir. 2001) ........................................................................................... 1

*United States v. Hylton*,
   30 F.4th 842 (9th Cir. 2022) ................................................................................. 3, 6, 13, 14

*United States v. Kim*,
   292 F.3d 969 (9th Cir. 2002) ................................................................................................. 9

*United States v. Korte*,
   918 F.3d 750 (9th Cir. 2019) ............................................................................................... 12

*United States v. Landeros*,
     913 F.3d 862 (9th Cir. 2019) ........................................................................................... 4, 6

*United States v. Leon*,
   468 U.S. 897 (1984) ............................................................................................................ 14

*United States v. Luckett*,
   No. 16-CR-00200-WHO-1, 2016 WL 4719268 (N.D. Cal. Sept. 9, 2016) .......................... 8

*United States v. Luckett*,
   729 F. App'x 614 (9th Cir. 2018) .......................................................................................... 8

*United States v. Mati*,
   466 F. Supp. 3d 1046 (N.D. Cal. 2020) ............................................................................ 13

*United States v. McCall*,
   268 F. App'x 646 (9th Cir. 2008) .......................................................................................... 3

*United States v. McCloud*,
   2021 WL 2322473 (N.D. Cal. June 7, 2021) ...................................................................... 6

*United States v. McReynolds*,
   No. 20-10115, 2021 WL 5492984 (9th Cir. Nov. 23, 2021) ............................................... 4

*United States v. Miles*,
   247 F.3d 1009 (9th Cir. 2001) ............................................................................................ 10

*United States v. Odom*,
   2022 WL 611206 (N.D. Cal. Mar. 2, 2022) ....................................................................... 13

*United States v. Patane*,
   542 U.S. 630 (2004) ........................................................................................................... 11

*United States v. Ramirez-Sandoval*,
   872 F.2d 1392 (9th Cir. 1989) ............................................................................................ 12

*United States v. Reilly*,
   224 F.3d 986 (9th Cir. 2000) .............................................................................................. 11

*United States v. Simon*,
   2022 WL 797016 (N.D. Cal. Mar. 16, 2022) ................................................................ 9, 13

*United States v. Sokolow*,
   490 U.S. 1 (1989) ............................................................................................................. 7, 9

*United States v. Spencer*,
   1 F.3d 742 (9th Cir. 1992) .................................................................................................... 7

*United States v. Taylor*,
   716 F.2d 701 (9th Cir. 1983) ............................................................................................. 10

*United States v. Torres-Sanchez*,
   83 F.3d 1123 (9th Cir. 1996) ............................................................................................. 10

UNITED STATES' SURREPLY
21-CR-242 YGR                                    iv

*United States v. Ward*,
   2017 WL 1549474 (N.D. Cal. May 1, 2017) ................................................................................. 13

*Washington v. Lambert*,
   98 F.3d 1181 (9th Cir. 1996) ....................................................................................................... 10

# INTRODUCTION

Defendant Lovell Taylor's reply brief glosses over or ignores the following facts: On October 15, 2020, at around 2:39 a.m., Sheriff's Deputy Jordan Dyer saw (1) the car in which Taylor was riding fail to stop at a stop sign; (2) after apparently seeing Deputy Dyer's patrol vehicle, the car sped up to 20 miles per hour above the limit on the highway; and (3) while speeding, the car abruptly crossed multiple lanes without signaling, causing three other cars to nearly crash. After Dyer turned on his overhead lights to initiate a stop, the car continued driving for a while, but when it eventually pulled over, it slow-rolled before completely stopping. Then, as Deputy Dyer approached the car on foot, he saw Taylor reach to the floorboard of the car near his feet and place an unknown object on the seat next to him. Taylor then moved a black jacket to the same spot where he placed the unknown object in an apparent effort to conceal the object. Taken together, these facts gave Deputy Dyer grounds to be concerned about officer safety and reasonable suspicion that criminal activity might be afoot.

In *Rodriguez v. United States*, the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. 348, 350 (2015). The Court concluded that the officer in the case unconstitutionally prolonged a traffic stop by conducting a dog sniff on the car (revealing the presence of narcotics) after he had already issued a written warning for the moving violation that motivated the stop. In reaching its decision, the Court approvingly cited a Tenth Circuit en banc opinion "recognizing officer safety justification for criminal record and outstanding warrant checks." *Id.* at 356 (citing *United States v. Holt*, 264 F.3d 1215 1221–22 (10th Cir. 2001) (en banc)).

Notably, the officer in *Rodriguez* "asked passenger Pollman for his driver's license," "began to question him," and then "completed a records check on Pollman." *Id.* at 351. Nowhere in *Rodriguez*, however, does the Supreme Court take issue with the officer's (1) asking the passenger for his driver's license; (2) questioning him; or (3) running a records check on him. More to the point, the Supreme Court made *no* indication that asking a *passenger* for identification, questioning him, or running a records check on him during a traffic stop for the *driver's* moving violation impermissibly prolongs a stop in violation of the Fourth Amendment.

Here, while Taylor challenges virtually every aspect of the October 20th traffic stop, he primarily

argues that Deputy Dyer's request for identification, question about whether anyone was on probation or parole, and running records checks on the *passengers* (including him) impermissibly prolonged the stop in violation of *Rodriguez*.  Reply 1–3.  In *Rodriguez*, the officer merely observed the vehicle veer slowly onto the highway shoulder for less than two seconds, in violation of Nebraska law, but had no other reason to suspect anything was amiss about the vehicle's driver or passenger.  575 U.S. at 351.  In contrast, as detailed in the government's opposition brief and herein, Deputy Dyer had ample reason to be concerned for officer safety and could reasonably suspect that criminal activity might be afoot.

Deputy Dyer's observations—including Taylor's furtive reaching towards his feet and moving and concealing an unknown object as the deputy approached the vehicle—justified his actions because, as *Rodriguez* recognized, officer safety is within the mission of a traffic stop and, furthermore, Deputy Dyer had developed independent reasonable suspicion.  Dyer's request for identification, questioning, and running of records checks on the passengers, including Taylor—actions that neither the Supreme Court, nor the Eighth Circuit, nor the district court found problematic in *Rodriguez*—therefore did not unwarrantedly prolong the stop.

Deputy Dyer's actions throughout the stop were reasonable under the circumstances and complied with the Fourth Amendment.  Even if he inadvertently exceeded what is permissible, Deputy Dyer would have eventually found Taylor's gun.  Furthermore, suppression is unwarranted because it would not deter similar behavior since Dyer acted in good faith.  Taylor's motion should be denied.

## ARGUMENT

**I.    Because Deputy Dyer Acted In Furtherance Of Officer Safety, Which Is Within A Traffic Stop's Mission, No Prolongation Occurred.**

The crux of Taylor's argument for why evidence leading to his indictment should be suppressed is premised on his assertion that the traffic stop was prolonged.  *See* Reply 3–9.  But that assertion rests entirely on the assumption that officer safety was never an issue during the stop.  *Id.* at 3 ("These inquiries were not part of the traffic-stop mission.  They did not address 'related safety concerns' . . . .").  As explained in the government's opposition brief, however, the car's multiple moving violations and seemingly evasive driving behavior, and, in particular, Taylor's reaching for and apparent concealment of an object as Deputy Dyer approached the car, gave Deputy Dyer much reason to be concerned for

officer safety.

As the Ninth Circuit recently reiterated in *United States v. Hylton*, the "interest in officer safety 'stems from the mission of the stop itself' because '[t]raffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.'" 30 F.4th 842, 847 (9th Cir. 2022) (quoting *Rodriguez*, 575 U.S. at 356)). Officers need no additional reasonable suspicion to conduct tasks consistent with this mission. *See Rodriguez*, 575 U.S. at 355; *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual," including "ask[ing] to examine the individual's identification." *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991). This is true, too, of the *passengers* in a vehicle. *See id.* at 434–38.

Deputy Dyer stated in his declaration that much about the traffic stop made him concerned about officer safety. This includes: his belief that the car was attempting to evade being pulled over after having committed multiple moving violations and driving in a highly dangerous manner; the car's "slow roll" to a complete stop (which may indicate the presence of contraband that occupants may be trying to hide); the fact that the stop occurred late at night in a potentially dangerous area; the fact that he and his partner were outnumbered 2-to-1; and his observation of Taylor reaching to the ground, putting an object next to him, and then moving a jacket near or over the object. Dyer Decl. ¶¶ 6–9. Dyer thus suspected that Taylor might have been concealing drugs or, worse yet, a weapon. As the Ninth Circuit has recognized, "[F]urtive movement in the car, . . . the hour, and the darkness of the location [can give] the officer reasonable concern for his own safety." *United States v. McCall*, 268 F. App'x 646, 647 (9th Cir. 2008). In sum, Dyer was rightly concerned about his and his partners' safety and the actions he took were directed towards ensuring officer safety, which is within the mission of a traffic stop.

Contrary to Taylor's assertion, asking for identification does not "detract[ ] from officer safety." Reply 4. Common sense would indicate that getting someone's identification is not an idle request—most obviously, it permits an officer to run a check on the individual to determine whether there are additional reasons to be concerned for officer safety. As the Ninth Circuit has observed, "On learning a suspect's true name, the officer can run a background check to determine whether a suspect has an outstanding arrest warrant, or a history of violent crime. This information could be as important to an

UNITED STATES' SURREPLY
21-CR-242 YGR                   3

officer's safety as knowing that the suspect is carrying a weapon." *United States v. Christian*, 356 F.3d 1103, 1107 (9th Cir. 2004).[1]  Deputy Dyer's officer-safety justification in asking for identification from Taylor is entirely consistent with the Ninth Circuit's reasoning.  *See* Dyer Decl. ¶¶ 10–11 (stating that it was important to verify identification to "assess any risks they posed" and "knowing whether someone is on probation or parole . . . can assist in assessing the likelihood that an individual may be dangerous").

Taylor cites no cases to support his argument that an officer cannot request identification from a vehicle's passengers.  As the Ninth Circuit has recently said, however, "Following a lawful traffic stop, an officer can ask questions of both the driver and passenger, so long as doing so does not prolong the stop."  *United States v. McReynolds*, No. 20-10115, 2021 WL 5492984, at *2 (9th Cir. Nov. 23, 2021).  Furthermore, "during that period that [a traffic stop] is reasonable, a police officer may lawfully request identification from a passenger in the car."  *United States v. Evans*, 445 F. App'x 29, 31 (9th Cir. 2011); *see also Bostick*, 501 U.S. at 434–38.  "A police officer may also lawfully conduct a [records] check on the passenger using his or her identification."  *Evans*, 445 F. App'x at 31; *United States v. Hicks*, No. 218CR00374JADCWH, 2019 WL 2905047, at *11 (D. Nev. July 5, 2019) (stating that *United States v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019), does not prohibit officers from requesting a passenger's ID during a traffic stop even without reasonable suspicion that he has committed a crime).  That is because "the same safety interest that permits an officer to conduct ordinary inquiries incident to the traffic stop as to the driver also applies to the passenger."  *Hicks*, 2019 WL 2905047, at *10 (internal quotations omitted).

Taylor asserts that asking him—a passenger and not the driver—for identification and his parole/probation status or running a records check on him is impermissible because he "was not the

---

[1] Taylor cites *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019), and *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015), for the proposition that learning a passenger's identity has nothing to do with officer safety, and may even undermine it. Reply 4.  The defendant in *United States v. Crenshaw* similarly cited those cases, and the *Crenshaw* court's analysis is apt here: "[Crenshaw] plucks a snippet from *Landeros* to say that asking for passenger identification is not within the scope of a traffic stop, and one from *Evans* to similar effect for an ex-felon registration check.  [ ]  This fails to see the forest for the trees.  The context of both cases was the prolongation of a stop after a traffic infraction had been resolved to pursue additional investigations.  Here, Crenshaw was questioned during the [vehicular violation] investigation, and the questions put to him had no measurable effect on the duration of the stop."  No. 20-CR-00015-JD-1, 2020 WL 6873422, at *4 (N.D. Cal. Nov. 23, 2020).  Similarly here, Deputy Dyer's request for identification came at the start of the traffic stop, so no prolongation occurred.

UNITED STATES' SURREPLY
21-CR-242 YGR                                                     4

1 'suspect'" and did not "commit[ ] any of the traffic violations that were the bases for the traffic stop."
2 Reply 5.  But that bit of misdirection attempts to distract from Deputy Dyer's actual basis for having
3 concerns about officer safety and then eventually developing reasonable suspicion about Taylor:  after
4 Dyer pulled over the car and as he approached, he observed Taylor reach for something by his foot, put
5 it on the seat next to him, and then apparently conceal it with a jacket.  So while the driver's vehicular
6 violations and driving patterns gave Dyer cause to pull over the car, Taylor's own actions gave Dyer
7 separate grounds to conduct further inquiries into Taylor.  Taylor would have officers remain willfully
8 blind to anything they observe after an initial stop simply because anything that happened afterwards
9 could not have motivated the stop itself, but that is not what the law or common sense requires.

10 Taylor makes much about the amount of time that elapsed during the stop.  For example, Taylor
11 notes that "[t]he CAD indicates that approximately four and a half minutes passed between the stop and
12 the request for a records check on Mr. Taylor." Reply 7–8.  But those four and a half minutes include:
13 the time it took for officers to call in the traffic stop; the time it took to initiate the stop; the time it took
14 for the car to pull over (which, per Dyer's declaration, did not promptly occur); the time during which
15 the car slow rolled; the time for Deputy Dyer to get out of his patrol vehicle and for him to walk up to
16 the car; the time it took for Deputy Dyer to speak with the passengers and request identification; and the
17 time it took Deputy Dyer to walk back to the patrol vehicle, enter it, and then run the check on Taylor.
18 Taylor also notes that "[i]nquiries into the four Ford occupants took approximately a minute to enter."
19 *Id.* at 8.  But taking one minute to run *four* checks on different individuals is far from unreasonable.
20 Similarly, four and a half minutes is hardly much time at all taking into account everything that occurred
21 during that time.  In *United States v. Evans*, the Ninth Circuit held that a "police officer's request for
22 identification from Evans's passenger and subsequent want/warrant check for her were [ ] lawful" even
23 where the "inquiry occurred about five to six minutes after the initial traffic stop and took about three to
24 five minutes to complete." 445 F. App'x at 31.  Here, far less time elapsed than in *Evans* to accomplish
25 the same tasks.  Thus, no prolongation occurred.

26 Taylor asserts that "[t]he government has not cited any post-*Rodriguez* case holding that police
27 may, without independent reasonable suspicion, prolong a traffic stop by asking questions about parole
28 and probation status and requesting identification from, and running records checks, on passengers."

UNITED STATES' SURREPLY
21-CR-242 YGR                                               5

1  Reply 3.  But the Ninth Circuit has expressly indicated that *Rodriguez* does not unsettle its "precedent
2  permit[ting] police to 'ask people [including passengers in cars] who have legitimately been stopped for
3  identification without conducting a Fourth Amendment search or seizure.'"  *United States v. Landeros*,
4  913 F.3d 862, 870 (9th Cir. 2019) (quoting *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th
5  Cir. 2007)) (second alteration in original).  And, as discussed earlier, the officer in *Rodriguez* "asked
6  passenger Pollman for his driver's license and began to question him," and then "completed a records
7  check on Pollman."  *Rodriguez*, 575 U.S. at 351.  But the Supreme Court did not so much as remark in
8  passing on any of this.  In other words, the Court cited not a single one of those facts concerning
9  inquiries into a car's *passenger* to support its ultimate conclusion that the stop was prolonged in
10 *Rodriguez*—the central case about traffic stop prolongations.

11      In any event, the Ninth Circuit's recent decision in *Hylton* should put to rest any doubt about
12 whether officers may conduct checks during a traffic stop without effecting an unconstitutional
13 prolongation.  There, the court held that "because a criminal history check 'stems from the mission of
14 the stop itself,' it is a 'negligibly burdensome precaution[ ]' necessary "to complete [the stop] safely.'"
15 *Hylton*, 30 F.4th at 848 (quoting *Rodriguez*, 575 U.S. at 356).  Thus, officers do "not need independent
16 reasonable suspicion to perform the criminal history check."  *Id.*  While there was only one person in the
17 car in *Hylton*, and the case makes no distinction between drivers and passengers, its reasoning extends
18 equally to passengers and there is no principled basis to discriminate between the two.  *See Hicks*, 2019
19 WL 2905047, at *10 ("the same safety interest that permits an officer to conduct ordinary inquiries
20 incident to the traffic stop as to the driver also applies to the passenger").

21      Finally, contrary to Taylor's insinuation, this case is not like *United States v. Landeros*, 913 F.3d
22 at 870, where the officer badgered a passenger for identification and would not take "no" for an answer.
23 Reply 8.  Here, Taylor—who was observed reaching to the car floor and concealing something—was
24 asked just once for his identification and parole/probation status.  Taylor provided that information
25 without incident and Dyer followed up on it.  Thus, "the relevant question" is *not* "whether Dyer
26 lawfully could 'order'" Taylor to identify himself, as Taylor frames it, because there was no "order" for
27 him to do so.  Reply 4; *see also* Opp'n 16 (discussing *Landeros*).  Deputy Dyer "simply asked [Taylor] a
28 question, and [Taylor] chose to answer it."  *United States v. McCloud*, No. 17-CR-00025-JD-1, 2021

WL 2322473, at *6 (N.D. Cal. June 7, 2021) ("McCloud says it was wrong for the officers to even ask him about whether he was on probation or parole.  That is a doubtful proposition that McCloud does not adequately support with case law.").

**II.    Even If The Stop Was Prolonged, Deputy Dyer Had Reasonable Suspicion In Part Because He Saw Taylor Reach Towards The Ground, Place An Object Next To Him, And Then Apparently Conceal It.**

"[A]n officer may [lawfully] prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *Evans*, 786 F.3d at 788.  Reasonable suspicion requires "something more than an 'inchoate and unparticularized suspicion or "hunch,"' but "*considerably less* than proof of wrongdoing by a preponderance of the evidence" and "*obviously less*" than the level of suspicion required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (emphases added).  In reviewing whether an officer had reasonable suspicion, courts must consider the totality of the circumstances. *Id.* at 8.  Even if each fact standing alone might be consistent with innocent activity, the factors can form reasonable suspicion when viewed together. *Id.* at 9–10.

Although Deputy Dyer's actions during the traffic stop were all in furtherance of officer safety, which is part of a traffic stop's mission, he also had reasonable suspicion to justify any prolongation that occurred.  The government has detailed the many facts that Deputy Dyer had before him that collectively supported a reasonable suspicion that criminal activity might be afoot, including Taylor's furtive movements, which led the officer to suspect that Taylor was trying to conceal drugs or possibly a firearm. *See* Opp'n 18–19.  The Ninth Circuit has held that "furtive movements in the car . . . as if to hide something" can create reasonable suspicion, *Kyles v. Erickson*, 99 F.3d 1146, at *1 (9th Cir. 1996), and, more specifically, that a defendant's "concealing movements" can, in part, justify an officer's belief that a firearm might be in the car, *United States v. Spencer*, 1 F.3d 742, 746 (9th Cir. 1992). *See also United States v. Castellanos*, No. 19-50342, 2022 WL 153187, at *2 (9th Cir. Jan. 18, 2022) (holding that where "officers observed [the defendant] make quick movements stuffing or hiding something away in his vehicle in a high-risk drug and gang-activity area, just after he saw their police vehicle approaching," "[t]he officers could reasonably suspect criminal activity given these circumstances").

Deputy Dyer had additional grounds for his reasonable suspicion when he later learned from Taylor that he was on parole for armed carjacking and was released from prison just two weeks before,

UNITED STATES' SURREPLY
21-CR-242 YGR                                          7

and that he was on probation for illegally possessing a firearm as a felon.  A suspect's probation status "can provide part of the basis for reasonable suspicion."  *United States v. Luckett*, No. 16-CR-00200-WHO-1, 2016 WL 4719268, at *3 (N.D. Cal. Sept. 9, 2016), *aff'd*, 729 F. App'x 614 (9th Cir. 2018).  Where an officer is aware of a defendant's "criminal convictions, including an arrest for carrying a loaded firearm," it is "reasonable for that officer to suspect that [the defendant] was engaged in criminal activity."  *United States v. Luckett*, 729 F. App'x 614, 615–16 (9th Cir. 2018).  Here, Taylor was on active parole and probation for not one, but two, weapons-related offenses.  Thus, in combination with everything else he knew and observed, Deputy Dyer's suspicion that Taylor might have a gun and was hiding it is more than reasonable.  *United States v. Cole*, 445 F. Supp. 3d 484, 489 (N.D. Cal. 2020) (holding that an individual's prior firearms-related offenses "are relevant to the totality of circumstances bearing on the reasonableness of the officers' suspicion").

Taylor argues that Dyer "cannot rely on Mr. Taylor's response [to the probation and parole inquiry] for the necessary reasonable suspicion."  Reply 13.  That is a red herring because Deputy Dyer had reasonable suspicion as to Taylor based on his observation of Taylor reaching towards the ground, putting an object on the seat next to him, and then apparently concealing it—not from Taylor's answer to Dyer's question later (although Taylor's answer provided further grounds for reasonable suspicion).

Taylor is incorrect that *only* his furtive reaching and concealing actions provided the *sole* basis for reasonable suspicion.  Reply 13–14.  On the contrary, as the government has argued, everything leading up to Dyer's questioning provided a mosaic of information that supports reasonable suspicion.[2]  Opp'n 13–14.  As noted, Deputy Dyer also found the fact that the car backtracked to be unusual[3]; the car then drove through a stop sign, sped around 20 miles per hour above the highway speed limit, and nearly caused three cars to crash; it then took awhile to pull over and slow rolled to a stop.  For example,

---

[2] For this reason, Taylor's nearly page-long string cite on page 13 of his reply brief, listing cases where something more than just furtive movements was necessary to support reasonable suspicion, is actually consistent with the government's position.

[3] While Taylor claims that "the Ford initially was heading the wrong way," Reply 1, there is no record evidence that the car was not intentionally driving the way it did.  Even if Taylor's assertion on reply were true, Deputy Dyer could not have known at the time that the car was going in the wrong direction.  "A court must assess officers' actions from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *United States v. Barajas*, 517 F. Supp. 3d 1008, 1016 (N.D. Cal. 2021) (quoting *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014)) (internal quotation marks omitted).

UNITED STATES' SURREPLY
21-CR-242 YGR                           8

Deputy Dyer could have reasonably believed that the fact that Taylor may have been hiding something could have been related to why the vehicle was seemingly appearing to avoid pulling over and then slow rolled to a complete stop. Deputy Dyer then learned that Taylor was on probation and parole for two separate weapons-related offenses, which further supported his reasonable suspicion.[4] The Supreme Court has specifically proscribed the sort of "divide-and-conquer analysis" proposed by Taylor and instead requires evaluating the "totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The totality of the circumstances here confirms the reasonableness of Dyer's suspicion—a threshold "obviously less" than what is required for probable cause. *Sokolow*, 490 U.S. at 7.

Taylor mischaracterizes one more of the government's arguments by asserting that the government did not dispute that the search or questioning of Taylor were fruits of the purported prolongation. Reply 16. Not so. As the government argued in its opposition brief, Deputy Dyer had safety concerns and reasonable suspicion concerning Taylor, thus the stop was not improperly prolonged in the first place and there are no fruits of unconstitutional conduct. *See* Opp'n 23.

### III. Taylor Did Not Need To Be *Mirandized* When He Was Questioned And, Even If He Did, The Public Safety Exception Applies And Suppression Is Unwarranted.

"An officer's obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). As the Supreme Court has explained:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there

---

[4] Taylor also claims that "[t]he government's main justification for the warrantless search of Mr. Taylor [ ] is his parole search condition." Reply 16. Untrue. As stated in the government's brief, "Deputy Dyer properly searched Taylor because Taylor had a search condition and Deputy Dyer had reasonable suspicion." Opp'n 23. "In any event, 'the pat down did not produce any evidence. Therefore, even if it was a violation of Defendant's Fourth Amendment rights, it is irrelevant to the discovery of the evidence Defendant seeks to suppress here.'" *Id.* (quoting *United States v. Simon*, No, 21-cr-352-JSW, 2022 WL 797016 (N.D. Cal. Mar. 16, 2022)).

has been such a restriction on a person's freedom as to render him "in custody."

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In *Berkemer v. McCarty*, the Supreme Court rejected the contention that "the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.'" 468 U.S. 420, 435 (1984). While the Court acknowledged that "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle," *id.* at 436, it explained that "the usual traffic stop is more analogous to a so-called 'Terry stop,' see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest," *id.* at 439. Thus, "'a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Id.* (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975)). "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.*

The Ninth Circuit allows "intrusive and aggressive police conduct without deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996) (emphasis omitted). The court has also "held that the use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, do not necessarily convert a *Terry* stop into an arrest necessitating probable cause." *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983). In some cases, even "holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest." *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001).

Taylor cites no authority for the proposition that asking him to exit the car, patting him down for weapons, and asking him to sit on the curb ripened into an arrest. Nor could he because it did not. The Ninth Circuit has held that even having a suspect sit in a patrol car for 20 minutes does not mean that he was in custody. *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996). In contrast,

UNITED STATES' SURREPLY
21-CR-242 YGR                                                    10

Taylor was only asked to wait on the side as Dyer completed a *Terry* stop.  Taylor also was not handcuffed, held at gunpoint, or asked to go down on his knees or lie on the ground.  Because Taylor was not in custody, Dyer did not need to *Mirandize* him before asking preliminary questions.

Taylor argues that the government is incorrect in claiming that the public-safety exception to *Miranda* applies.  *See* Reply 19–20; Opp'n 24–25.  Although unclear, Taylor appears to imply that the exception only applies when the greater public is endangered.  But as the Supreme Court and Ninth Circuit have explained, the exception is equally applicable to "protect the police . . . from any immediate danger associated with [a] weapon."  *United States v. Reilly*, 224 F.3d 986, 992 (9th Cir. 2000) (quoting *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984)).  Such was the case here and Taylor is mistaken.

Even if Taylor was entitled to be read his *Miranda* rights before being questioned, and his statements should be excluded from being offered into evidence, the gun that Dyer found need not be suppressed.  The Supreme Court has held that a failure to give a suspect *Miranda* warnings does not require suppression of the physical fruits of the suspect's unwarned but voluntary and uncoerced statements.  *United States v. Patane*, 542 U.S. 630, 634 (2004).  That is because the "nontestimonial fruit of a voluntary statement . . . does not implicate the Self–Incrimination Clause" since "admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial."  *Id.* at 643.  Here, Taylor does not claim that he was *coerced* into making any statements that led to discovery of the gun.  Thus, even if he should have been *Mirandized*, suppression of the gun is unwarranted.

**IV.     Deputy Dyer Properly Searched The Car, Jacket, And Handbag.**

Taylor challenges Deputy Dyer's search of the car, jacket, and handbag.  As Deputy Dyer stated, Taylor admitted that he was on parole for carjacking, and Dyer's records check later confirmed that Taylor was on parole and probation.  Dyer Decl. ¶ 13–14.  Taylor asserts, however, that Dyer could not search the car because Taylor does not "own[ ] or control[ ] the vehicle to be searched."  Reply 21 (quoting *United States v. Dixson*, 984 F.3d 814, 822 (9th Cir. 2020)).  But Taylor does not dispute that "a vehicle search based on a passenger's parole status may extend beyond the parolee's person and the seat he or she occupies," and extends "to those areas of the passenger compartment where the officer reasonably expects that the parolee could have stowed personal belongings or discarded items when

aware of police activity." *See* Opp'n 25 (quoting *People v. Schmitz*, 55 Cal. 4th 909, 926 (2012)).[5] Indeed, in *United States v. Korte*, a Ninth Circuit case cited by Taylor, the court cited approvingly *People v. Schmitz* for the proposition that "a parolee, who is only a passenger in a third-party's vehicle, is in control of areas within his reach in the passenger compartment" such that those areas would be subject to a parole search. 918 F.3d 750, 754–55 (9th Cir. 2019) (citing *People v. Schmitz*, 55 Cal.4th 909 (2012)). And rightly so because it would make no sense that an officer could not search the area of a car where a parolee was sitting merely because the car is owned by someone else, thereby creating a massive loophole in law enforcement's ability to supervise parolees, as Taylor argues.

## V. The Gun Would Have Been Inevitably Discovered.

Taylor argues that the government has not established that Dyer would have searched the car had he not learned about Taylor's probation and parole status or criminal history from the questioning or records check. Reply 24. If, "by following routine procedures, the police would inevitably have uncovered the evidence," then the evidence must not be suppressed despite any constitutional violation. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989). Given Taylor's furtive reaching to the floorboard, moving an object next to him, and then apparently concealing it, Deputy Dyer would have sought (and did seek) to ensure that the object would not threaten officer safety. Indeed, Taylor later *confirmed* that there was a gun in the car. Knowing there was a gun in the car, it would have been inconceivable that Dyer would not have sought to secure the weapon, if only to ensure his own safety, as well as that of his partner. Indeed, as Deputy Dyer stated in his declaration, "I wanted to ensure that Taylor did not have anything on him, such as a weapon, that could threaten officer safety." Dyer Decl. ¶ 15. Thus, regardless of what he learned from his inquiries concerning Taylor, Deputy Dyer would have inevitably searched for and found the gun based on Taylor's movements.

## VI. Taylor's Cited Cases Are Distinguishable.

In support of his arguments, Taylor cites *United States v. Ward*, in which the court stated, "Asking about parole and probation status or inquiring whether a person has anything illegal in his

---

[5] Taylor implies that a search in compliance with a parolee's search condition under California law does necessarily satisfy the Fourth Amendment. Reply 21 n.8. The U.S. Supreme Court has held otherwise. *Samson v. California*, 547 U.S. 843, 852–57 (2006).

UNITED STATES' SURREPLY
21-CR-242 YGR                                    12

1   vehicle are attempts by law enforcement to uncover criminal activity, not casual conversation.  Nor are
2   those questions related, as the government claims, 'to the mission of the traffic stop.'"  No. 16-CR-
3   00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal. May 1, 2017).  *Ward* is distinguishable, however,
4   because the opinion is entirely silent about officer safety issues.[6]  Thus, asking about parole or
5   probation, or about the presence of contraband, was irrelevant to a police contact concerning an expired
6   car registration.  Here, on the other hand, Deputy Dyer was legitimately concerned about officer safety,
7   and "[i]nquiries into a suspect's past criminal conduct is relevant to officer safety."  *Simon*, 2022 WL
8   797016, at *3.

9   Taylor cites *United States v. Odom* for the proposition that "prolonging a traffic stop by 'a few
10  seconds' to ask the driver's probation status violate[s] the Fourth Amendment."  Reply 7 (quoting
11  *United States v. Odom*, No. 21-CR-00259-JST-1, 2022 WL 611206, at *4 (N.D. Cal. Mar. 2, 2022)).
12  The *Odom* court explains, however, that "[b]ecause the Government does not argue that the probation
13  inquiry was supported by reasonable suspicion, the Court finds that the probation inquiry violated the
14  Fourth Amendment."  2022 WL 611206, at *4.  Here, in contrast, as explained above and in the
15  government's opposition brief, Dyer did develop independent reasonable suspicion during the course of
16  the traffic stop.  *Odom* is therefore distinguishable as well.[7]

## VII.    Deputy Dyer Acted In Good Faith And Exclusion Should Not Apply.

18  Taylor argues that the exclusionary rule should apply here because "the relevant law at the time
19  of the officer's challenged conduct was clear," and implies that no "reasonably well-trained officer in
20  this officer's position could have believed their conduct was lawful."  Reply 24 (internal quotation

---

[6] *Amanuel v. Soares*, a Section 1983 case cited by Taylor for the proposition that asking about probation and parole status and a prior arrest was "unrelated to [the] traffic-stop mission," is similarly distinguishable because there was no claim of officer safety issues.  *See* Reply 7 (citing *Amanuel v. Soares*, No. 13-CV-05258 NC, 2015 WL 3523173, at *7 (N.D. Cal. June 3, 2015)).  The same is true of *United States v. Clark*, 902 F.3d 404, 406 (3d Cir. 2018).  *See* Reply 6.

[7] Although *Odom* is simply persuasive authority for this Court, it may no longer be good law after the Ninth Circuit's recent decision in *Hylton*, 30 F.4th 842.  There, the Ninth Circuit rejected the contention that a "criminal history check [is] a prolongation of the stop and need[s] to be supported by independent reasonable suspicion."  *Id.* at 847.  Instead, the Ninth Circuit held that "because a criminal history check stems from the mission of the stop itself, it is a negligibly burdensome precaution necessary to complete the stop safely.  [O]fficers thus [do] not need independent reasonable suspicion to perform [a] criminal history check."  *Id.* at 848 (cleaned up).  For the same reason, *United States v. Mati*, 466 F. Supp. 3d 1046 (N.D. Cal. 2020), also cited by Taylor, may no longer be persuasive as well.

marks and alterations omitted).

Even if this Court finds that Taylor's Fourth Amendment rights were violated, exclusion of the evidence is unwarranted because the exclusionary rule is meant to "deter deliberate, reckless, or grossly negligent conduct." *United States v. Herring*, 555 U.S. 135, 144 (2009). The Court must determine that the officer's actions were "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.*

Here, there is no evidence whatsoever that the officer was deliberate, reckless, or even grossly negligent in his actions, or that exclusion would have any deterrent effect. While the reasoning in a few district court decisions arguably leads to the conclusion that a prolongation occurred here, those decisions do not represent a widespread judicial consensus (even within this district) such that the officer's actions could be described as flagrant or lacking in good faith. *See* Reply 24. Indeed, the Ninth Circuit has recently seriously cast doubt on, if not outright abrogated, cases holding that inquiring about a suspect's criminal history during a traffic stop is unrelated to officer safety, prolongs the stop, and/or requires independent reasonable suspicion. *See Hylton*, 30 F.4th at 847. Thus, "the magnitude of the benefit conferred" on Taylor if relevant evidence of his offense is excluded would "offend[ ] basic concepts of the criminal justice system." *United States v. Leon*, 468 U.S. 897, 907–08 (1984). Suppression of relevant evidence of a crime is an inappropriate and unnecessary remedy here.

## CONCLUSION

For the reasons stated in its opposition brief and herein, the United States respectfully requests that the Taylor's motion be denied.

DATED: July 5, 2022                                   Respectfully submitted,

                                                      STEPHANIE M. HINDS
                                                      United States Attorney

                                                       /s/ Kevin Yeh_____
                                                      KEVIN YEH
                                                      Assistant United States Attorney