**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 21-cr-00242-YGR |
| Plaintiff, | |
| | **ORDER GRANTING MOTION TO SUPPRESS** |
| v. | |
| | Re: Dkt. No. 33 |
| **LOVELL TAYLOR,** | |
| Defendant. | |

The Court addresses herein defendant Lovell Taylor's motion to suppress. The crux of the motion turns upon the scope of permissible questions during a routine traffic stop. Specifically, whether it violates the Fourth Amendment of the United States Constitution to ask for passenger identification and to inquire into passenger probation and parole status during an otherwise routine traffic stop without reasonable suspicion. Notably, the government does not dispute that a routine traffic stop can be abused for investigative purposes and argues at great length that the tactics employed in the present case did not cross the line in violating the protections afforded by the Fourth Amendment. This Court disagrees for the reasons set forth in this order.

Since the factual record was not developed with sufficient definiteness, clarity, and specificity to reach a resolution after substantial briefing and oral argument, the Court held an evidentiary hearing on September 14, 2022.[1] At the hearing, the government called Contra Costa County sheriff deputies J. Dyer, J. Sabella, and B. McDevitt. Having carefully considered the papers, the record in the case, the parties' oral arguments, the admissible evidence, and for the

---

[1] An evidentiary hearing on a suppression motion is necessary "only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). The hearing transcript further confirms that an evidentiary hearing was appropriate. For instance, there were significant factual disputes and ambiguities relating to the traffic stops at issue, the officer's safety concerns, the length of any searches, which officers were on scene, and the relevant search policies.

reasons set forth more fully below, the Court **HEREBY ORDERS** that the motion to suppress is **GRANTED**.

## I.    BACKGROUND

Defendant Lovell Taylor has been indicted for one count of violating 18 U.S.C. § 922(g)(1), felon in possession of a firearm and ammunition.  The offense arose out of a warrantless search on October 15, 2020, while Taylor was on parole and probation.

At approximately 2:39 a.m., deputies Dyer and Sabella[2] were parked in a seemingly concealed drive-way in Martinez, California while monitoring traffic.  The two deputies saw a black Ford Expedition exit Highway 4 and run a stop sign by not coming to a complete stop. Without turning on the vehicle's emergency sirens, the deputies then attempted to conduct a traffic enforcement stop by pulling out of their concealed location to pursue the vehicle.  However, as the deputies attempted to pursue the vehicle, the Ford Expedition entered the highway again where it exceeded the speed limit.[3]  As the deputies pursued the vehicle, they observed it change three lanes without signaling, causing other vehicles on the highway to break.[4]  For the first time, the deputies then turned on the police vehicle's emergency sirens and pursued the vehicle as it excited the highway.  According to Deputy Dyer, the vehicle did not immediately pull over, and pursuant to his testimony, it took approximately a quarter of a mile for the vehicle to come to a stop.  It appears that this stop was on a frontage road.

While Deputy Dyer had routinely conducted traffic stops prior, he admitted that he was nervous because this traffic stop was his first in months and stood out for that reason.  Once the Ford Expedition pulled over, Deputy Dyer turned on his flood lights to see into the vehicle.  It is

---

[2]  The police report prepared near the incident did not identify Deputy Sabella in anyway. As revealed at the hearing, Deputy Sabella joined Deputy Dyer for a ride along.  While Deputy Sabella has since had responsibilities as a patrol officer, the ride along at issue was very likely his first as revealed by his testimony.  Given his experience at the time of the incident, the Court finds that he is not credible and gives his testimony very little weight.

[3]  The record demonstrates that the vehicle was driving between 80 and 85 miles per hour where the speed limit was 65 miles per hour.

[4]  Taylor did not cross-examine the deputies with respect to these other traffic incidents. The Court takes the deputies' account of these events as true.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   undisputed that four people were inside of the vehicle, including Taylor as the passenger in the

2   right-back passenger seat. Having exited his police vehicle, Deputy Dyer approached the driver's

3   side of the vehicle on foot with his flood lights shining into the Ford Expedition.[5] Deputy Sabella

4   was instructed to approach on the passenger's side of the vehicle which he did. While using his

5   flashlight, Deputy Dyer saw Taylor reach towards the ground and then put an unknown object

6   between him and the other remaining defendant in the back seat.

7          Having approached the vehicle, Deputy Dyer proceeded to ask all passengers to place their

8   hands on the headrests and/or dashboards. This is consistent with Deputy Sabella's testimony,

9   which indicated that Taylor had his hands somewhere over his head as Deputy Sabella approached

10  the vehicle. Once the passengers, including Taylor, had placed their hands where Deputy Dyer

11  could see them, Deputy Dyer requested that everyone in the vehicle provide identification, which

12  he collected, and asked if anyone was on probation or parole. Taylor responded that he was on

13  parole for armed carjacking and was released from prison two weeks prior. Deputy Dyer admitted

14  that he did not believe there was a gun in the vehicle until Taylor had affirmatively answered his

15  question about being on probation or parole.

16         While Deputy Sabella remained near the vehicle with its occupants, Deputy Dyer

17  proceeded to return to his vehicle to run checks on *all of the* vehicle's occupants, where he

18  confirmed Taylor's parole status, and also learned that he was on felony probation for illegally

19  possessing a firearm. Taylor's information was accessed first, because according to Deputy Dyer,

20  his identification card was on the top of the stack of identification cards that he obtained. Based

21  upon Deputy Dyer's testimony, his records search automatically pulls up various categories of

22  information, including for example, DMV records, probation and parole status, and whether an

23  individual is registered in offender databases. While each category of information is automatically

24  _____

25         [5] At the evidentiary hearing, the government introduced photographic evidence to
    demonstrate how bright the lights would be at the relevant time. These photos show that it would
26  be plausible to see into the vehicle even though it had tinted windows that appeared to be rolled
    up. These photos were arguably brighter than those attached to Deputy Dyer's police report,
27  however, testimony revealed that he took those photographs while standing in front of his vehicle,
    obstructing the light in part. Ultimately, the Court finds it credible that an officer would be able to
28  see into the parked vehicle from several vantage points given the brightness of the lights.

United States District Court
Northern District of California

1    populated into the database, Deputy Dyer was required to affirmatively open each message to

2    learn about the contents of that message.[6]  The record shows that inquiries into all of the vehicle's

3    occupants took approximately four minutes.

4         Based upon his experience as a patrol officer, Deputy Dyer understood that Taylor had a

5    search condition per the terms of his parole and probation.  Given this status, Deputy Dyer asked

6    Taylor to exit the vehicle and searched his person.[7]  Nothing was found during the search.  Taylor

7    was then placed on the curb without restraint, where he was asked if there was anything illegal in

8    the car.  Taylor indicated that he did not want to go to jail, and when Deputy Dyer directly asked if

9    there was a gun in the car, Taylor nodded his head indicating yes.  Taylor was then handcuffed,

10   and the remaining occupants were asked to step out of the vehicle and were placed in handcuffs.

11   At this time, no one had been formally placed under arrest by either deputy.

12        Once all individuals had been secured, Deputy Dyer proceeded to search the car, where he

13   picked up a jacket that he saw Taylor place on top of something next to him.  A closed black

14   handbag was under the jacket.  Deputy Dyer unzipped the handbag and found a loaded gun with

15   ten bullets, as well as a separate high-capacity magazine with 25 bullets.[8]  Dispatch confirmed that

16   the gun was unregistered.

17        After securing the gun, Taylor was escorted to the patrol vehicle.  Considering Taylor

18   under arrest, he was read his *Miranda* rights.[9]  Taylor proceeded to decline to answer any

19   _____

20        [6] The government sought to admit a printout of the information that Deputy Dyer would
21   have been able to access in his patrol vehicle's system.  This exhibit was not admitted because it
     did not reflect the system at the time of the traffic stop.  However, the Court did permit the exhibit
     to be used as a demonstrative.

22        [7] Deputy Dyer and Deputy Sabella have inconsistent accounts on this point.  Deputy
23   Sabella testified with confidence that he conducted a pat search of Taylor.  Deputy Dyer's police
     report and testimony is at most ambiguous.  The salient point is that Taylor was in fact searched
24   by at least one officer and that search revealed nothing on his person.

25        [8] Deputy Dyer first testified that the handgun was protruding from the handbag.  He then
26   corrected this statement and clarified that he only saw the handgun after he opened the bag.  Thus,
     the handgun was not in plain view.

27        [9] The police report initially indicated that Taylor was *Mirandized* prior to any questioning
     about the gun's existence.  When asked about the inconsistency at the hearing, Deputy Dyer
28   confirmed that Taylor was *Mirandized* after the gun was discovered and that Taylor remained
     silent after he was *Mirandized*.

4

1    questions.  Deputy Dyer then began to question Teuila Failauga, who was in the back seat of the
2    car with Taylor, as well as the other occupants of the vehicle.  None of these occupants were
3    advised of *Miranda* rights.  When asked about the weapon, Failauga admitted she was aware
4    Taylor had a firearm on him, that she had seen him carry it on more than one occasion, and that
5    she believed he was carrying the firearm for protection since they were on their way to the casino.
6    The remaining two passengers indicated that they had no knowledge of the weapon being in the
7    car.  All of the remaining occupants were then permitted to drive away without any traffic citation
8    being issued.  Despite witnessing at least three traffic infractions, Deputy Dyer testified that he
9    believed that issuing a warning was sufficient.

10       Taylor now moves to suppress all fruits of: (1) the warrantless seizure of Taylor; (2) the
11   warrantless arrest of Taylor; (3) the warrantless search of Taylor; (4) the un-*Mirandized*
12   questioning of Taylor and the other car occupants; and (5) the warrantless search of the car, jacket,
13   and handbag.

14   **II.    DISCUSSION**

15       "The right of the people to be secure in their persons, houses, papers, and effects, against
16   unreasonable searches and seizures shall not be violated[.]"  U.S. Const. amend IV.  Warrantless
17   searches are *per se* unreasonable.  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir.
18   2012).  The parties do not dispute that the government bears the burden to show an exception
19   applies by a preponderance of the evidence.  *See United States v. Vasey*, 834 F.2d 782, 785 (9th
20   Cir. 1987).

21       Here, the pending motion to suppress raises myriad issues.  However, the crux of the
22   motion to suppress turns upon the lawfulness of Deputy Dyer's inquiries into passenger
23   identification, probation, and parole status with respect to the traffic stop at issue.  Indeed, this was
24   the primary issue discussed at both hearings held on the matter.  Since the Court finds Deputy
25   Dyer's inquiries unconstitutionally prolonged the traffic stop without reasonable suspicion, and
26   because the discovery of the gun is the fruit of the unlawful search, the motion to suppress is
27   **GRANTED**.

28   //

United States District Court
Northern District of California

**A.  WHETHER THE DEPUTIES INITIATED A LAWFUL TRAFFIC STOP**

Investigatory vehicle stops are lawful when the officer has reasonable suspicion that the vehicle has committed a traffic violation.  *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006).  Here, Deputy Dyer stopped the vehicle at issue after it failed to come to a complete stop, exceeded the speed limit during pursuit, and crossed three lanes of traffic without signaling and impacting traffic on the highway.  Therefore, the initial traffic stop was reasonable and a permissible seizure under the Fourth Amendment.

**B.  WHETHER DEPUTY DYER UNREASONABLY PROLONGED THE TRAFFIC STOP**

Taylor argues that Deputy Dyer unreasonably prolonged the traffic stop in violation of the Fourth Amendment when he asked for all occupant's identification, whether anyone was on probation or parole, and when he conducted a record search of all occupants.  Having closely considered the issue, the Court agrees.

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).  The Supreme Court has held that the "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to *related* safety concerns."  *Id.* at 354 (emphasis supplied) (internal citations omitted).  In *Rodriguez*, the Supreme Court explained that the mission extends to "determining whether to issue a traffic ticket" and to "ordinary inquiries incident to" the stop such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 355 (citations omitted).  These other inquiries "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."  *Id.*  Further, it held that since "[t]raffic stops are especially fraught with danger to police officers," the mission extends to "certain negligibly burdensome precautions in order to complete his mission safely."  *Id.* at 356 (citation and internal quotation marks omitted).  Notably, however, measures aimed at "detect[ing] evidence of ordinary criminal wrongdoing" and "[o]n-scene investigation into other crimes . . . detours from" the mission of the traffic stop.  *Id.* at 355-

6

1    56. While officers may "conduct certain unrelated checks during an otherwise lawful traffic stop,"

2    they "may not do so in a way that prolongs the stop, absent" reasonable suspicion. *Id.* at 355.

3           Here, the traffic stop resulted in three discrete acts: collecting identification of all

4    occupants of the vehicle, inquiring whether any passengers were on probation or parole, and

5    running records checks on all occupants. In the aggregate, these inquiries took approximately four

6    minutes. Each is addressed.

7                   **1.  Passenger Identification Is Outside of the Mission of the Traffic Stop**

8           Relevant here, the Ninth Circuit has recognized that "[a] demand for a *passenger's*

9    identification is not part of the mission of a traffic stop." *United States v. Landeros*, 913 F.3d 862,

10   868 (9th Cir. 2019) (emphasis supplied). Indeed, the government conceded at the evidentiary

11   hearing that *Landeros* does not support the deputy's conduct. Recognizing that the "ordinary

12   inquiries incident to [a] traffic stop . . . share[ ] the same objective as enforcement of the traffic

13   code: ensuring that vehicles on the road are operated safely and responsibly" the Ninth Circuit

14   held that "[t]he identity of a passenger . . . will *ordinarily* have no relation to a driver's safe

15   operation of a vehicle." *Id.* (emphasis supplied). While *Landeros* suggests a bright line rule that

16   any inquiry into passenger identification is unconstitutional, the Court does not agree with that

17   construction of the opinion.

18          As Deputy McDevitt testified based upon his extensive experience conducting field officer

19   training, there are circumstances where passenger identification is necessary for the safe operation

20   of a vehicle. For instance, a passenger may be asked to drive a vehicle if the driver is suspected of

21   driving under the influence or a passenger may be the lawful owner of the vehicle. This is

22   consistent with *Landeros*. In the opinion, the Ninth Circuit did not overrule *United States v. Diaz-*

23   *Castaneda*, 494 F.3d 1146 (9th Cir. 2007), a pre-*Rodriguez* decision. There, the Ninth Circuit did

24   hold that a passenger inquiry did not violate the Fourth Amendment. However, despite the

25   government's attempt to analogize the circumstances of this case to *Diaz-Castaneda*, the facts are

26   materially distinguishable.

27          Specifically, in *Diaz-Castaneda*, the passenger's identification was requested only after the

28   officer learned that the driver had a suspended license and could not leave without the car. *Id.* at

United States District Court
Northern District of California

1148.  The mission of the stop necessarily included the need "to 'discover if [the passenger] had a valid license so he could take the vehicle" in order to avoid it being impounded.  *Id*.  Within the confines of *Rodriguez*, the inquiry "ensur[ed] that vehicles on the road are operated safely and responsibly."  *Rodriguez*, 575 U.S. at 868.  Here, nothing in the record suggests that that passenger identification was necessary to further the safe and responsible operation of the vehicle.  Indeed, Deputy Dyer did not cite the driver and permitted him to proceed with a warning while Taylor was taken into custody.

Perhaps appreciating the force of *Landeros* and *Diaz-Castaneda* applied here, the government argues that the Supreme Court in *Rodriguez* endorsed a request for a passenger's identification and a record check based upon that identification.  The government stretches the case beyond its limits.  While it is true that in *Rodriguez*, a passenger was also asked for his identification and a records check was completed, the issue presented to the Supreme Court was whether a dog sniff after the investigation into the traffic infraction prolonged the search.  575 U.S. at 350.  The reasonableness of the passenger search was never analyzed and was not the cause of the Fourth Amendment violation in *Rodriguez*.  Thus, the Court declines the invitation to construe *Rodriguez* as endorsing all inquiries into passenger identities, especially since the Ninth Circuit rejected the result the government seeks in *Landeros* following *Rodriguez*.

Furthermore, the government argues that checking passenger identities is a negligibly burdensome precaution that permits officers to conduct the traffic stop safely.  Notably, the Ninth Circuit has expressly rejected the government's officer-safety rationalization.  Under the circumstances, "[k]nowing" the passenger's "name would not have made the officers any safer."  *Landeros*, 913 F.3d at 868.  "Extending the stop, and thereby prolonging the officers' exposure to [the passenger] was, if anything, 'inversely related to officer safety.'"  *Id*. (quoting *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015)).  Deputy McDevitt similarly testified that not all traffic stops require inquiries into passenger safety because the degree of danger is infraction specific.

Here, Deputy Dyer testified that despite his familiarity with *Landeros* he requests passenger identification in *every* traffic stop regardless of the circumstances.  When asked why he does this, he testified that it is to see if passengers have warrants and learn who they are.  He also

8

United States District Court
Northern District of California

testified that these inquiries are a powerful investigative policing tool.  Based upon his testimony, the request for identification under the circumstances had no relevance to the underlying traffic infractions and the safe operation of the vehicle.  Under *Landeros*, these inquiries are inversely related to officer safety.  Indeed, the attenuated relation to officer safety is further illustrated under the facts of this case.  Any risks were initially mitigated when the vehicle occupants were asked to secure their hands.  After those hands were secured and risks were mitigated, all vehicle occupants were then asked to pull out their identification, wherever those identifications may have been stored, inversely exposing the officer to increased risk after the vehicle's occupants demonstrated compliance with his safety requests.

Therefore, under these circumstances, the Court finds that the inquiries prolonged the traffic stop outside of its mission.  Absent independent reasonable suspicion, the inquiry is unconstitutional.

### 2.   Probation and Parole Inquiries are Outside of the Mission of the Traffic Stop

As a matter of his practice, Deputy Dyer asks *every* vehicle occupant whether they are on probation or parole *regardless* of the circumstances, including reasonable suspicion that criminal activity may be afoot.  Unlike passenger identification, the Ninth Circuit has not considered whether asking a driver, let alone a passenger in the back seat of a vehicle, about parole or probation status is part of the traffic mission.  Several judges in this District have held that inquiring about a *driver's* parole and probation status is improper during a traffic stop since the question "is not aimed at ensuring that vehicles on the road are operated safely and responsible," but rather "is intended to uncover evidence of criminal activity."[10]  The events here are even more

---

[10]  *United States v. Mati*, 466 F. Supp. 3d 1046, 1056 (N.D. Cal. 2020); *United States v. Ward*, No. 16-cr-00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal. May 1, 2017); *Amanuel v. Soares*, No. 13-cv-5258-NC, 2015 WL 3523173, at *7 (N.D. Cal. June 3, 2015); *see also United States v. Simon*, No. 21-cr-00352-JSW-1, 2022 WL 797016, at *4 (N.D. Cal. Mar. 16, 2022) (recognizing that the "question [about parole and probation status] may have been improper," however, concluding that the question "did not cause . . . the search that led to the discover of the relevant evidence"); *United States v. Odom*, No. 21-cr-00259-JST-1, -- F. Supp. 3d --, 2022 WL 611206, at *3 (N.D. Cal. Mar. 2, 2022 (incorporating *Ward*).

The government suggests that the district court in *Simon* held that the inquiry is

attenuated with the inquiry being made not only to a passenger, but one in the back-seat. The inquiry went beyond the mission of the traffic stop.

Indeed, Deputy Dyer testified that the inquiry had no relevance to the traffic violations at issue and that it is a powerful investigatory tool. Again, analogous to the request for identification in *Landeros*, the inquiry is inversely related to officer safety. It is also not credible given the circumstances. Here, the police report prepared at the time of the incident made no reference to officer safety or suspicion that a gun may be located in the vehicle. Furthermore, the inquiry transformed what would have been a routine traffic stop into an investigation into whether a felon was in possession of a weapon or contraband. Deputy Dyer left Deputy Sabella, his ride-along officer who was on his first ride, outnumbered with four unsecured occupants in the vehicle to follow his suspicion that Taylor had a search condition as part of his probation and parole status by using the comprehensive system in his vehicle.[11] These circumstances, compounded with the inquiry into passenger identification, further prolonged the stop.

The Court is aware that at least one district court has found that inquiring about a passenger's parole and probation status did not prolong the traffic stop in violation of the Fourth Amendment. *See, e.g.*, *United States v. Crenshaw*, No. 20-cr-00015-JD-1, 2020 WL 6873422 (N.D. Cal. Nov. 23, 2020). In *Crenshaw*, a passenger was asked for his probation and parole status while the driver was shuffling for his license and registration, to which the passenger responded that he was on probation. Having confirmed probation with dispatch, not through a records check in a police vehicle, the officer conducted a search of the passenger and found a handgun, magazine, and rounds of ammunition. Ultimately, the district court was persuaded that the simultaneous inquiry as the driver was being asked to produce registration did not increase the traffic stop in any way such that there was no measurable impact on the traffic stop. The district

permissible. That misconstrues the order, which recognized that the inquiry may have been improper, and focused on causation instead. Since, the same judge has found that inquiries into probation and parole status are outside of the mission of the traffic stop. *See, e.g.*, *United States v. Gould*, No. 21-cr-00475-JSW-1, 2022 WL 3226974, at *4 (N.D. Cal. Aug. 10, 2022). Counsel did not submit *Gould* as a recent decision while the motion was pending.

[11] Deputy Dyer testified that he could have asked dispatch for the information in lieu of returning to his vehicle for the comprehensive records check.

United States District Court
Northern District of California

court was also persuaded that *Rodriguez* endorsed inquiring into the parole and probation status even though the heart of that case concerned a dog sniff.

This is not a situation where there was no measurable impact on the traffic stops due to a simultaneous investigation into the driver over dispatch.  *Cf. id.*; *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) (finding no measurable impact where one officer questioned a defendant while another officer conducted the records search).  As the record demonstrates, the inquiries here added approximately four minutes to the traffic stop without considering the circumstances of the arrest.  Instead, Deputy Dyer converted the routine traffic stop to enforce various traffic infractions into one to uncover criminal activity by asking all occupants whether they were on probation or parole.  This is further demonstrated by the fact that the traffic infraction was not enforced, and the entire stop transformed into an investigation into Taylor, his record, and his possible crime.  The aim of ensuring that the road and vehicle is operated safely and responsibly was effectively abandoned for a thorough and comprehensive investigation, which Deputy Dyer admitted has potent evidentiary value for a patrol officer.

Moreover, the district courts above have found that it is irrelevant whether the inquiry adds a *de minimis* time to the stop because *Rodriguez* rejected a *de minimis* standard.  *See also Landeros*, 913 F.3d at 867 (rejecting reasonableness inquiry and recognizing that the traffic stop is unlawfully prolonged where "any time" is "added"); *United States v. Clark*, 902 F.3d 404, 410-11 (3d Cir. 2018) (recognizing that "there is no *de minimis* exception to this rule").  Measurable impacts in turn require an inquiry into whether there was reasonable suspicion to prolong the search.

Therefore, absent reasonable suspicion, the parole and probation inquiries violated the Fourth Amendment.

### 3. Whether the Records Searches are Outside of the Mission of the Traffic Stop

Next, the Court considers whether the records search of all occupants prolonged the traffic stop.  Since this is derivative of asking for passenger identification and parole and probation status in the first place, the Court has little difficulty determining that these passenger inquiries did.

Indeed, this Court has held that "[a] records check of a passenger . . . will ordinarily have no relation to the safe operation of that vehicle." *United States v. Maffei*, 417 F. Supp. 3d 1212, 1222 (N.D. Cal. 2019). The government's safety rationale does not compel a different result under the circumstances of this case.

### 4. Whether Deputy Dyer Had Independent Reasonable Suspicion to Support a Prolonged Stop

Given the Court's findings that the inquires prolonged the traffic stop, the stop will be considered unconstitutional unless it was supported by independent reasonable suspicion. *See Landeros*, 913 F.3d at 868. "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'" *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)) (emphasis in original). The parties do not dispute that this standard considers the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In summary, officers may "draw on their own experience and specialized training to make inferences from the deductions about the cumulative information available to them." *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citation omitted). Although a "mere hunch" is not sufficient, "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citation omitted).

The government broadly submits that Deputy Dyer had reasonable suspicion "to think that criminal activity was afoot." (Dkt. No. 34 at 18.) Specifically, the government asserts that various factors support a particularized suspicion of criminal activity prior to the traffic stop, including the traffic violations, the vehicle's evasion of the officers and "slow roll" when coming to a stop, the time of day combined with the stop in a high-risk area, and Taylor's furtive movements. Ultimately, the Court does not find this position credible and is not persuaded.

As a threshold issue, the government's post-hoc rationalization of Deputy Dyer's suspicion is not consistent with his own police report and testimony. "The officer's action must be justified at its inception, and . . . reasonably related in scope to the circumstances which justified the

12

interference in the first place." *Hiibel v. Sixth Judicial Dist. Courts*, 542 U.S. 177, 185-86 (2004) (internal citations and quotation marks omitted).  It was revealed at the evidentiary hearing that the government heavily prepared Deputy Dyer's declaration and spoke to him extensively about the nuance in the law that created concerns with the pending motion to suppress.  This alone is not dispositive, however, it does bear on the credibility determination.  Deputy Dyer's police report, which was prepared closer in time to the incident at issue, with a fresher recollection, makes no reference to safety, substantial evasion, or concern that a weapon was in the vehicle leading to the stop.  Furthermore, Deputy Dyer testified at the hearing that he did not have any suspicion concerning a gun until he received a response from Taylor that he was recently released on parole for armed jacking.  Thus, per his own admission at the hearing, it was his unlawful question that was the driving force of his particularized concern.  This is further bolster by the fact that he testified that he asks his questions in every traffic stop, suggesting that it is the question, not reasonable suspicion, that is his guide under the circumstances.

Setting aside Deputy Dyer's admissions under oath, the Court has concerns that the traffic infractions are a post-hoc rationalization to justify the search.  It is well established that "reasonable suspicion must be individualized."  *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016).  Prior to making the traffic stop, there is no indication in the record that Deputy Dyer knew there was more than one passenger in the vehicle prior to the stop.  His police report did not make any reference to these passengers until he turned on his flood lights to conduct the stop, and his declaration speculates that "the driver and/or occupants . . . were attempting to avoid being pulled over."  The driver's traffic infractions, without more, is insufficient to support reasonable suspicion that Taylor possessed a firearm.

His assertion that the vehicle came to a slow roll to conceal weapons or contraband, while plausible, is also inconsistent with the record.  Deputy Dyer testified that he did not activate his emergency lights until after the final traffic infraction.  There is no dispute that the vehicle attempted to pull over as soon as the lights were activated and once it was clearly apparent they were being pursued.  Deputy Dyer also testified that it is often safer for a vehicle to pull over off of the highway, which appears to have happened under the circumstances here where the vehicle

13

1    stopped on the frontage road.  While Deputy Dyer testified that it took approximately a quarter of

2    a mile for the vehicle to come to a stop even though it could have stopped sooner, it is not clear

3    whether this quarter of a mile occurred on the frontage road after the vehicle had exited the

4    freeway, and how the vehicle may have stopped.  Even if this slow roll occurred off of the

5    highway, there was no evidence that the officer was forced to give chase.  Moreover, courts

6    routinely find that evasion without reasonable suspicion of an underlying crime is insufficient.

7    *See, e.g.*, *United States v. Jones*, 438 F. Supp. 3d 1039, 1057 (N.D. Cal. 2020) (recognizing that

8    even if the defendants' conduct could be "characterized as 'evasive'," that conduct did not provide

9    reasonable suspicion to believe the defendants "engaged in any criminal conduct"); *see also*

10   *United States v. Burkett*, 612 F.3d 1103, 1104, 1107 (9th Cir. 2010) (holding that evasive driving

11   for eight-tenths of a mile, despite warnings to stop, combined with passing safe areas to pull over

12   and observed furtive movement during the evasive driving may support reasonable suspicion that

13   a gun was being concealed).  Here Deputy Dyer admitted that it was his questioning about parole

14   and probation that resulted in his suspicion that there was a gun in the vehicle.  Thus, his

15   testimony undermines the declaration prepared extensively by the government after the fact.[12]

16         The Court also finds the government's post-hoc rationalization about the area being unsafe

17   due to the presence of a nearby homeless shelter and resulting "mentally unstable and/or drug

18   addicted individuals" in the surrounding area uncredible and lacking foundation.  "While [a

19   defendant's] presence in a high-crime area cannot alone provide reasonable suspicion that he had

20   committed or was about to commit a crime, [officers] could consider this fact in forming

21   reasonable suspicion[.]"  *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002)

22   (cleaned up) (citations omitted).  Deputy Dyer declared that the unnamed shelter was less than a

23   mile away and his testimony under oath suggested it was less than a quarter of a mile away.  The

24   _____

25         [12]  The Court also notes that the government places substantial emphasis on Taylor's
     furtive movements to conceal the item next to him after the vehicle had already come to a stop,
26   and while Deputy Dyer was approaching the vehicle.  If the vehicle was slow rolling in order to
     conceal weapons or contraband, it is notable that the only particularized movements in the record
27   came after the vehicle had stopped.  Thus, this case is unlike *Burkett*, where the officer observed
     furtive movement during the evasive driving, and the passenger continued to provide evasive
28   responses and make furtive movements during the stop.

United States District Court
Northern District of California

1    proximity is speculative at best.  Furthermore, Deputy Dyer testified that officers have to be

2    careful because there are often individuals in bushes.  However, no admissible evidence was

3    proffered to support a conclusion that there were any individuals in the area at all, let alone how

4    many dangerous individuals may have been encountered in the past.  Photographic evidence put

5    forth by the government shows that the stop occurred near a frontage road and there were no

6    bushes in the photos to establish any foundation that people could have been hiding.[13]  This basis,

7    which was not identified in the initial police report, and is not developed in the record, is given no

8    weight.

9            Finally, the government argues that Taylor's furtive movements of rustling at the

10   floorboard, placing an unknown object next to him on the seat, and moving a jacket between the

11   two rear seat passengers added to Deputy Dyer's reasonable suspicion that there was a gun in the

12   vehicle.  The Court agrees that under certain circumstances furtive movements can give rise to

13   reasonable suspicion that a weapon is being concealed.  *Burkett*, 612 F.3d at 1107.  However,

14   furtive moments alone are insufficient to give rise to reasonable suspicion.  *See United States v.*

15   *Parr*, 843 F.2d 1228, 1229 (9th Cir. 1988) (furtive movement alone not sufficient to extend scope

16   of traffic stop); *United States v. McCraney*, 674 F.3d 614, 621 (6th Cir. 2012) (finding no

17   suspicion during a 1 a.m. traffic stop even though the vehicle's occupants were twice observed

18   leaning down as if to conceal something since the probable cause for a traffic violation did not

19   otherwise provide reasonable suspicion that the occupants might be armed and dangerous); *United*

20   *States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) (finding no reasonable suspicion during traffic

21   stop based upon two furtive movements into the center console).  Taylor's movements alone are

22

23          [13]  The Court is also left to speculate what kind of shelter was nearby.  While the shelter
     could very well support the government's theory that mentally unstable and drug addicted
24   individuals were in the area, there is no foundation for the Court to make the logical leap sought.
     Indeed, in authority provided by the government to justify the dangerousness of the area, more
25   foundation was provided.  *See, e.g.*, *United States v. Castellanos*, No. 19-50342, 2022 WL 153187
     (9th Cir. Jan. 18, 2022) (officer testified that he arrested 15 suspects in an area for crimes related
26   to drugs, weapons, and stolen cars to support that the stop occurred in a high crime area).  The
     broad generalization here without more are ripe for abuse.  For instance, it could very well have
27   been a battered woman's homeless shelter, which would not support the stigmatic inference the
     government is trying to make about mentally unstable and drug addicted individuals.  Consistent
28   with its obligations and authority invoked, the government could have provided more foundation.
     Significantly, none was.

insufficient to support reasonable suspicion that he was armed or concealing a weapon.  Again, Deputy Dyer testified that he did not suspect that Taylor was possessing a gun until he answered his question about probation and parole.  Thus, it was Deputy Dyer's questioning that resulted in any suspicion, not Taylor's movements.

Based upon the totality of the circumstances, the Court finds that Deputy Dyer did not have reasonable suspicion that Taylor was armed or concealing a weapon to independently justify prolonging the stop.  In fact, as his matter of practice, the question concerning probation and parole is asked without consideration of reasonable suspicion.  Accordingly, the Court finds that the traffic-stop was unconstitutionally prolonged in violation of the Fourth Amendment.

## C.  THE GOVERNMENT'S ALTERNATIVE ARGUMENTS DO NOT JUSTIFY THE SEARCH

The government argues that the gun would have been inevitably discovered because Deputy Dyer would have conducted a standard records check that would have revealed whether that person is on probation or parole.  In order to demonstrate the admissibility of evidence under the inevitable discovery exception, the government must establish by a preponderance of the evidence that the evidence inevitably would have been discovered by *lawful* means.  *Nix v. Williams*, 467 U.S. 431, 446 (1984).  Specifically, the government must provide a factual basis and point to evidence demonstrating that the government would have discovered the evidence absent the illegal search, not merely whether the government could have obtained the evidence in other ways.  *See United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003); *see also United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1400 (9th Cir. 1989) (finding that the inevitable discovery exception did not apply where the government failed to show that the officer would have in fact questioned the occupants in a van absent an illegal search that revealed incriminating information).  Here, the record search and any subsequent questioning would be derivative of the unlawful inquiry into passenger identification that is inversely related to officer safety.  The government has not made any other adequate showing that the information would have otherwise been discovered by a lawful means.  Thus, the government has not met its burden of establishing that the probation and parole information would have been inevitably discovered.

Finally, the government argues that the Court should not apply the exclusionary rule.

There is no dispute that police conduct triggers the exclusionary rule only when it is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Herring*, 555 U.S. 135, 144 (2009). However, this Court has already rejected the government's position that in the absence of any indication of deliberate, reckless, or grossly negligent conduct on the part of the officers, the evidence derived from the search of the vehicle should not be suppressed. *Maffei*, 417 F. Supp. 3d at 1231 n.31. Other district courts have been in accord. *See, e.g.*, *Odom*, 2022 WL 611206, at *10 (N.D. Cal. Mar. 2, 2022); *Mati*, 466 F. Supp. 3d at 1061; *see also United States v. Camou*, 773 F.3d 932, 945 (9th Cir. 2014) ("[t]he Supreme Court has never applied the good faith exception to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights.").

The prolonged traffic stop at issue led directly to finding the firearm. Deputy Dyer testified that he was aware of the rule set forth in *Landeros* and continued to ask all passengers for identification anyway, without any limit, as was his routine. He also asked whether all passengers, including Taylor, were on probation and parole, even though the totality of the circumstances failed to support a reasonable suspicion that Taylor was currently armed and dangerous. The government has not provided any authority to otherwise extend the good faith exclusion to an officer's conduct that led to the violation of a defendant's constitutional right. Therefore, suppression is appropriate in this case.

## III.  CONCLUSION

For the reasons set forth above, the Court **GRANTS** the motion to suppress. The Court **HEREBY SETS** a status conference for 9:02 a.m. on Thursday, October 27, 2022 in Courtroom One of the United States District Court, Oakland, California.

This Order terminates Docket Number 33.

**IT IS SO ORDERED.**

Dated: October 4, 2022

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE